

E-filing

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  RAYA, Abel
    (Last)          (First)         (Initial)

Prisoner Number  C-99451

Institutional Address  Correctional Training Facility, P.O. Box 689,
Soledad, CA. 93960-0689

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ABEL RAYA
(Enter the full name of plaintiff in this action.)

CV 08    1446

vs.

Ben Curry, Warden

(Enter the full name of respondent(s) or jailor in this action)

Case No. _____
(To be provided by the clerk of court)  PJH

**PETITION FOR A WRIT
OF HABEAS CORPUS**

(PR)

## Read Comments Carefully Before Filling In

### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these

counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located.  If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined.  Habeas L.R. 2254-3(b).

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13                 County Superior Court, Oakland):

14                 SUPERIOR CRT. OF CALIFORNIA, COUNTY OF FRESNO

15                 Court                      Location

16          (b)    Case number, if known  FRE-317151-9

17          (c)    Date and terms of sentence  01/09/85, 15 Years to Life

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                 parole or probation, etc.)      Yes _XX_   No ____

20                 Where?

21                 Name of Institution: CTF-Soledad

22                 Address: P.O. Box 689, Soledad, CA. 93960-0689

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26   2nd Degree Murder

27

28

PET. FOR WRIT OF HAB. CORPUS     - 2 -

3. Did you have any of the following?

      Arraignment:                           Yes __XX__     No _____

      Preliminary Hearing:            Yes __XX__     No _____

      Motion to Suppress:            Yes _____     No _____

4. How did you plead?

      Guilty _____     Not Guilty __XX__     Nolo Contendere _____

      Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

      Jury __XX__     Judge alone_____     Judge alone on a transcript _____

6. Did you testify at your trial?            Yes __XX__     No _____

7. Did you have an attorney at the following proceedings:

      (a)     Arraignment            Yes __XX__     No _____

      (b)     Preliminary hearing     Yes __XX__     No _____

      (c)     Time of plea           Yes __XX__     No _____

      (d)     Trial                   Yes __XX__     No _____

      (e)     Sentencing             Yes __XX__     No _____

      (f)     Appeal                 Yes _____     No __XX__

      (g)     Other post-conviction proceeding     Yes _____     No __XX__

8. Did you appeal your conviction?          Yes _____     No __XX__

      (a)     If you did, to what court(s) did you appeal?

              Court of Appeal           Yes _____     No _____

              Year: _____     Result: _____

              Supreme Court of California     Yes _____     No _____

              Year: _____     Result: _____

              Any other court           Yes _____     No _____

              Year: _____     Result: _____

      (b)     If you appealed, were the grounds the same as those that you are raising in this

1                  petition?               Yes _____      No_____

2         (c)    Was there an opinion?        Yes _____      No_____

3         (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                Yes _____      No_____

5                  If you did, give the name of the court and the result:

6     _____

7                  _____

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?        Yes _____     No XX

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16        (a)      If you sought relief in any proceeding other than an appeal, answer the following

17                  questions for each proceeding. Attach extra paper if you need more space.

18            I.      Name of Court: _____

19                  Type of Proceeding: _____

20                  Grounds raised (Be brief but specific):

21                  a._____

22                  b._____

23                  c._____

24                  d._____

25                  Result: _____ Date of Result:_____

26            II.      Name of Court: _____

27                  Type of Proceeding: _____

28                  Grounds raised (Be brief but specific):

1  a._____

2  b._____

3  c._____

4  d._____

5  Result: _____ Date of Result:_____

6  III.  Name of Court: _____

7  Type of Proceeding: _____

8  Grounds raised (Be brief but specific):

9  a._____

10  b._____

11  c._____

12  d._____

13  Result: _____ Date of Result:_____

14  IV.  Name of Court: _____

15  Type of Proceeding: _____

16  Grounds raised (Be brief but specific):

17  a._____

18  b._____

19  c._____

20  d._____

21  Result: _____ Date of Result:_____

22  (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23  Yes _____    No_____

24  Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26  State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS      - 5 -

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One:___ SEE ATTACHED WRIT OF HABEAS CORPOUS.

6

7   Supporting Facts:__ SEE ATTACHED WRIT OF HABEAS CORPUS

8

9

10

11   Claim Two:___ SEE ATTACHED WRIT OF HABEAS CORPUS

12

13   Supporting Facts:__ SEE ATTACHED WRIT OF HABEAS CORPUS

14

15

16

17   Claim Three:___ SEE ATTACHED WRIT OF HABEAS CORPUS

18

19   Supporting Facts:__ SEE ATTACHED WRIT OF HABEAS CORPUS

20

21

22

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1     List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4               SEE ATTACHED POINTS AND AUTHORITIES

5 _____

6 _____

7 Do you have an attorney for this petition?              Yes_____    No_XX_

8 If you do, give the name and address of your attorney:

9 _____

10     WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on ___3-3-08___            _Abel Kaya_

14         Date                 Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS      - 7 -

# CONTENTS

TOPIC                                                                          Pages

Index                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i,ii

POINTS AND AUTHORITIES          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii,iv

GROUND ONE:
    THE BOARD FINDING OF UNSUITABILITY AND REFUSAL
    OF THE GRANTING OF PAROLE VIOLATED THE
    PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED
    HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
    WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
    WITHOUT ANY RELIABLE EVIDENCE OR "SOME
    EVIDENCE" IN VIOLATION OF THE 5TH AND 14TH
    AMENDMENTS OF THE UNITED STATES CONSTITUTION.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
    PETITIONER POSES AN "UNREASONABLE RISK" OF THREAT TO
    PUBLIC SAFETY IF RELEASED ON PAROLE. THE DECISION WAS
    WITHOUT EVIDENCE AND WAS ARBITRARY AND CAPRICIOUS
    VIOLATING FUNDAMENTAL DUE PROCESS.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

B. THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
    PROHIBITS STATE ACTION THAT DEPRIVES A PERSON OF
    LIFE, LIBERTY, OR PROPERTY WITHOUT DUE PROCESS OF
    LAW.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

GROUND TWO:
    THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
    RELYING ON THE UNCHANGING FACTS OF THE CRIME
    IN THE FACE OF CLEAR EVIDENCE OF
    REHABILITATION & BY MAKING RECOMMENDATIONS OF
    WHAT TO DO TO BE FOUND SUITABLE AT EACH
    HEARING. A FINDING OF EGREGIOUSNESS IS BARRED
    BY THE INMATE'S COMPLIANCE WITH THOSE TERMS.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE
    CRIME VIOLATES DUE PROCESS.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
    DUE PROCESS.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
    UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM AND
    THE LIBERTY INTERESTS OF INMATES. THE ESSENCE OF THE
    PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS WHO NO
    LONGER POSE A PUBLIC DANGER.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST IN
    PAROLE DECISIONS.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

1

## CONTENTS (continued)

2

TOPIC                                                                    Pages

3    CONCLUSION                          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

4    PRAYER FOR RELIEF                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

5

6

## EXHIBITS

7    A.  Subsequent Parole Consideration Hearing, September 26,

8        2006, Hearing Transcripts and Decision. Parole Consideration
         Hearing Decision, March 17, 2005. Parole Consideration

9        Hearing, Decision, December 15, 2003.

10

11   B.  Psychological Evaluation, February 11, 2005., June 14,
         2002, March 9, 2001, October 25, 1999, July 3, 1998,

12       July 31, 1997.

13

14   C.  Life Prisoner EValuation Report 06-13-2006, March 2006,
         Laudatory 05-08-2006, 04-01-2006, 01-06-2006, 10-06-2005,

15       06-28-2005, 04-01-2005.

16

17   D.  Abstract of Judgement

18   E.  Probation Report.

19

20   F.  Fresno County Superior Court Denial, March 16, 2007.

21

22   G.  Court of Appeal of the State of California, Fifth Appellate
         District, Appellate Decision, April 19, 2007

23   H.  California Supreme Court Decision, December 12, 2007.

24

25

26

27

28

# POINTS AND AUTHORITIES

Name/Title                                                              Pages

In re Bramble
(1947) 31 Cal.2d 43, 51 [6] 187 P.2d 411
.............................................1

People v. Stuart
(1956) 47 Cal.2d 167, 175 [7] 302 P.2d, 5, 55 A.L.R.2d 705
.............................................1

People v. Smith
(1955) 44 Cal.2d 77, 79 [2] 279 P.2d 33
.............................................1

In re McVickers
(1946) 29 Cal. 2d 264, 278, 176 P.2d 40
.............................................1

People v. Valentine
(1946) 28 Cal.2d 121, 143 [20] 159 P.2d 1
.............................................1

People v. Ralph
(1944) Cal.2d 575, 581 [2] 150 P.2d 401
.............................................2

Biggs v. Terhune
(9th Cir. 2003) 334 F.3d 910, 914, 915,916
.........2,7,8,9,10,11,12,13,14,15,16,19

In re Ramirez
(2001) 94 Cal.App.4th 549, 564-565, 571
.............................................4,9,11,13

Edward v. Balisok
(1997) 520 U.S. 541, 648
.............................................4

In re Caswell
92 Cal.App.4th 1017, 1029
.............................................5

People v. Dubon
90 Cal.App.4th, 949, 952 (2001)
.............................................5

Charlton v. Federal Trade Comm.
543 F.2d 903-907, 908 (D.C. Cir. 1976)
.............................................5

McQuillion v. Duncan
306 F.3d 901-910, (9th Cir. 2002)
.............................................7,8,14,15,19

1          POINTS AND AUTHORITIES (continued)

2   Name/Title                                                    Pages

3   In re Smith
    109 Cal.App.4th 489 (2003)
4   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

5   Kentucky Dept. of Corrections v. Thompson
    490 U.S. 454, 459-460 (1989)
6   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

7   Board of Pardons v. Allen
    (1987) 482 U.S. 369, 376-78
8   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8,18,19

9   Greenholtz v. Inmates of Neb. Penal & Correctional Complex
    (1979) 442 U.S.1 11-12
10  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8,18,19

11  U.S. v. Guagliardo
    275 F.3d 868-872, (9th Cir. 2002)
12  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9,10

13  Graynet v. City of Rockford
    408 U.S. 104, 108-109, (1972)
14  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

15  Irons v. Warden
    358 F.Supp.2d 936 (E.D. Cal. 2005)
16  . . . . . . . . . . . . . . . . . . . . . .11,12,14,15,16

17  In re Scott
    Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595
18  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

19  Shaputis
    37 Cal.Rptr.3d at 335
20  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14,15

21  In re Rosenkrantz
    29 Cal.4th at 654-661
22  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14,17,18

23  In re Smith
    114 Cal.App.4th 343, 370, 372
24  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

25  Caswell v. Calderon
    363 F.3d 832, 389 (9th Cir.2004)
26  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

27  Scott
    119 Cal.4th at 899
28  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

1          POINTS AND AUTHORITIES (continued)

2   Name/Title                                              Pages

3   Scott
    133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920
4                   ...........................................15

5   Superintendent v. Hill
    472 U.S. 445, 455-457 (1985)
6                   ........................................15,16

7   In re Minnis
    (1972) 7 Cal.3d 639, 643, n.2
8                   ......................................16,17,18

9   People v. Morse
    (1964) 60 Cal.2d 631, 643, n.8
10                  ...........................................17

11  Masoner
    2004 WL1080177 *1-2
12                  ...........................................16

13  Bair
    2005 WL2219220 *12 n.3
14                  ...........................................16

15  Williams v. State of New York
    (1949) 337 U.S. 241, 247
16                  ...........................................17

17  CCR, Title 15, Division 2,
          §2000(b)(49)        .....................................4,6
18        §2000(b)(62)(90)    .......................................4
          §2402               .....................................2,3
19        §2402(a)(b)         .......................................6

20  Penal Codes
          §3041               ...........................4,6,11,12,18
21        §3041(a)            ....................................6,12
          §3041(b)            .......................................6
22
    Evidence Code
23        §115                .......................................4

24  California Constitution, Article V
          §8(b)               ......................................18

25

26

27

28

1  GROUND ONE:

2              THE BOARD FINDING OF UNSUITABILITY AND REFUSAL
               OF THE GRANTING OF PAROLE VIOLATED THE
3              PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED
               HIM OF HIS FEDERALLY PROTECTED LIBERTY
4              INTEREST WHEN THE BOARD DENIED PETITIONER A
               PAROLE GRANT WITHOUT ANY RELIABLE EVIDENCE OR
5              "SOME EVIDENCE", IN VIOLATION OF THE 5TH AND
               14TH AMENDMENT OF THE UNITED STATES
6              CONSTITUTION.

7      Section 3041 of the California Penal Code. creates substantial

8  presumption that a parole release date shall be set at the initial

9  parole hearing, and in a manner that is uniform to other similar

10 offenses. Subdivision (a) and (b), of §3041 mandates that a parole

11 release date "shall" be set "unless" the Board (BPT) finds that the

12 gravity of the commitment offense, or offenses, or the timing and

13 gravity of past convicted offenses are such that a consideration of

14 the public safety warrant not setting a release date at that hearing.

15 "Furthermore, if there be any reasonable doubt as to identity of

16 offense we are bound to resolve that doubt in favor of petitioner." (

17 In re Bramble, (1947), 31 Cal.2d 43, 51 [6], 187 P.2d 411). Moreover,

18 the rule is established that when language which is reasonably

19 susceptible of two constructions is used in a penal law ordinarily

20 that construction which is more favorable to the offender will be

21 adopted. The defendant is entitled to the benefit of every reasonable

22 doubt, whether it arise out of a question of fact, or as to the true

23 interpretation of words or the construction of language used in a

24 statute. (People v. Stuart (1956), 47 Cal.2d 167, 175 [7], 302 P.2d

25 5, 55 A.L.R.2d 705: People v. Smith (1955) 44 Cal.2d 77, 79 [2], 279

26 P.2d 33; In re Bramble, (1947) supra, 31 Cal.2d 43, 51 [6,7], 187

27 P.2d 441; In re McVickers (1946) 29 Cal.2d 264, 278, 176 P.2d 40;

28 People v. Valentine (1946) 28 Cal.2d 121, 143 [20], 159 P.2d 1;

People v. Ralph (1944), 24 Cal.2d 575, 581 [2], 150 P.2d 401.) There
is no other criteria in the statute for denying parole to a
prisoner. It appears from the language that "consideration of the
public safety" is nonetheless limited to the gravity of the offense
and/or the timing and gravity of any past "convicted" offense or
offenses. The statute does not encompass or authorize some of the
criteria set forth by the Cal. Code of Regulations, Title 15, §2402.
It does appear that the statute has been enlarged to include
additional criteria not expressly authorized by the statute.

Notwithstanding, the argument set forth in the petition is not
merely an argument about a state law violation. The presumption
vested by the statue is substantial, while the statutory criteria the
Board must meet in order to deny parole is limited to criminal
conduct at the time of the offense. For the Board to interpret the
statute in such a manner as to deny parole solely on the commitment
offense after the Board has denied petitioner on the exact same point
9 times deprives petitioner of a substantial liberty interest
protected by Federal Due Process. (See Biggs at 334 F.3d 917.) The
effect of such an interpretation, established by practice, is to
subject all prisoners to pro forma decisions, where the Board goes
through the motion of due process review, citing post hoc
rationalizations to justify the parole denial, that is now always the
result. This is little different than a decision to deny parole made
without any evidence to support it. Thus, by misinterpretation,
whether inadvertently or intentionally, the result is not merely a
violation because it is an action the Board is simply not authorized
to take by the enabling statue that impinges on Federally protected
liberty interests. Petitioner relies on this claim which is now

1 | brought before the State Court.

2 |     A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
3 |        PETITIONER POSES AN "UNREASONABLE RISK" OF THREAT TO
       PUBLIC SAFETY IF RELEASED ON PAROLE. THE DECISION
       WAS WITHOUT EVIDENCE AND WAS ARBITRARY AND
4 |        CAPRICIOUS VIOLATING FUNDAMENTAL DUE PROCESS.

5 |     The regulatory law requires the Board to set a release date

6 | unless it finds that the prisoner poses an "unreasonable risk" to

7 | public safety if released at that time. (15 CCR, §2402). This is

8 | consistent with the enabling statue which requires the setting of a

9 | release date.

10 |     If the preponderate record before the Board demonstrates that

11 | petitioner does not pose the "unreasonable risk" (which the record

12 | shows that he does not, from petitioner's last 9 parole hearings), a

13 | release date must be set.

14 |     If the Board denies petitioner parole without making this

15 | requisite finding based on relevant and credible facts in the record,

16 | then this is not merely a state law violation, but a deprivation of

17 | the substantial liberty interest he has in obtaining a release date.

18 | Failure of the Board to act in accord with the regulations, in such

19 | situations, constitutes a substantive due process violation because

20 | it constitutes an abuse of discretion that unfairly and inaccurately

21 | deprives the prisoner of his right to that Federally protected liberty

22 | interest. The Board needs more than "some evidence" to arrive at

23 | their decision, even though once the decision is made, the reviewing

24 | court needs only to find "some evidence" to support the decision or

25 | findings that were made. As petitioner will point out, the "some

26 | evidence" standard is not a "burden of proof." - although the Board of

27 | Prison Terms (BPT or Board of Parole Hearings) and the Governor seems

28 | to think it is. Petitioner will demonstrate by clear and convincing

-3-

1  facts that the Board's burden of proof is the "preponderance of

2  evidence" standard, but they totally ignore this in arriving at their

3  post hoc rationalization to deny parole in nearly every case. There

4  must be a weighing and balancing process according to a burden of

5  proof.

6     Thus, petitioner alleges that the Board's decision in his case

7  exceeded the bounds of "review" and was made without the procedural

8  safeguards required by the Constitution, and without applying the

9  proper proof necessary to overcome the presumptive right to release

10 delineated in Penal Code, §3041.

11    Statutory law in California applies the "rock bottom" burden of

12 proof in judicatory proceedings as the "preponderance of evidence"

13 level. (Evidence Code, §115). The Board of Prison Terms list under

14 "good cause," the preponderance evidence (15 CCR., Division 2,

15 §2000(b)(49)), and, also lists "relevant" and "material" evidence as

16 the standard for being valid "evidence." (15 CCR., Div. 2,

17 §2000(b)(62)(material evidence), and (90)(relevant evidence). The

18 "good cause" provision is a requirement for decision making that

19 applies to all substantive decisions. These regulatory and statutory

20 provisions initiate the weighing and balancing process of evidence at

21 parole hearings. A responsibility the Board must undertake. The Board

22 cannot apply the "some evidence" standard because it is not a burden

23 of proof. (In re Ramirez, (2001) 94 Cal.App. 4th 549 at 564-565;

24 Edwards v. Balisok, (1997) 520 U.S. 641, at 648). The "some evidence"

25 applies only to questions of evidentiary sufficiency as an

26 "additional requirement of due process, not substituted for other due

27 process requirements." (Ibid.). The "some evidence" standard is

28 applied only by the reviewing court to determine if the Board's

-4-

1  (Governor's) decision is supported by "some evidence", if the court

2  finds the Board complied with all other requisite due process

3  requirments. If the Board failed to apply a critical element in the

4  weighing and balancing of evidence, such as a burden of proof, then

5  the court cannot deny the petition because there isn't "some

6  evidence" in the record to support the decision. As the Appellate

7  court in In re Caswell 92 Cal.App. 4th 1017, 1029, pointed out, there

8  is always some evidence in the record of unsuitability of parole,

9  which if invoked, would subject every consideration of parole to an

10 arbitrary standard or political whim, but for a burden of proof, and

11 the burden of producing evidence, is clearly in California law, e.g.,

12 People v. Dubon, 90 Cal.App. 4th, 949, 952 (2001), and applies to all

13 state agencies.

14    Here, where the statute presumes that a parole date "shall

15 normally" be set, the Board must, in their weighing and balancing of

16 all relevant, material, and reliable evidence, present by a

17 preponderance of that evidence, a "rational connection" between the

18 basic facts the Board is asserting as sufficient to deny parole, and

19 the ultimate fact statutorily presumed, i.e., that the prisoner is

20 more than likely not "suitable" for setting a parole release date.

21    Petitioner submits that the Board and the Governor have broad

22 discretion in parole matter, but the requirement of procedural due

23 process embodied in the California Constitution...places some

24 limitations upon these discretionary powers.

25    As heretofore shown, the Board's burden of proof is the

26 preponderance of relevant and material evidence standard. This is the

27 "rock bottom" standard allowed by California law. (Evidence Code

28 §115; see e.g., Charlton v. Federal Trade Comm., 543 F.2d, 903-907,

1   908, (D.C. Cir. 1976)(Speaking to this standard as being "rock
2   bottom" burden of proof). "Good Cause" is defined in the BPT's
3   regulations as "a finding by the Board based upon a preponderance of
4   the (material and relevant) evidence that there is a factual basis
5   and good reason for the decision made. (Ibid. 2000). Here, in
6   petitioner's case, the Board, based on the "material and relevant"
7   evidence, found petitioner unsuitable for parole solely on the basis
8   of the commitment offense which petitioner has been denied 9 times
9   based primarily on the same issue, i.e., unchanging factors,
10  (commitment offense). This is a clear due process violation and
11  especially where the relevant and reliable evidence concerning public
12  safety, i.e., petitioner's psych report that was presented at
13  petitioner's 9th subsequent parole consideration hearing (in relevant
14  part), "If released to the Community, his violence potential would be
15  considered to be somewhat below average, relative to the average
16  citizen in the community," shows that petitioner does not pose an
17  "unreasonable risk" to the public if released at this time.  .

18      The mandatory language in §3041 of the Penal Code, established a
19  rebuttable presumption affecting the Board's burden of producing
20  evidence and the burden of proof implementing public policy regarding
21  the parole of "term to life" prisoners.

22      Petitioner asserts that the ultimate facts sought is a
23  determination whether the prisoner is currently an "unreasonable
24  risk" of danger to the public safety if released on parole. (Subd.
25  (b), Penal Code §3041; 15 CCR. §2402(a)).

26      The presumption created by mandatory language in both
27  subdivision (a) and (b) of §3041 is that petitioner "shall normally"
28  have a parole release date set "unless" the presumption is overcome

-6-

1  by the Board which carries the burden of proof as to the existence of
2  the presumed fact. <u>McQuillion v. Duncan</u>, 306, F.3d, 901-902 (9th Cir.
3  2002); <u>Biggs  v.  Terhune</u>,  334  F.3d.,  910,  916-917  (9th  Cir.
4  2003)(regarding the presumption in Penal Code §3041). If the Board
5  cannot  produce  the  evidence  according  to  the  burden  of  proof
6  required, then the presumption stands, and the court is obliged to
7  uphold the presumption, and under <u>In re Smith</u>, 109 Cal.App. 4th, 489
8  (2003), must order petitioner released from custody.

9      B. THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
          PROHIBITS STATE ACTION THAT DEPRIVES A PERSON OF
10         LIFE, LIBERTY, OR PROPERTY WITHOUT DUE PROCESS OF
           LAW.
11

12     The  due  process  clause  of  the  Fourteenth  Amendment  prohibits
13  state action that deprives a person of life, liberty, or property
14  without due process of law. A person alleging a due process violation
15  must first demonstrate that he or she was deprived of liberty or
16  property interest protected by the due process clause, and then show
17  that the procedures that led to the deprivation were constitutionally
18  insufficient. <u>Kentucky Dept. of Corrections v. Thompson</u>, 490 U.S.
19  454, 459-460 (1989); <u>McQuillion v. Duncan</u>, 306 F.3d, 895 900 (9th
20  Cir. 2002).

21     In the parole context, a prisoner alleging a due process claim
22  must demonstrate the existence of a protected liberty interest in
23  parole, and the denial of one or more of the procedural protections
24  that must be afforded when a prisoner has a liberty interest in
25  parole. The Supreme Court held in 1979, and reiterated in 1987, that
26  "a state's statutory scheme, if it uses mandatory language, creates a
27  presumption that parole release will be granted when or unless
28  certain designated findings are made, and thereby gives rise to a

1  constitutional   liberty   interest."   McQuillion,   306   F.3d,   16   901
2  (citing Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979)
3  and Board of Pardon v. Allen, 482 U.S. 369, 373 (1987)

4      The Ninth Circuit has held that California's parole scheme
5  creates a cognizable liberty interest in release on parole because
6  Penal Code §3041 uses mandatory language and is similar to the
7  Nebraska and Montana statutes addressed in Greenholtz and Allen,
8  respectively. McQuillion, 306 F.3d 15 901-902. As the Ninth Circuit
9  has explained, "§3041 of the California Penal Code creates in every
10 inmate a cognizable interest in parole which is protected by the
11 procedural safeguards of the due process clause," and that interests
12 arises "upon the incarceration of the inmate." Biggs v. Terhune, 334
13 F.3d 910, 914-915 (9th Cir. 2003).

14 ///
15 ///
16 ///

-8-

GROUND 2 :

THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY RELYING ON THE UNCHANGING FACTS OF THE CRIME IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION, & BY MAKING RECOMMENDATIONS OF WHAT TO DO TO BE FOUND SUITABLE AT EACH HEARING. A FINDING OF EGREGIOUSNESS IS BARRED BY THE INMATE'S COMPLIANCE WITH THOSE AGREED TERMS.

When the Board repeatedly relies on the unchanging facts of the crime to deny parole, in the face of clear evidence that the inmate has been rehabilitated, due process is violated. (Biggs, supra, at 915-916, Ramirez, supra, at 571). However, here, the Board goes a step further. At the conclusion of each hearing attended by petitioner, the Board gave him a series of recommendations of what to do in order to be found suitable for parole. If the crime was going to continue to be an impediment to parole, then what difference would it make whether petitioner followed those recommendations, since parole would be denied in any event as the crime will never change? How could the Board make those recommendations in good faith if the crime was such that parole was not going to occur no matter how well petitioner programs? Even worse, if he complies with those recommendations and the Board gives him a parole date, if the Governor is permitted to effectively negate this whole process unilaterally taking that parole date away, then the recommendations and compliance are rendered useless acts.

The Board has a duty to make all recommendations "sufficiently clear" to inform petitioner what conduct will result in a grant of parole. (U.S. v. Guagliardo, 278 F.3d 868-872, (9th Cir. 2002)[citing Graynet v. City of Rockford, 408 U.S. 104, 108-109, (1972)]).[1]   Thus,

---

[1]A prisoner's due process rights are violated if parole conditions are not made "sufficiently clear" so as to inform him of what conduct will result in his being returned to prison. Likewise, the Board of Prison Terms has a duty to make

1  the onus is on the board to clearly and specifically state what

2  conduct will warrant a finding suitability. Therefore, it follows

3  that there is only one way to interpret the recommendations given to

4  petitioner at the Documentation Hearings and at each of the Subsequent

5  parole hearings. They constitute the Board's "clear instructions" as

6  to what petitioner must do to be found suitable. As stated, it is

7  indisputable but that petitioner has complied with every single one

8  of the Board's directives to him, and, thus, the Board must finally

9  find petitioner suitable for release. If the Boards' directions to

10 the inmate are not acknowledged as sincere offers providing

11 legitimate goals for achieving a status of parole suitability, then

12 they are mere "hoops," designed to support elaborate rouse and a

13 further affront to the due process rights of all prisoners who rely

14 upon them.

15     As noted, petitioner sincerely relied upon the recommendation of

16 the prior Board panels, and, he partook to fulfill each one.

17 Petitioner's fulfillment may be recognized through his educational

18 and vocational accomplishments and gains, his ongoing self-help work,

19 and his crime free behavior throughout his nearly 23    years of

20 incarceration. Petitioner has complied with those directives

21 following each and every hearing, and the Board should finally

22 recognize his compliance by granting parole.

23     A.  CONTINUED RELIANCE ON THE UNCHANGING FACTS OF
        THE CRIME VIOLATES DUE PROCESS.
24

25     In Biggs v. Terhune, the 9th Circuit held that even if the

26 commitment offense(s) are sufficient to support a denial of parole,

27 recommendations for parole eligibility "sufficiently clear" so as to inform the
   inmate of conduct that will wrrant a finding of suitability. (see U.S. v.
28 Guagliardo, supra, 278 F.3d 868).

the crime alone will not justify repeated denials of parole based upon considerations of due process. Biggs v. Terhune, supra, 334 F.3d at 916. The Ramirez, court also acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. Thus, while concluding that there was factual support for the findings as to the crime and priors, the Ramirez court still found the Board's decision arbitrary since there had been 7 hearings at that point, 9 years had passed beyond the minimum term, and, it was 17 years after entering prison, and, all evidence showed rehabilitation. (Id. at 571). Likewise, as the Biggs court more recently said, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> "A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (Biggs, supra, at 916-917).

In the recently published case of Irons v. Warden, 358 F.Supp. 2d, 936 (E.D. Cal. 2005), the Federal court has applied the dictates of Biggs. In Irons, the court found that the Board violated the prisoner's due process by continuing to rely on the immutable factors. (e.g., the commitment offense and history prior to incarceration) to support the denial of parole. In doing so, the Federal judge there ruled that continuing to rely on those factors that can never change, such as the commitment offense, where there is no proof of continuing bad conduct to support a finding of current threat to the public, offends due process.

In interpreting the rule put forth in Biggs, and, the plain language of Penal Code §3041, it is clear that even if the crime may

1  be considered egregious, under federal due process principles, the
2  denial of parole based on the immutable facts of the crime is only
3  authorized at the first parole consideration hearing. The provisions
4  of Penal Code §3041, only talk of the use of the crime to defer
5  setting of a date at the initial hearing. (Penal Code §3041(a)). After
6  that, to give the statute a constitutional interpretation that is not
7  unreasonably vague, further denials would have to be based on some
8  facts arising subsequent to the crime that show a continued
9  propensity for violence, making the inmate a danger to the public.
10  (Biggs v. Terhune, supra, 334 F.3d at 914-915). To rule otherwise
11  would put petitioner in an impossible situation, where no matter what
12  he shows in terms of positive behavior, reformation, self-help, work
13  skills, parole plans, or just rehabilitation in general, he would
14  never be able to overcome the unchanging facts of the crime. The only
15  logical application of Constitutional Due Process dictates what the
16  court in Irons held, i.e., that any subsequent denial requires the
17  presence of some in-prison behavior showing that the inmate currently
18  presents an unreasonable risk of danger if paroled.

19      Here, the facts of the crime have been used as the real reason
20  for denying parole on  9  separate occasions, yet, those facts have
21  never been tied to current behaviors showing petitioner still
22  presents an unreasonable risk of danger to the public at this time. A
23  rule requiring the presence of in-prison, adverse behavior to justify
24  further denials based on the crime simply recognizes what the 9th
25  Circuit in Biggs alluded when it talked of the rehabilitative goals
26  of the system, and, the need to take into consideration that a person
27  can change. At this point, petitioner has been incarcerated for  23
28  years, eligible for parole for more than 12   of those years. His

-12-

1    programming clearly shows his full rehabilitation. In drawing the

2    line as to when further denials become arbitrary, that line has

3    definitely been crossed in this case, and, in fact, was crossed as

4    soon as the crime was used in the second parole hearing without the

5    presence of facts showing a continued risk of danger based on how

6    petitioner was programming in prison. To the contrary, the in-prison

7    facts are exclusively positive.

8        As the Ramirez court noted, the paroling authority must do more

9    than merely commend petitioner for the hard work done to rehabilitate

10   himself while in prison. They must actually consider these factors "as

11   ... circumstance[s] tending to show his suitability for parole."

12   Ramirez, supra, 94 Cal.App. 4th at 571-572 [emphasis original]. Of

13   course, all the Board did with petitioner's extensive accomplishments

14   was to brush them aside with several terse lines, and, issue a

15   superficial compliments. The Biggs rule is clear that if an inmate

16   continue[s] to demonstrate exemplary behavior and evidence of

17   rehabilitation, denying him a parole date simply because of the

18   nature of his offense and prior conduct would raise serious questions

19   involving his liberty interest in parole. Biggs v. Terhune, supra,

20   334 F.3d at 916. Here, the evidence of actual rehabilitation is

21   beyond dispute.

22       In comparing the present case with Biggs, it is undeniably clear

23   that the Board lacks any justification whatsoever to continue to deny

24   petitioner a parole date. In Biggs, the inmate was convicted of the

25   premeditated and deliberate 1st Degree Murder of a witness in a major

26   theft case against the defendants, and, yet, the court was quick to

27   caution the Board that it could not continue to solely rely on the

28   commitment offense to deny the inmate parole, even though it was only

-13-

1 │ his initial hearing at that point. Yet, petitioner has been denied
2 │ parole on 9 separate occasions, each time effectively relying
3 │ virtually exclusively upon the unchanging facts of his commitment
4 │ offense. The continued reliance upon the commitment offense is simply
5 │ arbitrary, particularly in the face of the Board's acknowledgements
6 │ of petitioner's model behavior in prison and extensive
7 │ accomplishments, all of which are conceded by the statement of
8 │ decision. Therefore, as the court stated in Biggs, denying him a
9 │ parole date simply because of the nature of the offense, not only
10 │ raises serious questions involving his liberty interests in parole,
11 │ but blatly violates due process. (see Biggs v. Terhune, supra, 334
12 │ F.3d at 915-916; Irons, supra.).

13 │ B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
     │    DUE PROCESS.
14 │

15 │ First, continued reliance upon these unchanging factors makes a
16 │ sham of California's parole system and amounts to an arbitrary denial
17 │ of petition's "liberty interest in release on parole," and his
18 │ "presumption that parole release will be granted." (See McQuillion v.
19 │ Duncan, 306 F.3d 895, 902 (9th Cir. 2002), Biggs, 334 F.3d at
20 │ 914-915, Rosenkrantz 29 Cal. 4th at 654, 661.) Petitioner has been
21 │ denied parole on 9 different occasions. Continued reliance upon
22 │ these unchanging factors amounts to converting petitioner's offense
23 │ to a term of life without the possibility of parole. (See Irons, 358
24 │ F.Supp.2d at 947 ["continuous reliance on the unchanging
25 │ circumstances transforms an offense into a de facto life imprisonment
26 │ without the possibility of parole"]; Scott, Cal.Rptr.3d at 919-920,
27 │ 133 Cal.App.4th at 594-595; Shaputis, 37 Cal.Rptr.3d at 335).

28 │ Second, the circumstances of the crime and petitioner's conduct

1  prior to imprisonment do not amount to some evidence supporting the

2  conclusion that petitioner "currently" poses an unreasonable risk of

3  danger if released. (See In re Smith, 114 Cal.App.4th 343, 370, 372

4  [Evidence must show "that a prisoner currently would pose an

5  unreasonable risk of danger if released at this time."] In re

6  Shaputis, (2006) 37 Cal.Rptr.3d 324, 334-335). In the parole context,

7  the requirements of due process can only be met if "some evidence"

8  supports the decision" and the evidence underlying the decision is

9  supported by "some indicia of reliability." Biggs, 334 F.3d at 914;

10 Caswell v. Calderon, 363 F.3d 832, 389 (9th Cir. 2004); Scott, 119

11 Cal.4th at 899; Superintendent v. Hill, 472 U.S. 445, 455-457 (1985);

12 McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002).

13      While it may have been reasonable to rely on petitioner's

14 offense and conduct prior to imprisonment as an indicator of

15 dangerousness for some period of time, continued reliance on such

16 unchanging circumstances after 23    years of incarceration and

17     parole suitability hearings, violates due process because these

18 factors now lack predictive value with regards to petitioner's

19 present and future dangerousness. After 23 years of rehabilitation in

20 which petitioner's eligible parole date for release was passed on

21 June 15, 1994    , (Exhibit C   , Initial M.E.P.D.), the ability to

22 predict petitioner's future dangerousness based simply on the

23 circumstances of the crime is nil. (See Irons, 358 F.Supp.2d at 947

24 n.2 ["four prior times in finding [Irons] unsutiable for parole" and

25 "after 15 years" imprisonment, ability to assess dangerousness "is

26 near zero."]; Scott, 133 Cal.App.4th at 595, 34 Cal.Rptr.3d at

27 919-920["the predictive value of the commitment offense may be very

28 questionable after a long period of time."].

-15-

1    Petitioner's record is replete with evidence of petitioner's

2   rehabilitation, which was expressed by the Board, including

3   Psychological Reports, Correctional Counselor's Reports, extensive

4   self-improvement through vocational, education, self-help therapy and

5   disciplinary free incarceration for the past 9 years. (See Exhibit

6   C ).

7    While the Board may initially have been entitled to rely upon

8   the commitment offense and petitioner's conduct prior to imprisonment

9   to find petitioner unsuitable for parole, under these circumstances,

10  petitioner submits that the continued reliance and sole reliance of

11  the convicted offense do not now constitute "some evidence" with

12  "some indicia of reliability" of petitioner's current dangerousness.

13  (See Hill, 472 U.S. at 445; Biggs, 334 F.3d at 917; Irons, 358

14  F.Supp.2d at 947; Masoner, 2004 WL1080177 *1-2; Bair, 2005 WL2219220,

15  *12n3; Scott, 133 Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 919-920.)

16       C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
            UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
17          AND THE LIBERTY INTERESTS OF INMATES. THE ESSENCE
            OF THE PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS
18          WHO NO LONGER POSE A PUBLIC DANGER.

19   Parole, the release of the imprisoned before they have served

20  the maximum time set by their sentences, has long been part of the

21  California penal system. The Indeterminate Sentencing Law, requiring

22  the trial judge to set a minimum but not a maximum sentence was enacted

23  in 1917. In re Minnis, (1972) 7 Cal.3d 639, 643 n.2 ("the court in

24  imposing the sentence shall not fix the term or duration of the

25  period of imprisonment")(citation and internal quotation omitted).

26  The goal of indeterminate sentences and the California parole system

27  is not only to punish, but also to provide for reformation and

28  rehabilitation:

> "The belief no longer prevails that every
> offense in a like legal category calls for an
> identical punishment without regard to the past
> life and habits of a particular offender ...
> retribution is no longer the dominant objective
> of the criminal law. Reformation and
> rehabilitation of offenders have become
> important goals of criminal jurisprudence."

People v. Morse, (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams v.

State of New York, (1949) 337 U.S. 241, 247). In a lengthy discussion

of this topic, the California Supreme Court stated as follows:

> [T]he purpose of the indeterminate sentence
> law, like other modern laws in relation to the
> administration of the criminal law, is to
> mitigate the punishment which would otherwise
> be imposed upon the offender. These laws place
> emphasis upon the reformation of the offender.
> They seek to make the punishment fit the
> criminal rather than the crime. The endeavor
> to put before the prisoner great incentive to
> well-doing in order that his will to do well
> would be strengthened and confirmed by the
> habit of well-doing.
>
> [...]
>
> [T]he interests of society require that under
> prison discipline every effort should be made
> to produce a reformation of the prisoner ...
> The Legislative policy [was to provide a
> system whereby] a hope was to be held out to
> prisoners that through good conduct in prison
> and a disposition shown toward reformation,
> they might be permitted a conditional liberty
> upon restraint under which they might be
> restored again to society...
>
> [...]
>
> Although good conduct while incarcerated and
> potential for reform are not the only relevant
> factors, the court has acknowledged their
> significance. Furthermore, the authority has
> declared that these factors are among those of
> "paramount importance."

In re Minnis, Cal.3d at 644-45. The Rosenkrantz court, citing Minnis,

reaffirmed the principles. "[E]ven before factors relevant to parole

1  decisions had been set forth expressly by statue and by regulations,

2  we concluded that [a]ny official or Board vested with discretion, is

3  under obligation to consider all relevant factors [citations], and

4  the [official or Board] cannot, consistently with its obligation,

5  ignore post conviction factors unless directed to do so by

6  Legislature." In re Rosenkrantz, (2002) 29 Cal.4th 616, 656 (quoting

7  Minnis, 7 Cal.3d at 645).

8       D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
          IN PAROLE DECISIONS.
9

10     "[P]arole applicants in this California have an expectation that

11  they will be granted parole unless the Board finds, in the exercise

12  of its discretion, that they are unsuitable for parole in light of

13  the circumstances specified by statute and by regulation."

14  Rosenkrantz, 29 Cal.4th at 659-61 (holding that the California

15  Constitution, Article V, §8(b) and California Penal Code §3041, "give

16  rise to a protected liberty interest" in that "a prisoner granted

17  parole by the Board has an expectation that the Governor's decision

18  to affirm, modify, or reverse the Board's determination will be based

19  upon the same factors the Board is required to consider," and that

20  "this liberty interest underlying a Governor's parole review

21  decisions is protected by due process law.")

22     Federal courts have also unequivically held that California's

23  parole system gives rise to a liberty interest constitutionally

24  protected by due process. (See Board of Pardons v. Allen (1987) 482

25  U.S. 369, 376-78; Greenholtz v. Inmates of Neb. Penal & Correctional

26  Complex (1979) 442 U.S. 1, 11-12 (holding a state's statutory parole

27  scheme that uses mandatory language may create a presumption that

28  parole release will be granted upon certain circumstances or

-18-

1  findings, thus, giving rise to a constitutionally protected liberty

2  interest); <u>McQuillion v. Duncan</u> (9thCir. 2002) 306 F.3d 896, 902-03

3  n.l, 903 (holding that because California's parole scheme uses

4  mandatory language and is largely parallel to the schemes found in

5  <u>Allen</u> and <u>Greeholtz</u>, to give rise to a protected liberty interest in

6  release on parole, "California's parole scheme gives rise to a

7  cognizable liberty interest in release on parole.") <u>Biggs v. Terhune</u>

8  (9th Cir. 2003) 334 F.3d 910, 915-916.

9                                CONCLUSION

10     Because there is nothing which, either singly or in conjunction

11 with other evidence, that could support any decision other than

12 parole suitable, the Board's decision should be vacated and

13 petitioner ordered released.

14                             PRAYER FOR RELIEF

15     Petitioner is without remedy save for Habeas Corpus. Accordingly,
   petitioner requests that the court:

16          1. Issue a Writ of Habeas Corpus granting petitioner's

17             Due Process violation claim;

18          2. Issue an Order To Show Cause;

            3. Declare the rights of petitioner;

19          4. Appoint counsel to represent petitioner;

20          5. Issue an Order releasing petitioner based on

21             supporting evidence;

            6. Grant any an all relief found necessary or

22             appropriate.

23 Dated this 3 day of march , 2008.

24                                        Respectfully submitted,

25

26                                        Abel Raya

27                                        Petitioner in Pro Se

   ///
28 ///

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

INMATE

| In the matter of the Life | ) | |
| Term Parole Consideration | ) | |
| Hearing of: | ) | CDC Number C-99451 |
| | ) | |
| ABEL RAYA | ) | |
| | ) | |

CORRECTIONAL TRAINING FACILITY SOLEDAD

SOLEDAD, CALIFORNIA

SEPTEMBER 26, 2006

3:40 P.M.

PANEL PRESENT:

Ms. Linda Shelton, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Abel Raya, Inmate
Mr. Peter Ferguson, Attorney for Inmate
Mr. Steven Polacek, Deputy District Attorney
Mr. David Ugalde, Interpreter
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

   ---------        See Review of Hearing
   ---------        Transcript Memorandum

**Sheila Orms**                    **House of Scribes**

ii

## INDEX

|                              | PAGE |
|------------------------------|------|
| Proceedings .................................... | 1 |
| Case Factors ................................ | 6 |
| Pre-Commitment Factors ...................... | 11 |
| Post-Commitment Factors ..................... | 17 |
| Parole Plans ................................ | 29 |
| Closing Statements .......................... | 36 |
| Decision .................................... | 42 |
| Adjournment ................................. | 49 |
| Transcriber Certification ................... | 50 |

--oOo--

1

| 1 | P R O C E E D I N G S |
|---|---|

2    **PRESIDING COMMISSIONER SHELTON:**  We are on

3    record.  Good afternoon, everyone.  We are here

4    for the subsequent, the ninth attempt, subsequent

5    parole consideration hearing for Abel Raya, R-a-y-

6    a, CDC Number C-99451.  The (indiscernible) and I

7    need to swear in our interpreter.  Would you

8    please state your name and spell it for the

9    record.

10    **THE INTERPRETER:**  David Ugalde, U-g-a-l-d-e,

11    from (indiscernible)

12    **PRESIDING COMMISSIONER SHELTON:**  Thank you.

13    (Interpreter sworn.)

14    **PRESIDING COMMISSIONER SHELTON:**  Thank you

15    very much.  Now to move forward.  All right.

16    Today's date is September 26th, 2006.  The time is

17    3:40 p.m.  We're located at CTF Soledad.  Mr. Raya

18    was received on January 22nd, 1985, committed from

19    Fresno County.  His life term began on November

20    7th -- it's 19 -- life term began November 7th,

21    1985, with a minimum eligible parole date of

22    October 23rd, 1994.  The controlling offense for

23    which Mr. Raya is committed is set forth in Case

24    No. 317151-9, charging count one, violation of PC

25    187, murder in the second degree, with a

26    (indiscernible) of 22.5 use of a firearm.  Mr.

27    Raya received a term of 15 plus two equaling 17

2

1  years to life.  All right.  Mr. Raya, this hearing

2  is being taken tape recorded, so for purposes of

3  identification, we'll go around the room and

4  identify ourselves, say our first name, last name,

5  spell our last name, and when we get to you,

6  please add your CDC number.  My name is Linda

7  Shelton, S-h-e-l-t-o-n.  Commissioner?

8      **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen

9  Blonien, B-l-o-n-i-e-n, Deputy Commissioner.

10     **DEPUTY DISTRICT ATTORNEY POLACEK:**  My name is

11 Steven Polacek, Steven as with a V, Polacek is P-

12 o-l-a-c-e-k, and I'm an attorney with the District

13 Attorney's office in Fresno.

14     **MR. FERGUSON:**  Peter Ferguson, F-e-r-g-u-s-o-

15 n, counsel for Mr. Raya.

16     **INMATE RAYA:**  My name is Mr. Raya, my CDC

17 number is C99451.  My name is R-a-y-a.

18     **THE INTERPRETER:**  David Ugalde, U-g-a-l-d-e,

19 from (indiscernible).

20     **PRESIDING COMMISSIONER SHELTON:**  Thank you.

21 And for the record, we have four officers in the

22 room for security purposes, who will not be

23 participating in today's hearing.  All right.  Mr.

24 Raya, you signed what's called a DPT Form 1073 on

25 November 2nd, 2005, indicating that you did not

26 have any disabilities.  Is that true?

27     **INMATE RAYA:**  That's correct.

3

1      PRESIDING COMMISSIONER SHELTON:  And do you

2  not wear glasses?

3      INMATE RAYA:  No.

4      PRESIDING COMMISSIONER SHELTON:  And your

5  hearing is okay?

6      INMATE RAYA:  Yes.

7      PRESIDING COMMISSIONER SHELTON:  And you can

8  walk and sit and stand comfortably?

9      INMATE RAYA:  Yes.

10      PRESIDING COMMISSIONER SHELTON:  Are you on

11  any medication right now, sir?

12      INMATE RAYA:  No.

13      PRESIDING COMMISSIONER SHELTON:  So you feel

14  like you're comfortable moving forward with this

15  hearing?

16      INMATE RAYA:  Yes.

17      PRESIDING COMMISSIONER SHELTON:  Counsel,

18  would you concur?

19      MR. FERGUSON:  Yes, ma'am.

20      PRESIDING COMMISSIONER SHELTON:  All right.

21  Thank you.  Mr. Raya, you've been here before.

22      INMATE RAYA:  Yes.

23      PRESIDING COMMISSIONER SHELTON:  Do you

24  understand why we're here today?

25      INMATE RAYA:  Yes.

26      PRESIDING COMMISSIONER SHELTON:  Tell me.

27      INMATE RAYA:  To talk about my sentence and

4

1  case.

2      PRESIDING COMMISSIONER SHELTON:   To see if

3  you're suitable for parole.

4   .  INMATE RAYA:  Yes.

5      PRESIDING COMMISSIONER SHELTON:   Okay.   We're

6  not here to retry your case, okay?

7      INMATE RAYA:  Okay.

8      PRESIDING COMMISSIONER SHELTON:   Thank you.

9  I do want to go over a couple of things with you.

10  You have certain rights.   Those rights include

11  the right to a timely notice of this hearing to

12  make (indiscernible) central file, adn the right

13  to present relevant documents.   Counsel, have we

14  met your client's rights so far?

15     MR. FERGUSON:  I believe so.

16     PRESIDING COMMISSIONER SHELTON:   Thank you.

17  Mr. Raya, you also have the right to an impartial

18  panel.   Today the panel would be Commissioner

19  Blonien and myself.   Is that all right with you?

20     INMATE RAYA:  It's fine with me.

21     PRESIDING COMMISSIONER SHELTON:   I appreciate

22  that.  Also, I want to let you know a couple of

23  years ago, the regulations changed with regard to

24  appeal rights.   If you need more information, talk

25  with your attorney or visit the go to the prison

26  law library, all right?

27     INMATE RAYA:  Okay.

5

1    PRESIDING COMMISSIONER SHELTON:  Now, sir, I

2 want you to know that you're not required to admit

3 to or discuss your offense; however, this panel

4 does accept as true the findings of the Court.  Do

5 you know what that means?

6    INMATE RAYA:  Yes.

7    PRESIDING COMMISSIONER SHELTON:  Tell me what

8 that means.

9    INMATE RAYA:  That means that I don't need to

10 talk of something that isn't in my file.

11    PRESIDING COMMISSIONER SHELTON:  It does and

12 it also means that like I said before, we're not

13 going to retry your case.  We're just going to

14 talk about information that determines your

15 suitability.  Commissioner, do we have any

16 confidential information?

17    DEPUTY COMMISSIONER BLONIEN:  There is none.

18    PRESIDING COMMISSIONER SHELTON:  All right.

19 I pass the hearing checklist around, and I know

20 that we have everything.  Mr. Polacek, you have

21 everything, correct?

22    DEPUTY DISTRICT ATTORNEY POLACEK:  Yes, I do.

23    MR. FERGUSON:  We also have everything.

24    PRESIDING COMMISSIONER SHELTON:  Mr. Ferguson

25 has everything, great.  Then we have all the

26 information we need.  It appears it we have all

27 the information we need to move forward.  Are

6

1  there any additional documents to be submitted?

2      MR. FERGUSON:  Mr. Raya does have some

3  support letters that I believe have not reached

4  the central file yet.

5      PRESIDING COMMISSIONER SHELTON:  Okay.  And

6  when we get to the parole plans and support

7  letters part, we'll collect those.  Are there any

8  preliminary objections?

9      MR. FERGUSON:  None at this time.

10      PRESIDING COMMISSIONER SHELTON:  Will your

11  client be speaking with us today, sir?

12      MR. FERGUSON:  Yes, ma'am.

13      PRESIDING COMMISSIONER SHELTON:  With regards

14  to all aspects?

15      MR. FERGUSON:  Yes, ma'am.

16      PRESIDING COMMISSIONER SHELTON:  Would you

17  raise your right hand, sir?

18  (Inmate sworn.)

19      PRESIDING COMMISSIONER SHELTON:  Thank you.

20  All right.  Mr. Raya, what we're going to do next

21  is I'm going to enter in the summary of the

22  offense.  I'd like to refer though to the summary

23  of offense that comes from the Appellate Court

24  ruling, and that was filed on November 19th, 1986.

25   And that would be on page two.  And -- okay.  I'm

26  going to enter this into the record and then

27  you'll have an opportunity to tell us your

7

1  perspective of what happened.  All right?

2        **INMATE RAYA:**  Yes.

3        **PRESIDING COMMISSIONER SHELTON:**  On the

4  evening of July 7th, 1984, in the Sanger Bar, Raya

5  shot and killed Conception Sanchez (phon.).

6  Sanchez depicted at trial as a loud-mouthed bully

7  and regular bar patron provoked an argument with

8  Raya.  Raya was 25, 129 pounds, Sanchez was 50,

9  165 pounds, both men were drunk.  Sanchez had a

10  .23 percent blood alcohol level at 12:11 a.m.,

11  several hours after the shooting.  Raya's blood

12  alcohol tested at .17.  Before coming to the bar,

13  Raya and friend Bortebo Brazalis (phon.) had spent

14  the day drinking with bar maid Delma Balmus

15  (phon.) and another person.  Raya consumed an

16  additional 17 beers.  After the shooting, he drove

17  Brazalis to the Sacramento area where he was

18  stopped and arrested at about 11:30 p.m., July

19  7th, 1984, for driving under the influence.  Ramos

20  and Rosellette (phon.) both of whom were drunk on

21  the evening in question testified to the events

22  preceding the shooting.  Neither witness was

23  shooting itself.  Ramos was at the bar and

24  Rosellette was sleeping in Raya's car parked

25  outside.  The evidence of the shooting itself

26  derives solely from Raya's extra judicial

27  statements and his trial testimony.  All right.

8

1  Payne Ramirez (phon.), Sanger Police Department
2  detective assigned to investigate the shooting
3  interviewed Raya at the Sacramento County Jail.
4  The interview in Spanish was tape-recorded.  Raya
5  was dancing with Roma Ramos (phon.) at the El
6  Cinco Ropo Bar (phon.) in Sanger.  Sanchez
7  approached him and said he didn't want her dancing
8  with him, asked him to leave the bar, and said if
9  he didn't, that he would be killed.  Sanchez
10  reached for his waistband as if he had a weapon,
11  Sanchez also pointed at others in the bar and said
12  that if he didn't kill Raya, one of the others
13  would.  Raya never saw a weapon in Sanchez'
14  possession.  Raya left the bar, went to his car,
15  retrieved a gun from the trunk, returned to the
16  bar, opened the door with one foot and fired four
17  times.  After shooting Sanchez, Raya got into his
18  car and drove away to avoid the police.  Raya said
19  he had been drinking and was a little drunk, but
20  recalled what he was doing.  When asked why he had
21  shot Sanchez, Raya said that Sanchez had
22  threatened to kill him and reached for an apparent
23  weapon.  Also said that others would kill him if
24  he didn't kill Sanchez, Raya thought that Sanchez
25  would kill him.  He was very mad at Sanchez for
26  what he had said.  In a later spontaneous
27  statement, Raya said that he regularly carried a

9

1 gun that no one had put him down in a bar, and

2 that he couldn't stand for someone to get smart

3 with him, but he knew what he was done, he was

4 blinded by Sanchez' asking him to leave the bar.

5 Why don't you tell us in your own words what went

6 on that day.

7     INMATE RAYA:  I'm listening to something that

8 I have never said. That I knew of one that can be

9 offended, I didn't say that word.

10     PRESIDING COMMISSIONER SHELTON:  I want to

11 know what you did.

12     INMATE RAYA:  What I did is I shot against

13 Mr. Sanchez.  Because I felt I was

14 (indiscernible).  I didn't know any one of them.

15 If I knew them, I could've speaked to them.  I

16 (indiscernible).

17     PRESIDING COMMISSIONER SHELTON:  Mr. Raya,

18 why didn't you leave when you went out to get the

19 gun, why didn't you just leave?

20     INMATE RAYA:  I said that I went to the car,

21 truly I didn't go to car.  I carried the gun.

22     PRESIDING COMMISSIONER SHELTON:  So you had

23 the gun on you all the time?

24     INMATE RAYA:  Most times because I felt that

25 somebody might (indiscernible).

26     PRESIDING COMMISSIONER SHELTON:  Why?

27     INMATE RAYA:  I couldn't leave it there

10

1 because I was dealing with a lot of people.

2 (Indiscernible) is the best I can tell you.

3      PRESIDING COMMISSIONER SHELTON:  Why did you

4 have a gun in the first place?

5      INMATE RAYA:  The places that I used to go

6 lately, there were a lot of robbery.  I didn't

7 know (indiscernible).  The house where I was

8 living at was a (indiscernible).  People who come

9 there to (indiscernible).  And (indiscernible) the

10 gun there.

11      PRESIDING COMMISSIONER SHELTON:  Did you have

12 an opportunity to leave without shooting him that

13 night?

14      INMATE RAYA:  He intended to put a gun in his

15 shirt, then I put on my gun (indiscernible).

16      PRESIDING COMMISSIONER SHELTON:  So the story

17 you're saying is not the one that I read that you

18 went out to the car to get a gun, you said that

19 was a lie again, you didn't go to the car?

20      INMATE RAYA:  I didn't go.  I know there are

21 two tapes there for the (indiscernible) in

22 Sacramento.

23      PRESIDING COMMISSIONER SHELTON:  When you

24 were arrested.

25      INMATE RAYA:  Yes.

26      PRESIDING COMMISSIONER SHELTON:

27 Commissioner, questions at this point?

11

1        DEPUTY COMMISSIONER BLONIEN:  No.

2        PRESIDING COMMISSIONER SHELTON:  Just so you

3   understand, Mr. Raya, we'll be asking you

4   questions all along and will probably return to

5   us, but I'm going to -- you're going to talk about

6   your prior record right now.  Of which I couldn't

7   find any.  Did you ever get in trouble as a kid?

8        INMATE RAYA:  Not ever.

9        PRESIDING COMMISSIONER SHELTON:  Where were

10   you born?

11        INMATE RAYA:  In Mexico.

12        PRESIDING COMMISSIONER SHELTON:  How old were

13   you when you came over to the United States?

14        INMATE RAYA:  13 or 14.

15        PRESIDING COMMISSIONER SHELTON:  And you

16   didn't get in trouble in Mexico?

17        INMATE RAYA:  No.

18        PRESIDING COMMISSIONER SHELTON:  And you

19   don't have an adult record either.

20        INMATE RAYA:  I work in --

21        PRESIDING COMMISSIONER SHELTON:  So this is

22   your first time getting in trouble?

23        INMATE RAYA:  Yes.

24        PRESIDING COMMISSIONER SHELTON:  Okay.  Let's

25   talk about your social history.  I want you to

26   work with me and help me out so we can fill in the

27   gaps on this, all right?  You were born -- your

12

1  birthday's 2/15/59.

2        INMATE RAYA:  Yes.

3        PRESIDING COMMISSIONER SHELTON:  That would

4  make you 47 now.

5        INMATE RAYA:  Yes.

6        PRESIDING COMMISSIONER SHELTON:  Your

7  father's name is Roberto and your mom's name is

8  Alena (phon.).

9        INMATE RAYA:  Yes.

10        PRESIDING COMMISSIONER SHELTON:  You're the

11  oldest of five children.  You were raised on a

12  family ranch in Wonawaka (phon.).

13        INMATE RAYA:  Yes.

14        PRESIDING COMMISSIONER SHELTON:  This says

15  your family life was normal in a rural

16  environment, no violence, no abuses.  You went to

17  school and dropped out in the third grade and

18  started working on the family ranch.

19        INMATE RAYA:  Yes.

20        PRESIDING COMMISSIONER SHELTON:  What did you

21  do in the third grade on the family ranch?  You

22  were like what, eight or nine years old?

23        INMATE RAYA:  I stuck on (indiscernible) and

24  help provide for other children.

25        PRESIDING COMMISSIONER SHELTON:  Where was

26  your father, was he dead, too?

27        INMATE RAYA:  No.

13

1     PRESIDING COMMISSIONER SHELTON:  So he left

2  to another state.

3     INMATE RAYA:  Then he had come back for me

4  for a year, that's why I stopped going to school

5  to help my mom.

6     PRESIDING COMMISSIONER SHELTON:  What did

7  your father do in another state?

8     INMATE RAYA:  He worked.  (Indiscernible) he

9  sent any money for (indiscernible).

10    PRESIDING COMMISSIONER SHELTON:  So basically

11  you and your mom and your brothers and sisters

12  were together most of the time?

13    INMATE RAYA:  Yes.

14    PRESIDING COMMISSIONER SHELTON:  You came to

15  the United States when you were about 13 years

16  old?

17    INMATE RAYA:  13 or 14.

18    PRESIDING COMMISSIONER SHELTON:  13 or 14.

19  And it says you came here illegally, so

20  (indiscernible).

21    INMATE RAYA:  (Indiscernible.)

22    PRESIDING COMMISSIONER SHELTON:  What did you

23  do?  Where did you come?

24    INMATE RAYA:  I always (indiscernible) of my

25  father, it's my (indiscernible) did not have

26  (indiscernible).

27    PRESIDING COMMISSIONER SHELTON:  So you came

14

1  to California to earn money to send money back to

2  your family and you ended up drinking more of the

3  money than sending it back?

4      INMATE RAYA:  I spent more in

5  (indiscernible).

6      PRESIDING COMMISSIONER SHELTON:  When did you

7  start drinking?  How old were you?

8      INMATE RAYA:  Probably eight or nine or so.

9      PRESIDING COMMISSIONER SHELTON:  So that was

10  probably a common practice when you were working

11  at the ranch, you were drinking there?

12      INMATE RAYA:  Yes.

13      PRESIDING COMMISSIONER SHELTON:  Did you ever

14  try any drugs?

15      INMATE RAYA:  No.

16      PRESIDING COMMISSIONER SHELTON:  At the time

17  of your commitment offense, how much were you

18  drinking a day?

19      INMATE RAYA:  I used to drink day and night,

20  so I cannot tell, count.

21      PRESIDING COMMISSIONER SHELTON:  Okay.  I

22  appreciate that.  So you came to California and

23  says in 1980, you've been here and lived with a

24  lady named Teresa Delagos (phon.) and you had two

25  children with her.

26      INMATE RAYA:  Yes.

27      PRESIDING COMMISSIONER SHELTON:  How old are

15

1  your children?

2       INMATE RAYA:  25 and 26.

3       PRESIDING COMMISSIONER SHELTON:  Are you

4  still in contact with them?

5       INMATE RAYA:  Yes.

6       PRESIDING COMMISSIONER SHELTON:  Where do

7  they live?

8       INMATE RAYA: In (indiscernible).

9       PRESIDING COMMISSIONER SHELTON:  And so how

10  long were you together?

11       INMATE RAYA:  Quite a few years.

12       PRESIDING COMMISSIONER SHELTON:  Okay.

13  You've not been ever in the military.

14       INMATE RAYA:  (Indiscernible.)

15       PRESIDING COMMISSIONER SHELTON:  What kind of

16  employment history did you have before you were

17  arrested?

18       INMATE RAYA:  Harvesting fruits, all kinds of

19  fruits.

20       PRESIDING COMMISSIONER SHELTON:  Did you ever

21  get married again or have any other children?

22       INMATE RAYA:  No.

23       PRESIDING COMMISSIONER SHELTON:  You just

24  have two children.

25       INMATE RAYA:  Yes.

26       PRESIDING COMMISSIONER SHELTON:  Who else

27  comes and visits you here, sir?

16

1     INMATE RAYA:  I have not received any visits
2  from anybody.

3     PRESIDING COMMISSIONER SHELTON:  Who do you
4  write to?

5     INMATE RAYA:  My sisters, my friends, my
6  children.

7     PRESIDING COMMISSIONER SHELTON:  And most of
8  them live in Mexico?

9     INMATE RAYA:  (Indiscernible.)

10     PRESIDING COMMISSIONER SHELTON:  You have no
11  family or friends here in California?

12     INMATE RAYA:  (Indiscernible) no family like
13  (indiscernible).

14     PRESIDING COMMISSIONER SHELTON:  You've been
15  incarcerated for 22 years.

16     INMATE RAYA:  Yes.

17     PRESIDING COMMISSIONER SHELTON:  Why have you
18  not learned to speak English?

19     INMATE RAYA:  I speak a little English
20  (indiscernible), that's why I'm not speaking to
21  you in English.

22     PRESIDING COMMISSIONER SHELTON:  I would
23  think that it would be very difficult for you to
24  do programming and all of that that you need to do
25  without learning English.

26     INMATE RAYA:  I was programmed here, I don't
27  speak quite English.  I understand what I'm

17

1   reading.  I don't have too much communication with

2   people I'm working with.  I know (indiscernible)

3   reading.

4       PRESIDING COMMISSIONER SHELTON:  Do you

5   understand English when you read a book, when you

6   read it?

7       INMATE RAYA:  Most of it I can understand.

8       PRESIDING COMMISSIONER SHELTON:  Mr. Raya, is

9   there anything you wanted to add about your social

10  history that's not on the record?

11      INMATE RAYA:  No.

12      PRESIDING COMMISSIONER SHELTON:  We've

13  covered everything comfortable?

14      INMATE RAYA:  Yes.

15      PRESIDING COMMISSIONER SHELTON:  All right.

16  Thank you.  We're going to Commissioner Blonien,

17  and she's going to go over your post-conviction

18  factors.

19      DEPUTY COMMISSIONER BLONIEN:  Mr. Raya, this

20  is your tenth subsequent hearing.  And you last

21  appeared before the Board on March 17th of '05,

22  and the decision was for a one year denial, and

23  the panel recommended that you continue to get

24  self-help, that you stay disciplinary free, that

25  you earn positive chronos and try to take your

26  GED.  You're (indiscernible) medium A, your

27  classification score is 19.  Sir, in order to do

18

1  this report, I read your C file, I've read the

2  Board report, I read the counselor's report, by

3  Counselor Arno, A-r-n-o, dated June 13th of this

4  year, and the psych report by Dr. Reed dated 2/11

5  of '05. And I see that you did an Olson review of

6  your C file on May 25th, '06, and you didn't need

7  a Spanish interpreter to do that. You were able

8  to read on your own; is that correct?

9      INMATE RAYA:  Yes.

10      DEPUTY COMMISSIONER BLONIEN:  And you went

11 through everything?

12      INMATE RAYA:  Yes.

13      DEPUTY COMMISSIONER BLONIEN:  And have you --

14 did you take your GED again, did you try that?

15      INMATE RAYA:  No.

16      DEPUTY COMMISSIONER BLONIEN:  Why?

17      INMATE RAYA:  I been working.

18      DEPUTY COMMISSIONER BLONIEN:  Day and night?

19      INMATE RAYA:  No day and night

20 (indiscernible).

21      DEPUTY COMMISSIONER BLONIEN:  I just saw a

22 few of the scores that you achieved, and it seemed

23 like you were awfully close. And you talked to

24 the last panel extensively about the GED and they

25 recommended that you give it a try. And I know

26 that you can sign up to take the test and they can

27 give it when you're not at work. Did you know

19

1  that?

2      **INMATE RAYA:**  I know I can take it.  It's not

3  easy for them to come (indiscernible) at night,

4  there's (indiscernible).

5      **DEPUTY COMMISSIONER BLONIEN:**  So are you on

6  the waiting list to take your GED?

7      **INMATE RAYA:**  (Indiscernible.)

8      **DEPUTY COMMISSIONER BLONIEN:**  You've been

9  always waiting?

10     **INMATE RAYA:**  It's not easy to get in.

11     **DEPUTY COMMISSIONER BLONIEN:**  Okay.  But

12  there is a waiting list and I know it's not easy,

13  but if your name is on the waiting list, they will

14  call you and it should take only about a year for

15  you to be able to take it.  That doesn't mean you

16  pass it, but it means that you tried to take it,

17  and I think you have a good chance of passing

18  that.

19     **INMATE RAYA:**  The last time I took the class,

20  so I had from the (indiscernible) more than 41

21  points, 47 points.  He was going to give me the

22  GED.  I know that (indiscernible) 47, okay,

23  (indiscernible).

24     **DEPUTY COMMISSIONER BLONIEN:**  Because 47's

25  very close.

26     **INMATE RAYA:**  Do it again because he knew I

27  could get a better score.

20

1      DEPUTY COMMISSIONER BLONIEN:  I think you can

2  get a better score.  I can just see what a good

3  worker you are and all the different jobs you've

4  accomplished and the employability skills and

5  training that you've accomplished, that you're

6  doing very well, and the GED would be a nice

7  accomplishment for you.  So keep that in mind and

8  look for the waiting list to try to take it again.

9   Not take the classes again, you don't need to do

10  that.  Review some of the books and just take the

11  test.

12      INMATE RAYA:  I want to do that stuff.

13      DEPUTY COMMISSIONER BLONIEN:  Okay.  In

14  talking about -- I'm just supposed to talk about

15  what you've done since your last hearing.  You're

16  very consistent.  You go to AA and you've been

17  involved in AA since 1990, and we talked about

18  your commitment offense, your drinking problem was

19  extremely serious, and there's not one bit of

20  evidence that you've had a drink since you've been

21  in the institution; is that true?

22      INMATE RAYA:  Correct.

23      DEPUTY COMMISSIONER BLONIEN:  And have you

24  gone to AA in Spanish?

25      INMATE RAYA:  I be going to English and

26  Spanish.

27      DEPUTY COMMISSIONER BLONIEN:  And you have

21

1  the book in English and Spanish, the AA book?

2       INMATE RAYA:  Yes.

3       DEPUTY COMMISSIONER BLONIEN:  And have you

4  worked through the steps?

5       INMATE RAYA:  Yes.

6       DEPUTY COMMISSIONER BLONIEN:  And is there

7  one step in particular that you think will help

8  you stay sober if you're released into the

9  community?

10      INMATE RAYA:  I (indiscernible) number eight,

11 number eight the one that (indiscernible) the

12 most.  (Indiscernible) want to learn from us the

13 (indiscernible).

14      DEPUTY COMMISSIONER BLONIEN:  You have made a

15 list of those people?

16      INMATE RAYA:  Made many lists.  I have always

17 (indiscernible) asking for (indiscernible) people.

18      DEPUTY COMMISSIONER BLONIEN:  Sir, you didn't

19 know the victim of your crime, did you?

20      INMATE RAYA:  I never seen him before.

21      DEPUTY COMMISSIONER BLONIEN:  And you didn't

22 know his family?

23      INMATE RAYA:  No.

24      DEPUTY COMMISSIONER BLONIEN:  As you went

25 through the court process, did any of his family

26 testify at sentencing?

27      INMATE RAYA:  Yes.

22

1      DEPUTY COMMISSIONER BLONIEN:  And have you

2  written them a letter about how you feel about

3  this crime?

4      INMATE RAYA:  I never got that list for the -

5  -

6      DEPUTY COMMISSIONER BLONIEN:  There is a way

7  that you can try and contact the victims, and it's

8  through the district attorney's office.  And the

9  district attorney has a special office that may

10  have information on the victim, and then they

11  contact the family, and they ask if they want to

12  receive a letter or not.  And sometimes they say

13  no.  They don't want to.  And sometimes they say

14  yes, but the (indiscernible) for you, is that you

15  get to express your thoughts on paper because I

16  think you feel a lot of remorse for what happened.

17      INMATE RAYA:  If law school gives me address,

18  I'll be pleased.

19      DEPUTY COMMISSIONER BLONIEN:  You do that

20  through the Fresno District Attorney's office, ask

21  them if they can forward the letter.  And again,

22  the answer may be no.

23      DEPUTY DISTRICT ATTORNEY POLACEK:  Can I

24  interrupt?

25      DEPUTY COMMISSIONER BLONIEN:  Yes.

26      DEPUTY DISTRICT ATTORNEY POLACEK:  I think in

27  most counties in the state, the Victim Services is

23

1  part of the district attorney's office.  In

2  Fresno, it's part of the probation department.

3       **DEPUTY COMMISSIONER BLONIEN:**  Oh.

4       **DEPUTY DISTRICT ATTORNEY POLACEK:**  And there

5  is a section of the probation department that is

6  called victim services.

7       **DEPUTY COMMISSIONER BLONIEN:**  Okay.

8       **DEPUTY DISTRICT ATTORNEY POLACEK:**  And so I

9  just wanted to clarify that.

10      **DEPUTY COMMISSIONER BLONIEN:**  That's good,

11 thank you.  Did you understand that?  I told you

12 wrong.

13      **INMATE RAYA:**  If I could get that address of

14 family, I'd be more than happy to write.

15      **DEPUTY COMMISSIONER BLONIEN:**  Okay.  And you

16 get the address maybe through the probation

17 department, not the district attorney.  In Fresno,

18 it's the probation office.  No, they will -- ..

19      **INMATE RAYA:**  Forward down a letter.

20      **DEPUTY COMMISSIONER BLONIEN:**  Right.

21      **PRESIDING COMMISSIONER SHELTON:**  What you

22 need to do is you need to write to the Fresno

23 County Probation Department.

24      **DEPUTY DISTRICT ATTORNEY POLACEK:**  Victim

25 Services Unit.

26      **PRESIDING COMMISSIONER SHELTON:**  Victim

27 Services Unit and it'll be part of your record if

1  you refer to it.  This is if you're interested in

2  writing a letter to the victim family.  They'll

3  send it on to them, not directly to the victim's

4  family.  You can't get their home address.

5      **DEPUTY COMMISSIONER BLONIEN:**  I'm sorry that

6  I confused you.  If you could write a letter, what

7  would you tell the family of the victim?

8      **INMATE RAYA:**  They, I would ask forgiveness,

9  because I knew I took away a member of their

10  family, if I can get address of their children

11  (indiscernible), like so a little girl that went

12  when I was going to court, if I could get their

13  address (indiscernible) I would be asking

14  forgiveness.  I know that I took away their

15  (indiscernible).  I know that they might be

16  suffering.  (Indiscernible) a lot of Mexicans

17  (indiscernible) for my father.  I think

18  (indiscernible) forever because I know I

19  (indiscernible).  I would do (indiscernible).

20      **DEPUTY COMMISSIONER BLONIEN:**  Okay.  You --

21  I've done your hearing before, a couple of years

22  ago, I remember.  We talked about you had five

23  128s and only one 115 way back in 1989.  But

24  you've had some of the five 128s, you had a couple

25  for stealing for -- I think I remember you didn't

26  even know you had to, is that right?  Am I

27  remembering right?  Five all together.  Two for

25

1  stealing food and two 002.

2       **INMATE RAYA:**  Oh, I knew that I received one

3  chrono for stealing one danish roll.

4       **DEPUTY COMMISSIONER BLONIEN:**  Right.  And

5  then there was one for tater tots.

6       **INMATE RAYA:**  I didn't know I receive that,

7  it was there.

8       **DEPUTY COMMISSIONER BLONIEN:**  But when he did

9  his C5, his Olson review, did he see it?

10      **INMATE RAYA:**  Yeah, but I couldn't do

11 anything about it anymore, because a lady there

12 suggested to me why I didn't ask for a

13 (indiscernible).  A year later.

14      **DEPUTY COMMISSIONER BLONIEN:**  Okay.  Do you

15 remember getting caught with state food that you

16 shouldn't have had in your pocket?

17      **INMATE RAYA:**  I had it in my pocket.  It was

18 on a plate and somebody left it there.  The

19 officer that gave the 128, (indiscernible).

20      **DEPUTY COMMISSIONER BLONIEN:**  Oh, okay.

21 You're a very good worker.  You work at the PIA

22 factory, and your job is -- are you a furniture

23 finisher now?  You're in upholstery?

24      **INMATE RAYA:**  Upholstery.

25      **DEPUTY COMMISSIONER BLONIEN:**  And what's your

26 pay number?

27      **INMATE RAYA:**  65 cents.

26

1      DEPUTY COMMISSIONER BLONIEN:  So it's almost

2 at the top.

3      INMATE RAYA:  I don't consider myself top

4 because (indiscernible).

5      DEPUTY COMMISSIONER BLONIEN:  And what else

6 do you do?  Do you read self-help books?

7      INMATE RAYA:  Yes.

8      DEPUTY COMMISSIONER BLONIEN:  What do you

9 read?

10      INMATE RAYA:  Especially about AA.

11      DEPUTY COMMISSIONER BLONIEN:  And anything

12 else that you're doing that you want to tell me

13 about?

14      INMATE RAYA:  The only thing that I do is

15 sometimes practice typing.

16      DEPUTY COMMISSIONER BLONIEN:  And what's the

17 goal of practicing typing?

18      INMATE RAYA:  I always been interested in

19 typing, because I know it's something that helps,

20 and a year when I go out (indiscernible).

21      DEPUTY COMMISSIONER BLONIEN:  I know you can

22 read in English very well.  Can you write in

23 English very well?

24      INMATE RAYA:  Yes.  I can write all the

25 English I can speak.

26      DEPUTY COMMISSIONER BLONIEN:  Very good.  I

27 was looking at your psych report by Dr. Reed and

1   he notes that under current diagnostic impressions

2   that your alcohol abuse is in a sustained full

3   remission in a controlled environment by history

4   only, that you have no contributory personality

5   disorder or mental illness, that you have no

6   physical disorder.  You're very healthy; is that

7   right?

8        INMATE RAYA:  I feel healthy.

9        DEPUTY COMMISSIONER BLONIEN:  And he states

10  that -- now once you did receive a 115 in 1989 for

11  force and violence; however, this involved in a

12  possible fight with another inmate with no major

13  injury, that you also received a number of minor

14  128 chronos, that you have no previous juvenile

15  criminal history, you have no history of gang

16  involvement.  You do not have a pattern of

17  increasing violent behavior.  You're a first

18  termer and the incident of your commitment offense

19  is your entire criminal history.  That you have

20  worked, that you appear to have matured greatly

21  during your incarceration within CDC, and

22  successfully completed a number of self-help

23  groups.  You completed over 15 years of Alcoholic

24  Anonymous, and now I see, you're also attending

25  Narcotics Anonymous, correct?

26       INMATE RAYA:  Yes.

27       DEPUTY COMMISSIONER BLONIEN:  That in

28

1  addition to the psychological interview, two

2  psychological assessments were completed, and

3  results from the one test suggests a low risk of

4  violence, comparable to the inmate population,

5  both within a controlled setting and within the

6  community, and the name of that test was the HCR-

7  20, and that the results from the Harris

8  Psychopathic Test, the short version, do not

9  suggest the presence of any socialpathy.

10 Therefore, in Dr. Reed's opinion in light of these

11 factors, your violence potential is considered to

12 be significantly below that of the average inmate,

13 and if released to the community, clinically

14 assessed, his violence potential is considered to

15 be no more than the average citizen.  That you're

16 confident, responsible.  You have the capacity to

17 abide by institutional standards, that you don't

18 have any mental health disorders, and that you do

19 have the significant alcohol abuse history;

20 however, his 20 years of continued abstinence at

21 15 years of continuous participation in AA and NA

22 groups, strongly suggest complete remission of his

23 condition.  So is there anything else you want to

24 tell me before I return to the chair?

25        **INMATE RAYA:**  No.

26        **DEPUTY COMMISSIONER BLONIEN:**  Okay.

27        **PRESIDING COMMISSIONER SHELTON:**  All right,

29

1 sir. Let's talk about your parole plans. Now we

2 understand, we talked about the fact that you have

3 an INS hole, and you have no family, so to speak

4 here in California or the United States.

5      INMATE RAYA:  I don't have anybody.

6      PRESIDING COMMISSIONER SHELTON:  So I am

7 assuming that you want to go back to Mexico.

8      INMATE RAYA:  Yes.

9      PRESIDING COMMISSIONER SHELTON:  If you were

10 deported back to Mexico, would you try to come

11 back to the United States again?

12      INMATE RAYA:  No, by no means.

13      PRESIDING COMMISSIONER SHELTON:  It says here

14 that you want to live with your parents.  Back

15 down there on the ranch.

16      INMATE RAYA:  That's where my friends are.

17      PRESIDING COMMISSIONER SHELTON:  Does your

18 family still do the cattle ranching?

19      INMATE RAYA:  Yes, they have all the time.

20      PRESIDING COMMISSIONER SHELTON:  What would

21 you do to work?

22      INMATE RAYA:  Help my sister (indiscernible).

23 I think I can pick up some work there in a

24 machine shop, that's why I have learned welding.

25      PRESIDING COMMISSIONER SHELTON:  So what if

26 you go there and your family wants you to work on

27 the ranch instead?

30

1      **INMATE RAYA:**  I can do both things because
2  the (indiscernible) are next to each other.   I
3  could do both.
4  (End of tape 1, side A.)
5      **DEPUTY COMMISSIONER BLONIEN:**  Okay.  We're
6  back on record, side two.
7      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Thank
8  you.  Do you have some letters you wanted to give
9  me in regards to your parole plans?
10     **INMATE RAYA:**  I do not (indiscernible).
11     **PRESIDING COMMISSIONER SHELTON:**  Are they
12  translated into English?
13     **INMATE RAYA:**  They're in Spanish all four.
14     **PRESIDING COMMISSIONER SHELTON:**  They're all
15  in Spanish?  And I know I'm trying to learn
16  Spanish, but I'm not that good in Spanish yet.
17  Why don't I see them and (indiscernible).  You
18  know you will have to get those translated.
19  You'll have to get these letters translated.
20     **INTERPRETER:**  He's asking me if I could read
21  them.
22     **PRESIDING COMMISSIONER SHELTON:**  You still
23  have to get them translated in writing.  I'm just
24  going to take a quick look.  Christina is your
25  sister?
26     **INMATE RAYA:**  Yes.
27     **PRESIDING COMMISSIONER SHELTON:**  And she's

31

1  the one that's going to offer you, what a place to
2  live (indiscernible).

3      INMATE RAYA:  Yes.

4      PRESIDING COMMISSIONER SHELTON:  Mr. Ugalde,
5  if you'd just take a second to review these, read
6  to me and let me know if they verify residence.

7      INTERPRETER:  Yes.

8      PRESIDING COMMISSIONER SHELTON:  Or
9  employment, or if they're just -- not just, but if
10  they are a support letter.  That one first is from
11  his sister.

12      INTERPRETER:  Okay.  She says that I could
13  see Raya responsible, but my brother doesn't
14  (indiscernible) and the day that he gets out of
15  prison, I could help him find lodging, all that he
16  needs.  He could open some business with my
17  brother, he has a metal shop as a welder, and I
18  could help him with the money that he needs so he
19  could start work immediately helping
20  (indiscernible) family.

21      PRESIDING COMMISSIONER SHELTON:  Okay.  So
22  that's like a financial support.  What does your
23  sister do for a living, sir?

24      INMATE RAYA:  She sells (indiscernible),
25  shoes.  Also she helps people in (indiscernible).

26      PRESIDING COMMISSIONER SHELTON:  Elana
27  Rodriguez.

32

1          INMATE RAYA:  My mom.

2          PRESIDING COMMISSIONER SHELTON:  Your mom.

3    Okay.  This is a letter from Mom.

4          INTERPRETER:  My son, Raya is honest man,

5    hard worker, and good (indiscernible).  He has

6    helped us very much in his work in the field

7    (indiscernible) house for whatever he gets out of

8    prison, he could live along with us.  There's no

9    problem with (indiscernible).  He will be

10   (indiscernible).

11         PRESIDING COMMISSIONER SHELTON:  And this

12   looks like another letter from Elana Rodriguez and

13   Roberto, so this would be a second letter from Mom

14   and Dad.

15         INMATE RAYA:  Yes.

16         PRESIDING COMMISSIONER SHELTON:  And then

17   another letter from his sister.  So I think these

18   are duplicate letters.

19         INMATE RAYA:  Oh, in one of these letters,

20   his son also offers that he can help him.

21         PRESIDING COMMISSIONER SHELTON:  Okay.  What

22   I would like for you to do, sir, when you bring

23   letters of support in, if you don't get a date

24   today and you have another hearing, the letters

25   need to be translated ahead of time.

26         INMATE RAYA:  I'll translate it in person.

27         PRESIDING COMMISSIONER SHELTON:  Okay.  You

33

1  need to write that down for us.  Okay?  So you

2  have obviously a place to live in Mexico and you

3  have the offer to work at your family ranch, and

4  it sounds like you've been talking with your

5  sister about opening up your own small engine

6  business down there.

7      INMATE RAYA:  Yes.

8      PRESIDING COMMISSIONER SHELTON:  I would

9  assume that you would know when you got down

10 there, it would probably take a while to open up a

11 business, take a little time.

12     INMATE RAYA:  In Mexico, you don't need that

13 much time.  I know I could buy a machine

14 (indiscernible).

15     PRESIDING COMMISSIONER SHELTON:  You're

16 probably right, sir.  Okay.  Is there anything

17 that you would like to add with regards to parole

18 plans?

19     INMATE RAYA:  That's all I have, what's in

20 the letters, and I know if I leave (indiscernible)

21 work.

22     PRESIDING COMMISSIONER SHELTON:  All right.

23 We're at the portion of our hearing where we would

24 ask you questions, means the Commissioner and I

25 can ask you questions, as can both attorneys.

26 I've been asking questions you all along, so I

27 don't think I have anymore.  Commissioner, do you

34

1  have any questions?

2      DEPUTY COMMISSIONER BLONIEN:  No, I just did

3  want to put on the record that he does have a

4  welding certificate.  He earned one while he was

5  here at the institute in 2002.

6      PRESIDING COMMISSIONER SHELTON:  That's

7  vocational welding?  Okay.

8      DEPUTY COMMISSIONER BLONIEN:  That's all I

9  have.

10      PRESIDING COMMISSIONER SHELTON:  Okay.  Mr.

11  Polacek, do you have any questions?

12      DEPUTY DISTRICT ATTORNEY POLACEK:  Just a

13  couple.  With respect to his release plan, there's

14  been reference to this ranch.  I'm curious, how

15  big is this ranch and is he knows the word acres

16  and knows what that means.

17      INMATE RAYA:  In the area that I live, there

18  are enough acres, it's about 60.

19      DEPUTY DISTRICT ATTORNEY POLACEK:  6-0, 60?

20      INMATE RAYA:  Yes.

21      DEPUTY DISTRICT ATTORNEY POLACEK:  And I

22  don't mean to be insensitive on this, but if -- I

23  hope his parents are alive and well and leading

24  happy, healthy and productive lives, but in the

25  next -- by my calculations, his father would be 81

26  now and his mother would be 74, according to some

27  paperwork in here.  My question would be, God

35

1 forbid they should pass away within the next year

2 or two, what happens to the ranch?

3     INMATE RAYA:  The youngest brother, my

4 youngest brother (indiscernible).

5     PRESIDING COMMISSIONER SHELTON:  Does he work

6 the ranch, too?

7     INMATE RAYA:  Yes, he also works the ranch.

8     PRESIDING COMMISSIONER SHELTON:  So if like

9 the DA said something should happen to your folks,

10 and we certainly don't want anything to happen to

11 them, before you got there, there would still be a

12 spot for you, your brother would fit you in?

13     INMATE RAYA:  Oh, yes.  Yes.

14     DEPUTY DISTRICT ATTORNEY POLACEK:  And you've

15 answered the question that there's a place there.

16  And he may want to solicit a letter from the

17 inheritor of the ranch, which may not happen for

18 20 or 30 years, but --

19     PRESIDING COMMISSIONER SHELTON:  Perhaps a

20 recommendation from --

21     DEPUTY DISTRICT ATTORNEY POLACEK:  Yeah, and

22 I don't have any other questions.

23     PRESIDING COMMISSIONER SHELTON:  All right.

24 Mr. Ferguson, do you have any questions?

25     MR. FERGUSON:  Yes.  Mr. Raya, do you know if

26 there are any AA type of programs in Mexico in the

27 Guatamato (phon.) area where you'll be returning

36

1  to?

2      **INMATE RAYA:** Yes. Nearby where I live,

3  there are places where I could attend to AA. I

4  couldn't (indiscernible).

5      **MR. FERGUSON:** Thank you. That's the only

6  question I have.

7      **PRESIDING COMMISSIONER SHELTON:** Okay. We

8  are going to move into closing statements now,

9  sir. And first, Mr. Polacek will speak and Mr.

10 Ferguson, and then you will have an opportunity to

11 give an opening statement, if you like. Mr.

12 Polacek.

13      **DEPUTY DISTRICT ATTORNEY POLACEK:** Thank you.

14  Regarding the facts of this case, I didn't think

15 it'd be productive to ask Mr. Raya about that.

16 There's clearly two different versions of how the

17 crime occurred. One, is that he was insulted,

18 went out to the car and retrieved a .38 caliber

19 and came back in and shot the victim. The other

20 is, what he is saying today, which according to

21 the appellate opinion is what he testified to at

22 the trial, that no, he was carrying it with him,

23 and he was insulted and immediately fired at him.

24  From a tactical standpoint at a trial, that would

25 be a basis for self-defense, complete self-

26 defense, or the honest, but unreasonable belief in

27 the need for self-defense, which gives him a

37

1  manslaughter, neither of those panned out for him,

2  and it's a second degree murder.  But I believe --

3  anyway, the -- I didn't see much point in going

4  into that.  He's been saying the same thing since

5  his trial 22 years ago, anyway.  People are

6  opposed still for his relief.  This offense was

7  carried out in a manner demonstrating an

8  exceptionally callous disregard for human

9  suffering, and I am saying that based on the

10  version that I believe the jury found, that he

11  went out to the car and retrieved the gun and just

12  came back in and shot the victim.  The motive for

13  the crime is inexplicable or trivial, and it would

14  appear that it was a matter his pride was

15  offended, how dare somebody speak to him this way.

16  And that seems to be the only motivation for

17  this.  He did have the opportunity to simply

18  leave.  He was outside at his car, could have just

19  driven away, chose not to, retrieved the gun and

20  went back in and shot the victim.  Additionally,

21  inside the bar, there were other patrons that

22  could have been shot, could have been injured but

23  were not.  Mr. Raya has an unstable social

24  history, beginning at -- well, at age 13, he

25  entered the United States illegally and I believe,

26  has done so two or three times or more during his

27  lifetime.  I don't believe his plans for release

38

 1 are firmed up well enough for release at this

 2 time.  He doesn't have an actual job lined up, and

 3 I don't know that he will ever be able to have an

 4 actual job lined up.  With respect to his

 5 education, I'm -- when he first came here, his

 6 grade -- came to -- was committed to prison, his

 7 grade level was very poor.  And when I went

 8 through this chronologically, it seemed in the

 9 first few years, he sky rocketed and did

10 exceptionally well, to where his grade level was

11 around grade ten in most subjects.  And it just

12 seemed like he did really well.  And when I went -

13 - continued to go through this chronologically, I

14 saw that he didn't do anything with that.

15 Throughout his prison stay, the Board has given

16 him generic, you know, upgrade vocationally and

17 educationally, but for the four, maybe four times,

18 the Board has specifically said, not just upgrade

19 educationally, but specifically said, get a GED,

20 get a GED.  And by my reading of the reports in

21 here, plus based on what he told us today, he not

22 only hasn't done anything educationally, he hasn't

23 even tried to take the test.  I don't know if that

24 amounts to him just thumbing his nose at the Board

25 at their telling him to get a GED, but he has

26 clearly not followed the directions of the Board

27 that he needs to do that, and not just last year.

39

1   It was -- it's been I think since '02 perhaps,

2   every single time, has been told to do that.   In

3   any event, the people are opposed to release at

4   this time.   Thank you.

5        PRESIDING COMMISSIONER SHELTON:   Thank you.

6   Mr. Ferguson.

7        MR. FERGUSON:   Yes.   With regard to the GED

8   issue, I think if I could stand inside Mr. Raya's

9   shoes for a moment, I could only perceive this as

10  a complete exercise in what's the point.   He's

11  going to go back to Mexico, a GED is going to be

12  completely meaningless to him.   He has made

13  certain efforts at securing his GED.   He's

14  explained what those efforts were.   He's done

15  everything else that's been asked of him by the

16  Board, short of accomplishing a GED, but it hasn't

17  happened, but I'm not sure what would be

18  accomplished by him obtaining a GED, given the

19  point he's going back and live in Mexico and be

20  with his family, where a GED is completely

21  meaningless.   But in any event, as far as the

22  crime itself, my interpretation of everything

23  that's in the file, is that this was an extremely

24  unfortunate event that was in extremely a large

25  part attributable to somebody who was a raging

26  alcoholic at the time.   Mr. Raya had started

27  drinking at about ten or eleven years old, and at

40

1   the time of this crime, it sounds like he had

2   consumed in the order of 15 or 17 beers in the

3   course of the day, and his judgment was clearly

4   out the window.  This confrontation occurred, and

5   he was not in his right mind obviously, extremely

6   inebriated.  And in that regard, the record's

7   clear that he's lived 20 years now of abstinence.

8    He's put that behind him.  As the Deputy

9   Commissioner pointed out, the psychologist has

10  indicated that that issue is in complete

11  remission.  He has -- it doesn't seem to me like

12  he probably even has any cravings any longer.  So

13  he's moved past that.  He's completely dedicated

14  himself to AA.  He's been a participant on a

15  regular and continuous basis.  He knows that that

16  is not something he can participate in, and he has

17  the intention of continuing that program when he

18  gets back to Mexico, and he knows how to go about

19  that.  Now, with regard to the psychological

20  report, it endorses release.  It indicates that if

21  he's released to the community, his violence

22  potential is considered to be no more than the

23  average citizen in the community.  Mr. Raya has

24  had no violence whatsoever -- or excuse me.  He

25  had a 115 back in 1989, which involved a fight,

26  but there wasn't any serious injury that occurred

27  to anybody.  And that's the one isolated event

1  that involved any kind of physical altercation in

2  the entire almost 22 years in custody that he's

3  experienced.  Mr. Raya has resources in Mexico,

4  both his parents where he can return to the ranch

5  and work.  He's convinced me that he's somebody

6  who wants to go out there and be productive.  He's

7  got an excellent job reviews from his supervisors,

8  and he's clearly a motivated worker.  That's what

9  he wants to do.  He wants to return and be

10  productive again.  His parents have the resources

11  to assist him in accomplishing a successful

12  release back into society, and to retain him in

13  custody in the United States, where we all as

14  taxpayers are paying for him to be locked up here

15  makes no sense to me whatsoever.  Mr. Raya is

16  suitable for parole, and we urge this Board to

17  find that.  Thank you.

18      **PRESIDING COMMISSIONER SHELTON:**  Mr. Raya,

19  would you like to make a closing statement?

20      **INMATE RAYA:**  No.

21      **PRESIDING COMMISSIONER SHELTON:**  No?  Okay.

22  You don't have to.  We will recess for

23  deliberations and then we'll get you back here

24  shortly.

25                    R E C E S S

26                   --oo0oo--

27

42

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3        DEPUTY COMMISSIONER BLONIEN:  We are on

4   record.

5        PRESIDING COMMISSIONER SHELTON:  All right.

6   And welcome back, everyone.  We're back in the

7   tenth parole consideration hearing with Abel Raya,

8   R-a-y-a, CDC Number C99451.  Everyone has returned

9   to the room that was here during the hearing.  Mr.

10  Raya, the panel has reviewed all the information

11  received and we've relied on the following

12  circumstances in concluding that you are not yet

13  suitable for parole, and would pose an

14  unreasonable risk of being a danger to society, or

15  a threat to public safety if released.  Mr. Raya,

16  we both really liked you.  You're moving in the

17  right direction.  You've been here for 22 years.

18  We're giving you a one year denial.  We're going

19  to be specific why.  Because we think you need to

20  be going home, too.  The problem is, sir, to be

21  perfectly frank, is that your file doesn't show

22  it, your presentation doesn't show it, you kind of

23  need to practice, think about parole, think about

24  what you want to do, and we're going to give you

25  some (indiscernible), okay?

26       INMATE RAYA:  Okay.

27  ABEL RAYA C-99451    DECISION PAGE 1    9/26/06

43

1        PRESIDING COMMISSIONER SHELTON:  First of

2    all, you have to talk about the commitment

3    offense.  By your own admission, you indicated

4    that offense was committed, one, you were under

5    the influence of alcohol; two, basically you got

6    your feathers ruffled; it was your pride got

7    involved and didn't like being insulted, didn't

8    want somebody to tell you not to dance with a girl

9    and you didn't want to, and we talked about that.

10   You indicated that you thought you were operating

11   in self-defense, unfortunately it went to a court

12   hearing and an appellate hearing, and all of that,

13   and still came out with murder.  So the offense

14   was carried out in a cruel and callous manner,

15   which showed not much regard for human life, and

16   the motive is very, very trivial and inexplicable,

17   kind of follow and understand why that whole

18   situation even happened in the first place.  We

19   reviewed the statement that came from the

20   appellate court ruling on pages two and three,

21   whereby you had been drinking during the day,

22   you'd gone into a bar, your victim, Mr. Sanchez,

23   approached you and wanted you to leave, he'd been

24   drinking, and he'd been considered a bully, you

25   thought he had a gun, you carried a gun evidently.

26   The record indicates that you left the building

27   **ABEL RAYA C-99451    DECISION PAGE 2      9/26/06**

44

1  to go to your car to get a gun, but you've

2  insisted all along, that you had the gun on your

3  person at the time and you ended up shooting him.

4   You have no prior record, which is to your

5  advantage, okay.  That's a good thing.  We don't

6  know much about your life other than the fact that

7  you indicated to us you started drinking at a very

8  early age.  You admitted that you were an

9  alcoholic.  Alcohol played a part in this crime.

10 With regards to your institutional behavior, Mr.

11 Raya, that's where we come into some stumbling

12 blocks.  You've done a lot of good things, but

13 there are still some things that you could do to

14 better your case with the parole board.  First of

15 all, you received one 115 in 1989, you've received

16 a total of five 128As, two of them were in 2002,

17 for stealing food.  And do not get anymore 128s,

18 and no more 115s, okay?

19     **INMATE RAYA:**  All right.

20     **PRESIDING COMMISSIONER SHELTON:**  Keep it

21 clean, we'll put some distance between you and

22 these disciplinaries.  As well, sir, other than

23 your AA, we couldn't find any self-help

24 programming.  So you need to participate in self-

25 help programming and will help you understand why

26 you did what you did.  And I think if there's an

27 **ABEL RAYA C-99451   DECISION PAGE 3      9/26/06**

45

1 anger management, stress management, have you

2 taken any of those kinds of classes?

3      INMATE RAYA:  (Indiscernible.)

4      PRESIDING COMMISSIONER SHELTON:  I know that

5 you can read English, but this is what we're going

6 to -- well, I'll get into the recommendations in a

7 second, but I want you to start thinking about

8 what books you can read, that can teach you how to

9 control your temper, to not be insulted or

10 offended by what people say.  That's what happened

11 that day that landed you here.  We want you to go

12 home, too, so you've got to do some things to show

13 us that you're not going to go shoot somebody

14 again.

15      INMATE RAYA:  (Indiscernible.)

16      PRESIDING COMMISSIONER SHELTON:  Let me ask

17 you a question.  When you get a parole date and

18 you're going to go home and go to the ranch,

19 you're going to be in a position to carry a gun

20 again.  You know that, I know that.  I want to

21 know that you're not going to use it again.  I

22 want to know that you've learned something about

23 what you did, so we're going to ask you that.  And

24 I'm going to give you some more hints on that in a

25 minute.  The psychological report was written by

26 Dr. Reed in February 2005.  It was a pretty

27 **ABEL RAYA C-99451    DECISION PAGE 4    9/26/06**

46

1  positive report for you.  But since we're giving

2  you one more year denial, we're also going to

3  recommend a brand new psychological evaluation for

4  you so it will be current at your next hearing,

5  okay.

6       INMATE RAYA:  Okay.

7       PRESIDING COMMISSIONER SHELTON:  With regards

8  to your parole plans, they look pretty good to us,

9  based on the fact that you would be deported,

10  that's good to get deported, and I'm assumign

11  that's most likely will be the case, and

12  unfortunately, INS information is one of my weak

13  points, and it changes all the time.  We do have

14  letters from your family indicating that you have

15  a place to live and places to work, so that's

16  good.  What you need to do though is this, at your

17  next hearing, bring new letters from your family.

18  They need to be translated, but you can't do it.

19  They need to be translated by somebody that is a

20  neutral party, somebody that, you know, like a

21  counselor here.  Okay?  You've got counselors that

22  can speak Spanish, right?

23       INMATE RAYA:  Personal where I am

24  (indiscernible).

25       PRESIDING COMMISSIONER SHELTON:  Okay.  You

26  have a year to find somebody.

27  **ABEL RAYA C-99451    DECISION PAGE 5    9/26/06**

47

1       MR. FERGUSON:  In the alternative, I've seen

2   letters that are translated and notarized from

3   Mexico.

4       PRESIDING COMMISSIONER SHELTON:  That's just

5   as good.  That's just as good.

6       MR. FERGUSON:  So that they arrive both in

7   Spanish.

8       PRESIDING COMMISSIONER SHELTON:  That would

9   be good.  Okay?  As well as if your family can

10  send you an AA information about where you might

11  be attending classes, that would make your parole

12  plans stronger as well.  We sent out 3042 notices,

13  and letters that go out to agencies that have an

14  interest in your case, and that's why the Deputy

15  District Attorney is here representing Fresno.  We

16  did not receive any other responses, any other

17  letters that we sent out, so I wanted to let you

18  know that.  I want to get on the record what

19  you've been doing that's positive.  You've been

20  ivnolved in AA since 1990.  And you've been, I

21  guess, recently participating in NA as well.

22      INMATE RAYA:  Yes.

23      PRESIDING COMMISSIONER SHELTON:  You work in

24  upholstery, apparently, through the PIA work

25  factory.  You received a vocational certificate in

26  welding in 2002, and you would like to commit that

27  **ABEL RAYA C-99451    DECISION PAGE 6    9/26/06**

48

1  for your future employment, open a business in

2  Mexico.  You read English well, evidently.  You

3  practice typing.  You've been studying the AA

4  book.  And even though you've been doing that all

5  really well, I don't see anything about anger

6  management or self control or those kinds of

7  things that we talked about, okay?  I'm going to

8  give you a summary of what I would like to see you

9  do.  Number one, we're not going to make you get a

10  GED.  We agree with your attorney, that if you did

11  go to Mexico, at this point, you don't need a GED,

12  okay?

13      INMATE RAYA:  Okay.

14      PRESIDING COMMISSIONER SHELTON:  You do need

15  to read some books and write some book reports, in

16  how to deal with anger, stress, maybe some

17  interpersonal relationships, pride, not to let

18  other people get to you where you do something

19  stupid.  You can read English, I know, and you say

20  you can write English, correct?

21      INMATE RAYA:  That's true.

22      PRESIDING COMMISSIONER SHELTON:  So read some

23  books, write some book reports.  They only have to

24  be like a half a page, but what you learned,

25  because I know where you're going some day there

26  are guns.  You need to be careful how you handle

27  **ABEL RAYA C-99451    DECISION PAGE 7    9/26/06**

49

1  your temper in your life situation.  It doesn't

2  matter if it's in California or Mexico.  You need

3  to have you distance yourself from those two 128s

4  you received in 2002, update your letters like we

5  talked about, and if you can get any information

6  on where you might be attending AA groups in

7  Mexico, I think that would add to your case.  All

8  right.  Commissioner, do you have anything to add?

9      **DEPUTY COMMISSIONER BLONIEN:**  I just wanted

10 to say I was impressed how you've gone to AA so

11 long, but you know the steps, you've lived the

12 steps, and that's very good.  I wish you good

13 luck. I hope I see you next year.

14     **INMATE RAYA:**  Thank you.

15     **PRESIDING COMMISSIONER SHELTON:**  Good luck to

16 you, sir.  Keep on the track and do what we're

17 telling you to, okay?  All right.  That concludes

18 this hearing, it's 5:15 p.m.

19                    --o0o--

20

21

22

23 **PAROLE DENIED ONE YEAR**
                                    JAN **2 4** 2007
24 **THIS DECISION WILL BE FINAL ON:** _____

25 **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26 **DATE, THE DECISION IS MODIFIED.**

27 **ABEL RAYA C-99451    DECISION PAGE 8      9/26/06**

50

## CERTIFICATE AND DECLARATION

## OF TRANSCRIPIONIST

I, TAMA BRISBANE, the owner of House of

Scribes, have designated Sheila Orms, a duly

designated transcriber with House of Scribes

residing in the State of Texas, to prepare the

foregoing transcript.  With my signature, I do

hereby declare and certify, under penalty of

perjury, that I have directed her to transcribe

tape(s) that total one in number and cover a total

of 52 pages.  The recording was duly recorded at

CTF, SOLEDAD, SOLEDAD, CALIFORNIA, and the

foregoing pages constitute a true, complete and

accurate transcription of the aforementioned tape

to the best of her ability.

I hereby certify that House of Scribes and

its designated transcribers are disinterested

parties in the above-captioned matter and have no

interest in the outcome of the proceeding.

Dated October 14, 2006 in Stockton,

California.

_Tama Brisbane_

HOUSE OF SCRIBES

62

1              CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3        **DEPUTY COMMISSIONER MEJIA:**  Okay.  We're back on

4    record for our decision.

5        **PRESIDING COMMISSIONER DALY:**  Okay.  This is in

6    the matter of Abel Raya.  The Panel has reviewed all

7    of the information received from the public and

8    relied on the following circumstances in concluding

9    that the prisoner is not suitable for parole and

10   would pose an unreasonable risk of danger to society

11   or a threat to public safety if released from

12   prison.  And the offense most of all was carried out

13   in an extremely callous manner.  It was carried out

14   in a calculated manner, and that depends on which

15   version.  The prisoner absolutely had to pull his

16   gun and do the shooting, or he had to go his car and

17   retrieve the gun.  The victim was shot four times.

18   And the offense was carried out in a manner that

19   showed a total disregard for the consequences of

20   one's actions, and a total disregard for the

21   possible harm to the victim, as the prisoner fled

22   and did not try to seek medical attention or

23   anything for the victim.  And the motive for the

24   crime was very trivial in relation to the offense.

25   Even though the victim was (indiscernible).  They

26   had been in a bar.  Everybody had been drinking.  As

27   **ABEL RAYA    C-99451    DECISION PAGE 1    3/17/05**

1    soon as there was even a hint of a problem the

2    prisoner should have left.  But due to the fact that

3    he had been drinking all day and was under the

4    influence he chose to stand up to the victim and not

5    leave the bar.  And the actions resulted in a final

6    altercation between the two of them with the

7    prisoner shooting the victim four times killing him.

8    This Panel notes that the prisoner does not have a

9    prior criminal history.  And I find this really

10   remarkable considering the fact that the inmate has

11   been heavily involved in the use of alcohol on a

12   continual round the clock basis since the time he

13   was about nine or ten years of age.  He was in the

14   United States illegally doing farm labor work.  Was

15   going back into Mexico where he had a wife and two

16   children.  He was dropped out of school at an early

17   age, which this Panel understands that it was very

18   common for workers who came from Mexico to work in

19   the fields and support their families.  But his

20   unstable social history really is a result of his

21   alcoholism and heavy drinking from the age of about

22   nine or ten.  This Panel does not feel that the

23   prisoner has sufficiently participated enough

24   beneficial self-help programs.  It is recognized

25   that you've only had one 115, and that was in 1989

26   for fighting.  You've had five counseling chronos.

27   **ABEL RAYA    C-99451    DECISION PAGE 2    3/17/05**

64

1    And while this Panel recognizes the counseling

2    chronos are not really considered serious

3    discipline, what bothers this Panel was the

4    minimization of stealing or taking a sweet roll, and

5    then blaming the officer for writing you up for

6    other things. We show -- We just felt this kind of

7    went hand in hand with your insight into the

8    commitment offense. And then it would appear that

9    you just have a difficult time accepting

10   responsibility for your actions. The psychiatric

11   report dated 2/11 of '05 prepared by Dr. Joe Reed we

12   note is a supportive report, and we think it's

13   wonderful that you have good family support. And

14   your parole plans appear to be okay from Mexico.

15   The hearing Panel notes that 3042 Notices show an

16   opposition to a finding of parole suitability from

17   the District Attorney of Los Angeles County.

18        **DEPUTY DISTRICT ATTORNEY GUNDERSON:** Fresno.

19        **PRESIDING COMMISSIONER DALY:** Fresno. I've

20   (indiscernible) all week. From Fresno County. And

21   the other information that the Panel really looked

22   at in making this decision on a one-year denial goes

23   to the insight and the fact that you still feel this

24   was quite an accident, and that you don't really

25   understand the seriousness in your actions in

26   carrying a gun and handling the situation the way

27   **ABEL RAYA    C-99451    DECISION PAGE 3    3/17/05**

65

1    you did and shooting and killing the victim.

2    Nevertheless, the Panel does recognize that you were

3    able to read English very well.  So you have done

4    quite well.  You brought your grade point level up

5    to 10.3.  You've been doing some video instruction.

6    You have taken your classes for GED, but you just

7    kind of dropped out.  You've lost interest and

8    haven't tried to better yourself in that, even after

9    every Panel has suggested that you do that.  You

10   have a certification in 1999 in your vocational

11   machine shop.  And you were certified in your

12   welding in 2001.  And you are currently working in

13   the PIA wood furniture finishing factory with above

14   average to exceptional work reports.  And I do show

15   at one time you had some vocational print training.

16   You've worked in the kitchen as an apprentice cook,

17   and then later as a cook.  And you've worked in

18   culinary as a line server.  And you have been

19   involved in the AA program, Lifeplan for Recovery,

20   and the Alternatives to Violence.  And you took the

21   Advanced Alternative to Violence.  And then you also

22   took the training for trainers on the Alternative to

23   Violence.  Despite from Alternatives to Violence in

24   the early '90s, and your Lifeplan for Recovery, and

25   then I saw where you had a recovery substance abuse

26   program, you really haven't done a whole lot to take

27   **ABEL RAYA    C-99451    DECISION PAGE 4    3/17/05**

66

1    any other classes, and especially dealing with

2    insight into impact of victims, you know, what the

3    impact of this crime did on the victim's family.  So

4    when we look at the positive aspects of your

5    behavior it does not outweigh your factors of

6    unsuitability.  This is going to be a one-year

7    denial.  We're recommending that you stay

8    discipline-free, no more 128s, no more 115s,

9    participate -- see if there are some self-help

10   classes that you can get involved in.  And this

11   Panel is strongly suggesting that you get back into

12   your studies and try to take your GED again.  And

13   with that I wish you good luck.  Do you have any

14   comments, Mr. Mejia.

15        **DEPUTY COMMISSIONER MEJIA:**  Keep up your good no

16   115s since 1989, and just work more on your insight

17   about the commitment offense.  Okay.  Good luck to

18   you.

19        **PRESIDING COMMISSIONER DALY:**  Okay.  That

20   concludes the hearing.  It's 11:15.

21                     --o0o--

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON:**_____JUL 15_____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **ABEL RAYA    C-99451    DECISION PAGE 5    3/17/05**

42

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER BLONIEN:**  We are back

4    on record.

5    **PRESIDING COMMISSIONER LAWIN:**  Thank you.

6    And all parties have returned to the room in

7    the hearing for Abel Raya.  Mr. Raya, the

8    Panel has reviewed all information received

9    from the public and relied on the following

10   circumstances in concluding that you're not

11   suitable for parole and would pose an

12   unreasonable risk of danger to society or a

13   threat to public safety if released from

14   prison.  This is a one-year denial.  The

15   commitment offense was the murder of

16   Concepcion Sanchez.  Mr. Sanchez was 50 years

17   old.  He was in a bar that Mr. Raya came into,

18   and the two apparently had some sort of

19   exchange -- verbal exchange.  Mr. Raya

20   contends that Mr. Sanchez sent some of his

21   friends over to talk to him; Mr. Raya, and

22   they told him Mr. Sanchez didn't want him in

23   the bar, wanted him to leave.  Ultimately,

24   Mr. Sanchez did speak directly to Mr. Raya.

25   Mr. Raya says he felt threatened.  He thought

26   Mr. Sanchez was going for a weapon.  He

27   **ABEL RAYA  C-99451  DECISION PAGE 1   12/15/03**

43

1    instead went for his first; pulled a gun out

2    and shot Mr. Sanchez four times, hitting him

3    in the heart and lungs.  And the wounds were

4    fatal.  This crime clearly shows a lack of

5    regard for the life and suffering of not only

6    Mr. Sanchez, but of others, because the shots

7    were fired inside of the bar.  Mr. Raya was

8    under the influence of alcohol.  Apparently

9    Mr. Sanchez was under the influence of

10   alcohol.  And there certainly could have been

11   others that were injured in this shooting.

12   The motive for the crime is inexplicable.

13   Apparently Mr. Raya did not like the way

14   Mr. Sanchez talked to him.  He did not like

15   being told to leave, and ultimately he says he

16   felt threatened.  There are reports -- not

17   only the probation officer's report, but the

18   Appellate Court opinion that say that

19   Mr. Sanchez was a bully.  According to the

20   Appellate Court opinion it says that Sanchez

21   depicted at trial as a loudmouth, bully, and

22   regular bar patron and provoked an argument

23   with Raya.  Regardless, Mr. Raya certainly had

24   the opportunity to leave and instead chose to

25   fire the weapon, killing Mr. Sanchez.  The

26   second reason would be the fact that the

27   **ABEL RAYA  C-99451  DECISION PAGE 2   12/15/03**

44

1   inmate has not sufficiently upgraded

2   educationally.  The point is well taken that

3   he will be going to Mexico.  However, an

4   education is important everywhere for

5   employment purposes.  He has completed welding

6   and machine shop and is to be commended for

7   this.  He's also been a participant in AA

8   since 1992, and previously completed Life Plan

9   for Recovery and Alternatives to Violence.

10  He's also to be commended for the fact that he

11  received satisfactory work reports in

12  culinary.  These positive aspects of his

13  behavior do not yet outweigh the factors of

14  unsuitability.  Another factor to commend

15  Mr. Raya for is that he has not had a 115

16  since 1989.  He has only one 115, and that was

17  for fighting.  However, he's had five 128(a)

18  counseling chronos and the most recent one was

19  October 12th, 2002; not quite a month before

20  his last hearing for stealing food.  The

21  psychiatric report dated October 25th, 1999, by

22  Doctor Joe Reed is generally supportive of

23  release.  Doctor Reed states that the inmate

24  did have a significant alcohol problem and

25  recommends continued participation in AA or

26  NA.  Both while incarcerated and as a

27  **ABEL RAYA  C-99451  DECISION PAGE 3   12/15/03**

45

1    contingency for parole.  He says his violence

2    potential within a controlled setting is

3    considered to be significantly below average.

4    And if released to the community, his violence

5    potential is considered to be no more than the

6    average citizen.  He also states his prognosis

7    for successful community living is good if

8    he's afforded to -- if he is deported to

9    Mexico.  The Panel is going to ask for an

10   updated psychological evaluation prior to the

11   next hearing, just to make sure the next Panel

12   has a current report.  There is an active

13   USINS Hold and the inmate has appropriate

14   plans to live with his parents in Mexico.  He

15   doesn't have a specific job offer, but he does

16   have marketable skills.  Again, he completed

17   welding and machine shop.  The positive

18   aspects of Mr. Raya's suitability as I stated

19   are still outweighed by the factors of

20   unsuitability.  Therefore, a longer period of

21   incarceration is required before the Board

22   should find him suitable for parole.

23   Mr. Raya, the Panel makes the following

24   recommendations to you:  And these aren't new;

25   you've heard these before.  It is very

26   important that you remain disciplinary free.

27   **ABEL RAYA  C-99451  DECISION PAGE 4   12/15/03**

46

1    According to the rules, a 128 is discipline.

2    You can't get any more 128's.  The last Panel

3    told you that.  I told you that two years -- a

4    year before that; two years ago.  You've got

5    to come back here with no new counseling

6    chronos and no new 115's.  And if it's

7    available to you, you should upgrade

8    educationally.  Try and get back into GE --

9    into ABE, and get that GED.  And if it's

10   available to you, participate in self-help.

11   It's wonderful that you're participating in AA

12   and you have been for a long time.  But if

13   there is anything else available, any other

14   class that's available to you, you need to

15   sign up for it.  You  haven't been very active

16   in anything except work.  So add to your

17   current program with whatever you can.  You

18   did a really good job with your parole plans.

19   It was very impressive for your family to not

20   only send a letter, but to send photographs as

21   well.  Unfortunately, you're going to have to

22   have new letters for your next hearing.  I

23   wish you good luck.

24       **INMATE RAYA THROUGH INTERPRETER:**  Thank

25   you.

26       **DEPUTY COMMISSIONER BLONIEN:**  I just want

27   **ABEL RAYA  C-99451  DECISION PAGE 5   12/15/03**

47

1    to say it's important that you review your C-

2    File.  You cannot come in here and say you

3    don't know about the 128.  You've got to read

4    it, and if it's wrong, correct it.  That's to

5    your benefit and presents a better picture of

6    you.  And I hope you do that.  And I wish you

7    well.

8         INMATE RAYA THROUGH INTERPRETER:  I'm

9    sorry.  But if I read my file and I find

10   something wrong, then I tell my counselor that

11   this is wrong?

12        DEPUTY COMMISSIONER BLONIEN:  Correct.

13   And file a 602.

14        INMATE RAYA THROUGH INTERPRETER:  Well

15   that's not easy if I put in a 602 that I'm

16   going to win the case.

17        DEPUTY COMMISSIONER BLONIEN:  It's not

18   easy that -- to come to the Parole Board and

19   say you don't know about it.  That's worse.

20   Good luck.

21        INMATE RAYA THROUGH INTERPRETER:  Well you

22   can't really do anything here with your

23   counselors, because then they --

24        PRESIDING COMMISSIONER LAWIN:  Okay,

25   Mr. Raya.

26        INMATE RAYA THROUGH INTERPRETER:  Okay.

27   ABEL RAYA  C-99451  DECISION PAGE 6  12/15/03

48

1        **INMATE RAYA:**  Thank you very much.

2        **PRESIDING COMMISSIONER LAWIN:**   Thank you

3    very much.

4                        --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED ONE YEAR**

26    **FINAL DATE OF DECISION**_____MAR 1 4 2004_____

27    **ABEL RAYA  C-99451   DECISION PAGE 7   12/15/03**

# EXHIBIT "B"

7

*PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS*
*(REVISED AUGUST 1999)*
*PAROLE CONSIDERATION HEARING*
*MARCH 2005 LIFER CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*FEBRUARY 11, 2005*

This is an addendum to a psychological evaluation previously completed for the Board of Prison Terms by Dr. Reed on 08/16/99, for inmate Abel Raya, CDC# C-99451.

Inmate Raya is a 46-year-old, Mexican male. He is bilingual and a Mexican citizen. He has conversational-level English speaking skills. His stated religious preference is Catholic. No obvious unusual physical characteristics were observed, and he denied ever using any nicknames or aliases.

The record indicates that inmate Raya has obtained a TABE overall grade point level of 10.3, according to the record for his annual administrative hearing 12/10/02. He states that he is currently working towards his GED.

He further noted that he still has no contact with his former wife; however, does receive supportive letters from his two children who live in Mexico.

Inmate Raya reported that before his incarceration, he had worked over 20 years as a field worker. During his incarceration, he became certified in 1999 in machine shop and obtained certification in 2001 in welding. He also has worked one year in small engine repair. He currently works in PIA Industries in woodwork finishing. He has obtained exceptional to above average work performance ratings by his work supervisors.

He continues to regularly attend Alcoholics Anonymous. Notably, he has attended AA since 1990, a period of over 15 years. At this point, noting his successful completion of attendance at AA, this inmate appears to have a substance abuse history only, and does not appear to have a current substance abuse problem.

If granted parole, this inmate plans to live in Mexico, and to work in a machine shop, in welding, or in small engine repair.

His prognosis for successful community living appears to be good.

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Raya was alert and oriented to person, place and time. He was well dressed and groomed, and his speech was articulate and contextually meaningful. He is bilingual and speaks conversational-level

*RAYA, ABEL*
*CDC NUMBER: C-99451*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE TWO*

English, articulating with an accent. His mood and affect were within normal limits, and his behavior was appropriate to the setting. No evidence of a mood or thought disorder was demonstrated. His estimated level of intellectual functioning was within the average range. He presents with excellent insight generally.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

**AXIS I:** Alcohol abuse, in sustained full remission in a controlled environment by history only.
**AXIS II:** No contributory personality disorder.
**AXIS III:** No contributory physical disorder.

In addition to previously attending over 15 years of AA and NA groups, inmate Raya has completed a number of other self-help groups, including Life Plan for Recovery and Substance Abuse, Alternatives to Violence, and Training Trainers for Alternatives to Violence. He also completed in 1992 follow-up training for Alternatives to Violence and other self-help groups. His current level of insight and judgment supports a positive prediction of successful adaptation to community living.

## XIII.  REVIEW OF LIFE CRIME:

Inmate Raya described the circumstances surrounding his commitment offense, involving second degree murder with a handgun. He admitted killing the victim. Showing good insight into the causative factors related to the instant offense, he acknowledged that alcohol intoxication greatly limited his judgment and impulse control, and that having possession of a handgun was also a causative factor resulting in the instant offense. He noted that he should have simply avoided the confrontation and left the bar. He demonstrated good empathy for the damage done to the victim and the victim's family, and seems genuinely penitent for his crime. He does seem genuinely committed to never abusing substances or possessing firearms again. He also has shown a commitment and ability to avoid potential confrontations.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.   His violence potential within a controlled setting is considered to be significantly below average relative to the inmate population. This conclusion is based upon several factors.

On the one hand, he did receive a CDC-115 disciplinary in 1989 for force and violence. However, this involved a possible fight with another inmate, with no significant injury in this altercation. He has also received a number of minor CDC-128 disciplinaries.

RAYA, ABEL
CDC NUMBER: C-99451
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

On the other hand, however, he has no previous juvenile criminal history. He has no history of gang involvement. He does not have a pattern of increasing violent behavior. Moreover, he is a first-termer, and the instant offense represents his entire criminal history. He has received only one CDC-115 disciplinary during his 20 years of incarceration. Moreover, he has not received a disciplinary for violent behavior in approximately 15 years and has never received a disciplinary for substance abuse during his 20 years completed within CDC. He has obtained a number of employable job skills, including welding, small engine repair, wood refinishing, and machine shop skills. He also has worked 20 years working in the fields. He does appear to have matured greatly during his incarceration within CDC and has successfully completed a number of self-help groups. Moreover, he has completed 15 years of successful participation within AA and NA, and seems genuinely committed to never abusing substances again. In addition to the psychological interview, two additional psychological assessments were completed. Results from the HCR-20 suggest a low risk of violence comparable to the inmate population both within the controlled setting and within the community. Results from the Hare Psychopathy Checklist, Short Version, do not suggest the presence of sociopathy. Therefore, in light of these factors, his violence potential is considered to be significantly below that of the average inmate.

**B.**    If released to the community, clinically assessed, his violence potential is considered to be no more than the average citizen in the community.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

*1.*    This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has largely done so during his incarceration.

*2.*    This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

*3.*    This inmate does have a significant alcohol abuse history; however, his 20 years of continued abstinence and 15 years of continuos participation in AA and NA groups strongly suggest complete remission of this condition. Therefore, it is no longer suggested that he continue to participate within substance abuse groups within CDC. However, it is suggested that he remain alcohol abuse free during his parole.

*RAYA, ABEL*
*CDC NUMBER: C-99451*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FOUR*

*Joe Reed, Ph.D.*
*Staff Psychologist*
*Correctional Training Facility, Soledad*

*B. Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*JR/gmj*

*D: 02/11/05*
*T: 02/24/05*

*D:\Word Files\BPT - 2005\RAYA, ABEL    C-99451    03-05    REED.doc*

### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### NOVEMBER 2002 LIFER CALENDAR

#### CORRECTIONAL TRAINING FACILITY, SOLEDAD
#### JUNE 14, 2002

Inmate Abel Raya, CDC# C-99451, was seen for a psychological
evaluation for the Board of Prison Terms by Joe Reed, Ph.D.,
Staff Psychologist at the Correctional Training Facility
(CTF), on 08/16/99 for the November 1999 Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.



**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:   06/14/02
T:   06/14/02

RAYA, A.      C-99451      CTF-CENTRAL      06/14/02      gmj

**MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS**
**PAROLE CONSIDERATION HEARING**
**(REVISED AUGUST 1998)**
**JUNE 2001 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**MARCH 9, 2001**

Inmate Abel Raya, CDC# C-99451, was seen for a mental health
evaluation for the Board of Prison Terms by Dr. Joe Reed,
Staff Psychologist at CTF, on 08/16/99 for the November 1999
Lifer Calendar.

According to the agreement that CDC psychologists and
psychiatrists made with the Board of Prison Terms, once a
mental health evaluation is completed in the new format
created in 1998, a new evaluation is not necessary each time
the inmate appears before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at
this time.

**R. S. COATE, Psy.D.**
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

RSC/gmj

D:  03/09/01
T:  03/09/01

RAYA        C-99451        CTF-NORTH        03/09/01        gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
NOVEMBER 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
AUGUST 16, 1999

This is a psychological evaluation for the Board of Prison
Terms on inmate Abel Raya.  This report is based upon a
personal clinical interview of the inmate, conducted on
08/16/99, as well as a review of his Central file and unit
health record.  This clinical interview and a review of all
pertinent documents were for the express purpose of
preparing this report.

I.     IDENTIFYING INFORMATION:

       Inmate Raya is a 40-year-old, single (with common-law
       wife in Mexico), Hispanic male who was born on
       02/15/59.  He is a Mexican citizen.  His primary
       language is Spanish and he speaks conversational
       English.  His stated religious affiliation is Catholic.
       No obvious unusual physical characteristics were
       observed and he denied having any nickname or aliases.

II.    DEVELOPMENTAL HISTORY:

       Inmate Raya denied any significant developmental
       history.  He denied a childhood history of physical or
       sexual abuse as either a perpetrator or a victim.

III.   EDUCATIONAL HISTORY:

       Inmate Raya stated that he attended public school and
       completed the third grade in Mexico.  In 1997, his
       measured grade point level was 4.5 TABE.  He has no
       history of special education or academic or behavioral
       problems in school.  He has no current educational
       involvement.

IV.    FAMILY HISTORY:

       Inmate Raya reported that there is no significant
       history of crime or drug abuse in his family.  He
       generally described his current relationships with his
       family members as warm and supportive with no history
       of abuse.

RAYA, ABEL
CDC NUMBER:  C-99451
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Raya is a heterosexual male.  He denied any
history of sexual aggression or high-risk sexual
behavior.

VI.   MARITAL HISTORY:

Inmate Raya has never been formally married.  He has a
common-law wife in Mexico and they were together for
two years.  He has maintained no contact with her in 18
years.  There was no abuse in this relationship.  He
has two children who are now of adult age.  He
described his relationship with his children as good
with no history of abuse.

VII.  MILITARY HISTORY:

Inmate Raya has no history of military service.

VIII. EMPLOYMENT AND INCOME HISTORY:

Inmate Raya stated that his preincarceration work
history includes working 20 years as a field worker.
During his incarceration, he became certified in
machine shop in 1999.  He worked for one year in small
engine repair and is currently working in the welding
shop.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Raya acknowledged having a substance abuse
history, stating that he abused alcohol.  He has
regularly attended Alcoholics Anonymous from 1990 until
the current date, regularly attending Narcotics
Anonymous from 1993 until 1994.

This inmate does appear to have a substance abuse
problem.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Raya has a prior psychiatric diagnosis of
Alcohol Dependence, in remission.  He has had no prior
hospitalizations or history of serious accidents.  He
has no history of seizures, other neurological

RAYA      C-99451      CTF-CENTRAL      10/25/99      gmj

RAYA, ABEL
CDC NUMBER:  C-99451
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

conditions or significant impairments or illnesses.  He
is currently taking no medication.

XI.  <u>PLANS IF GRANTED RELEASE</u>:

If granted parole, inmate Raya wishes to be deported to
Mexico to live with his father, who has agreed to this
arrangement.  His financial and vocational plans
include working in the fields, in a machine shop or in
small engine repair.

His prognosis for successful community living upon
parole is good if deported to Mexico.

<u>CLINICAL ASSESSMENT</u>

XII.  <u>CURRENT MENTAL STATUS/TREATMENT NEEDS</u>:

During the clinical interview, inmate Raya was alert
and oriented to person, place and time.  He was well
dressed and groomed.  His speech was reasonably
articulate, given that English is his secondary
language, and contextually meaningful.  His mood and
affect were within normal limits and his behavior was
appropriate to the setting.  No evidence of a mood or
thought disorder was demonstrated.  His estimated level
of intellectual functioning was within the average
range.

<u>CURRENT DIAGNOSTIC IMPRESSIONS</u>:

**AXIS I**:    Alcohol Dependence.  In sustained full
               remission.  In a controlled environment.
**AXIS II**:   No Contributory Personality Disorder.
**AXIS III**:  No Contributory Physical Disorder.

In addition to his previous attendance at Alcoholics
Anonymous and Narcotics Anonymous, inmate Raya has
completed a number of self-help programs.  In 1991, he
completed Life Plan for Recovery and Substance
Abuse, Alternatives to Violence, and Training Trainers
Alternatives to Violence.  In 1992, he completed
follow-up training for Alternatives to Violence.

RAYA, ABEL
CDC NUMBER:  C-99451
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


His current level of insight and judgment supports a
positive prediction of successful adaptation to
community living.

## XIII. REVIEW OF LIFE CRIME:

Inmate Raya described the circumstances surrounding
his commitment offense.  He admitted killing the
victim.  He insightfully acknowledged how having a
weapon readily available and alcoholism played
substantial roles in the commitment offense.  He
demonstrated good empathy towards the victims and
seemed genuinely penitent for his crimes.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.  His violence potential within a controlled setting
    is considered to be significantly below average
    relative to this Level II inmate population.  This
    conclusion is based upon several factors.

    On the one hand, he received a CDC-115 violation in
    1989 for force and violence.  He has also received
    two CDC-128s, the last received in 1992.

    On the other hand, however, he has no previous
    preincarceration criminal history.  He is a first-
    termer with no known gang affiliation.
    Additionally, he has received only one significant
    disciplinary action during his 14 years of
    incarceration within CDC and has not received a
    disciplinary for violent behavior in ten years.
    Moreover, he was only 25 years old at the time of
    the crime and he has greatly matured during his
    time within CDC.

    Therefore, in light of these factors, his violence
    potential is considered to be significantly below
    average relative to this Level II inmate
    population.

B.  If released to the community, his violence
    potential is considered to be no more than the
    average citizen in the community.

RAYA, ABEL
CDC NUMBER:  C-99451
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

      C.    Substance abuse does present a significant risk
           factor which may be a precursor to violence for
           this individual.

**XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

    1)    This inmate is competent and responsible for his
        behavior.  He has the capacity to abide by
        institutional standards and has largely done so
        during his incarceration.

    2)    This inmate does not have a mental health disorder
        which would necessitate treatment either during his
        incarceration period or upon parole.

    3)    This inmate does appear to have a significant
        alcohol problem and continued participation either
        in Alcoholics Anonymous or Narcotics Anonymous is
        suggested both during his incarceration and as a
        contingency for parole.

JOE REED, Ph.D., J.D.
Staff Psychologist
Correctional Training Facility, Soledad

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:  10/18/99
T:  10/25/99

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
OCTOBER 1998

CORRECTIONAL TRAINING FACILITY
JULY 1, 1998

This is the seventh psychological evaluation for the Board of Prison Terms on inmate
Raya. This report is the product of a personal interview, conducted on 7/1 /98, as well as
a review of his unit health record. His C-File was not reviewed as it has been
unavailable. This interview was a single contact with this inmate for the sole purpose of
preparing this report.

Inmate Raya was convicted of murder for an incident in 1984. Asked for his thoughts
and feelings regarding this crime, he states that he "feels bad". He said that when he is
drinking, it is like he doesn't care what happens and that he recognizes that alcohol was a
problem for him back then.

The inmate stated his most recent CDC-115 violation was in 1989.

He currently attends Alcoholics Anonymous and does acknowledge he has a significant
alcohol problem. Educationally, he is working on his high school degree. Vocationally,
he has experience in machine shop. If paroled, his plans include returning to Mexico and
working in a machine shop.

MENTAL STATUS EXAMINATION:          Inmate Raya is a 39 year-old well
                                    nourished, short statured Hispanic male,
who appeared his stated age. He was appropriately dressed and groomed. He was alert,
cooperative and calm.. His flow of thought and affect were normal. His speech had an
Hispanic accent but his English was easily understandable. Intellectual functioning was
estimated to be within the average range. He demonstrated some insight into his
commitment offense. His judgment appears to be sound. There was no evidence of a
mood or thought disorder.

DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | Alcohol dependence, in remission. |
| AXIS II: | No contributory personality disorder. |
| AXIS III: | No contributory physical disorder. |

RAYA          C-99451          CTF-N          7/3/98          CJW

RAYA, ABEL
CDC NUMBER: C-99451
PAGE TWO


CONCLUSIONS AND RECOMMENDATIONS:

1)    This man is competent and responsible for his behavior. He has the capacity to
      abide by institutional standards and he has done so during his incarceration
period.

2)    Regarding violence potential, in consideration of a number of factors including
      his lack of criminal history, his lack of a violent criminal history, as well as his
relative lack of CDC-115's and his lack of violent CDC 115's, his violence potential is
estimated to be below average relative to this inmate population.

3)    As he has acknowledged a problem with alcohol, abstinence monitoring and
      attendance at Alcoholics Anonymous should be mandatory conditions of parole.

4)    This man does not have a mental health disorder, which would necessitate
      treatment either during his incarceration period or following parole.


STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

SJT:cjw


D:    7/1/98
T:    7/3/98

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## PAROLE CONSIDERATION HEARING
### NOVEMBER 1997 CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
### JULY 17, 1997

This is the sixth psychological evaluation for the Board of Prison Terms on inmate Abel Raya. This report is the product of a personal interview, as well as a review of his Central file and medical record.

His crime consisted of the 1984 shooting of a man in a bar. The man threatened him saying he wanted to kill him. When he reached for his waistband, Mr. Raya, thinking he was pulling a gun, shot him. He said he kept his gun with him for protection. In expressing his regret, he said he wished that he had just left on that day.

He had a CDC-115 infraction in 1989 for fighting. Since then he has had a good record.

He had a problem with alcohol prior to his incarceration and he does attend Alcoholics Anonymous now. Educationally, he dropped out of school in the third grade in Mexico. He does not have his GED as yet. Vocationally, he is now in the machine shop. He has previously studied small engines and ranch work. His future plans include living in Mexico with his family and working there as a machinist or in small engine repair.

MENTAL STATUS EXAMINATION:        Inmate Raya is a well developed, well nourished short stocky man, who appeared to be his stated age of 38. He was appropriately dressed and groomed and was fully cooperative during interview. His English is good and understandable, even though it is for him a second language. His affect was normal. His flow of thought was normal with no hallucinations nor delusions noted. He was fully oriented with normal intellectual functioning. His attention and concentration are good. His insight and judgment also appear to be good.

PSYCHIATRIC DIAGNOSIS (DSM-IV):

AXIS I.:       Alcohol dependence, in remission.
AXIS II:       No contributory personality disorder.
AXIS III:      No contributory physical disorder.

RAYA        C-99451        CTF-NORTH           07/31/97            ig

RAYA
C-99451
PAGE TWO

PSYCHIATRIC CONCLUSIONS:   His diagnosed psychopathology appears to be indirectly related to his offense. His drinking was a contributing factor in that he would not have been in a bar in the first place, were if not for that. He does not have a psychiatric condition now, which would benefit from mental health treatment following his release. He is showing improvement in his behavior. If released, I expect him to be able to maintain the gains that he has made, provided he continues in his determination to avoid alcohol.

SUGGESTED ACTIONS:   If he is to be continued in his present program, he should continue his participate in Alcoholics Anonymous and to his vocational training, especially to complete machine shop. If he is considered for parole, his level of dangerousness is likely to be less now than for the average inmate. Conditions for parole should include no alcohol.

RECOMMENDATION TO CLASSIFICATION COMMITTEE:   Until released, he should:

1)   Continue to attend Alcoholics Anonymous.

2)   Complete his training in the machine shop, so that he will be able to get a good job.

*Bruce Bakeman Ph.D.*

BRUCE M. BAKEMAN, M.D.
Senior Psychologist
Correctional Training Facility, Soledad

BMB/ig

d:   07/17/97
t:   07/31/97

RAYA        C-99451        CTF-NORTH            07/31/97            ig

# EXHIBIT "C"

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐    DOCUMENTATION HEARING

☒    PAROLE CONSIDERATION HEARING      a/2l6     **ADDENDUM**

☐    PROGRESS HEARING

INSTRUCTIONS
     TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
     TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
           ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/05 to 5/25/06 (Present) | | | **PLACEMENT:** Correctional Training Facility II and housed in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted during this review period. **ACADEMICS:** None noted during this review period. **WORK RECORD:** Assigned to PIA Wood Furniture Factory-Upholstery Shop. The Work Supervisor's Reports (CDC 101s) dated 12/1/05, 3/1/06 and 6/1/06 reflect satisfactory to above average work grades. **GROUP ACTIVITIES:** Actively attended the Alcoholics Anonymous (Group C) meetings per 128B dated 10/6/05; and for the third quarter year, (July, August and September) 2005 per 128B dated 09/21/05. **PSYCH. TREATMENT:** None noted during this review period. **PRISON BEHAVIOR:** None noted during this review period. **OTHER:** The prisoner was afforded an opportunity to examine the Central File on 5/25/06 pursuant to the Olson Decision per a CDC 128B. He refused the assistance of an interpretor for the purpose of his C-File review. Note a 128-B dated 8/9/00, which reflects a reading level of 6.8; language 11.1 and total TABE score of 10.3. |

Sent to inmate on 7/13/06

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| RAYA, ABEL      C99451      CTF-SOLEDAD | 6-13-06 |

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    **ADDENDUM**


6-13-06
Date

H. Staten
Correctional Counselor I


6/30/06
Date

F. DeGuzman
Correctional Counselor II(A)


7-3-0
Date

R. Pope
Facility Captain


Levorse CPR 7-11-06
Date

D.S. Levorse
Classification and Parole Representative


RAYA, ABEL                    C99451                    CTF-SOLEDAD

C-file copy

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2006 CALENDAR

RAYA, ABEL R.                                                    C99451

I.   COMMITMENT FACTORS:

A.   Life Crime: PC 187, Murder 2nd Degree, enhanced for PC 12022.2 due to the use
     of a handgun. Fresno County Superior Court number FRE 317151-9, Sentenced to
     15 years to Life, plus 2 years for the enhancement, totaling 17 years to Life.
     Minimal Eligible Parole Date (MEPD) of 6/15/94. Victim was Conception
     Sanchez, 50 years old. Date received by CDC: 1/22/85.

     1.   Summary of Crime: The life crime occurred in Sanger, California at the
          El Cinco Rojo Tavern. Raya, by witness/companion Primativo Ramirez's
          statement, was drunk at the time. Raya has also previously admitted to
          drinking sixteen to seventeen beers on the day of the crime. Raya danced
          with a barmaid but was interrupted and threatened with being killed by
          Sanchez. It was reported that Sanchez said that he intended to kill Raya if
          Raya didn't leave the bar immediately. Raya left he bar, and retrieved a .38
          caliber revolver from his car, then returned and shot at Sanchez's four
          times. The gunshot wounds, which damaged Sanchez's heart and lungs,
          were fatal wounds. Raya was arrested later following a police homicide
          investigation.

     2.   Prisoner's Version: Raya claims he began drinking about 11:00 a.m. At
          the time of the offense he was drunk, but still conscious of what he was
          doing. As soon as he (Raya) entered the bar, approximately 6:00 p.m., four
          men, including the victim, Conception Sanchez, told him and his friend,
          Primativo Ramirez, that they did not want to see them in the bar. Raya and
          Ramirez said nothing and sat down. The four men also sat back down.
          Two girls came over to Raya's table and sat with him and his friend. The
          four men returned and threatened Raya and his friend again, by stating, "If
          you don't leave we will kill you and if you don't, they (pointing at some
          men sitting at the bar) will kill you." The four men sat back down at their
          table. Raya began to dance with one of the girls. They danced one dance
          and sat down. Ramirez left to go to sleep in the car, Raya stayed to finish
          his beer. Upon finishing his beer, Raya attempted to leave the bar,
          however, the victim, Sanchez, grabbed him by the shoulder as he was
          exiting through the door. Sanchez turned Raya around and said, "Don't be
          a chicken. I'm gonna kill you now." Sanchez then opened his jacket and

Sent to Inmate on 12/16/05

Raya, thinking Sanchez was going to pull a gun, pulled his own pistol from his waistband and fired at Sanchez. Raya claims he carried a gun for protection while working at the ranch. Raya does not remember firing any shots after that. After he shot Sanchez, he left the bar and drove to Sacramento. He did not know Sanchez was dead. Raya claims to be very sorry about what happened and didn't mean to kill anyone. He claims he only shot Sanchez because he felt Sanchez was going to kill him. This information taken from the POR in the central file, pages 2-3.

3.    Aggravating/Mitigating Circumstances:

a.    Aggravating Factors:

-   The prisoner had an opportunity to cease but instead continued with the crime.

b.    Mitigating Factors:
-   The prisoner has no prior criminal behavior.

B.    Multiple Crime(s):  N/A

1.    Summary of Crime:  N/A

2.    Prisoner's Version:  N/A


II.    PRECONVICTION FACTORS:

A.    Juvenile Record: None.

B.    Adult Convictions and Arrests:  None, except the instant offense, which is his life crime.

C.    Personal Factors: Raya was born to Roberto and Elena Raya on February 15, 1959 in Mexico. He is the oldest of 5 children, raised on the family ranch in the State of Guanajuato. Raya says that his family life was normal for a rural ranch environment, and specifically says that it was free of violence and abuse. Raya says that he dropped out of school in the third grade to assist with the family's cattle ranching. When 13 years old, Rays says that he entered the USA illegally to do farm work. In 1980, he began to co-habit with Theresa Gallegos, having 2 children with her. He had no military service, no regular steady employment history, and no physical or mental health problems. He also describes himself as an "alcoholic" at the time of the life crime. Raya says that his work was not steady because it was seasonal.

LIFE PRISONER EVALUAT:    REPORT                                                    3
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2006 CALENDAR

III.    **POSTCONVICTION FACTORS**:

    A.    Special Programming/Accommodations:  None.

    B.    Custody History: Since the last hearing, the subject remained at CTF in the
general population with Medium A custody. Raya continued as a Furniture
Finisher in the Prison Industries Authority Wood Products section. He received
exceptional, satisfactory, and above average ratings on his Work Supervisor's
Reports (CDC 101's) in various categories.

    C.    Therapy and Self-Help Activities:  Raya continued his participation in the
AA/NA, programs. On 1/7/05 he received a CDC 128-B laudatory chrono for his
participation in the Inmate Employability Program.

    D.    Disciplinary History:  He remained disciplinary-free since the last hearing.

    E.    Other: On 3/17/05 the Board of Parole Hearings denied Raya's parole for 1 year
and recommended the following: Get self-help (accomplished), stay disciplinary-
free, (accomplished), earn positive chronos (accomplished), and get a GED (not
accomplished).

IV.    **FUTURE PLANS**:

    A.    Residence:  Raya has no family resources available in California. Since he
realizes he may be deported upon release, he has solid plans with his parents,
Roberto and Elena Rodriguez on their family ranch Nuevo de Patreros in
Guanajuato, Mexico.

    B.    Employment: Raya intends to use his skills in machining and welding to obtain
employment.

    C.    Assessment:  Raya has solid support assistance and he keeps in contact with his
two children who live with their mother Teresa Gallegos in Ira Puerto, Mexico,
with whom he is also on good terms.

V.    **USINS STATUS**: #A27118816 from Mexico.

VI.    **SUMMARY**:

RAYA, ABEL R.            C99451                CTF-SOLEDAD            MAR/2006

LIFE PRISONER EVALUAT    1 REPORT                                        4
SUBSEQUENT PAROLE CUNSIDERATION HEARING
MARCH 2006 CALENDAR

A.    Prior to release the prisoner could benefit from: continued AA participation and
      other self-help programs, remaining disciplinary free, getting a GED, and earning
      positive chronos.

B.    This report is based on an interview with the prisoner on 11/16/05
      lasting approximately 1 ½ hours and a complete review of the
      central file by the counselor lasting approximately 3 hours.

C.    The prisoner was afforded an opportunity to examine his Central File on 11/2/05
      and declined the BPH Olsen Review per CDC 128B dated 11/2/05.

D.    No accommodation was required per the Armstrong vs. Davis BPH Parole
      Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUAT    T REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2006 CALENDAR

5

_____     12/7/05
S. Arno,                          Date
Correctional Counselor I


_____     12-12-05
R. Leach,                         Date
Correctional Counselor II


_____     12-12-05
R. Pope,                          Date
Facility Captain


_____ CPR  12 15 05
D. S. Levorse,                    Date
Classification and Parole Representative

BOARD OF PRISON TERMS                                                                  STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
   TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
   TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
       ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 10/04 to Present | | | **PLACEMENT:** CTF<br>**CUSTODY:** MED A<br>**VOC. TRAINING:** None noted during this period.<br>**ACADEMICS:** None noted during this period.<br>**WORK RECORD:** Raya continued as a Furniture Finisher in P.I.A. and received exceptional, above average, and satisfactory ratings in various categories per CDC 101's dated 12/1/04, 3/1/05, 6/1/05, and 9/1/05.<br>**GROUP ACTIVITIES:** Raya continued his fine participation in the AA/NA programs per CDC 128-B laudatory chronos dated 10/1/04, 10/14/04, 12/22/04, 4/2/05, 6/28/05, and 10/6/05.<br>**PSYCH. TREATMENT:** None noted during this period.<br>**PRISON BEHAVIOR:** He remained disciplinary-free during this period.<br>**OTHER:** None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 12/7/05 |
|---|---|---|
| RAYA, ABEL R. | C99451 | CTF-SOLEDAD | MAR/2006 |

Name and Number:     Raya, A  Bph 7-11-04  C99451 MM     ED079L          CDC-128B (Rev.4/74)

Inmate Raya has been actively attending the Alcoholics Anonymous (Group "Esperanza Sobria") at CTF-Central Facility. The meetings are held in the Chapel on Mondays between 1830 and 2000 hours. Mr. Raya has been a contributing member of this group since 12/31/2005. Mr. Raya has positively participated and shown his ability to understand and comprehend all aspects of the Twelve Steps Programs, through his own self-improvement techniques. Mr. Raya is to be commended for his continued participation and positive contributions to Alcoholics Anonymous at CTF-Central Facility.

Original Signature
     cc: Inmate                           Dave Rodriguez
         Sponsor                          Alcoholics Anonymous Sponsor
                                          CTF-Central Facility

Date: 5/08/2006          **(LAUDATORY A.A. PARTICIPATION)**          GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

NAME and NUMBER      RAYA, A.                    C99451      ED-079L

Inmate RAYA is a current member of a **Twelve Steps Program** modeled on the principles of **Alcoholics Anonymous** and **Narcotics Anonymous**. He has been actively attending the **Alcoholics Anonymous** (Group "C") at CTF-Central Facility. The meetings are held in the Dining Hall #2 on Saturdays between 1030 and 1230 hours. Mr. RAYA has been an contributing member of this group since 10/2003. Mr. RAYA has positively participated and shown his ability to understand and comprehend all aspects of the Twelve Steps Programs, through his own self-improvement techniques. Mr. RAYA is to be commended for his continued participation and positive contributions to A.A./N.A. here at CTF-Central Facility.

[For :1st Quarter 2006]

ORIG  :   CENTRAL FILE       (RAYA, C99451)
cc    :   INMATE
      :   SPONSOR

**DAVE RODRIGUEZ**
Alcoholics Anonymous Sponsor
CTF-Central Facility

DATE    4/1/2006           *LAUDATORY A.A. PARTICIPATION CHRONO*          **GENERAL CHRONO**

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

**NAME and NUMBER**      RAYA, A.              C99451      ED-079L

You attended meetings for the Monday NA Central A Group for the 4th Quarter (Oct, Nov, Dec)  2005.
You provide service to the Group with your attendance. Through this program, you are shown the tools available to you.
By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

Elected Position: None

J. Kramer
Group Staff Sponsor

Original : Central File
     cc: Staff Sponsor
       : Inmate

DATE:      1/6/06              **Monday NA Central A  -LAUDATORY CHRONO**

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER**      RAYA, A.                   C99451      ED-079L

Inmate RAYA, has been actively attending the **Alcoholics Anonymous** (Group "C") at CTF-Central Facility. The meetings are held in the Dining Hall #2 on Saturdays between 1030 and 1230 hours.  Mr. RAYA has been an contributing member of this group since 10/2003. Mr. RAYA has positively participated and shown his ability to understand and comprehend all aspects of the Twelve Steps Programs, through his own self-improvement techniques. Mr. RAYA is to be commended for his continued participation and positive contributions to Alcoholics Anonymous here at CTF-Central Facility.

[For: 4th Quarter 2005]

ORIG  :   CENTRAL FILE       (RAYA, C99451)
cc    :   INMATE
      :   SPONSOR

**DAVE RODRIGUEZ**
Alcoholics Anonymous Sponsor
CTF-Central Facility

DATE    12/27/05           *LAUDATORY A.A. PARTICIPATION CHRONO*          **GENERAL CHRONO**

STATE OF CALIFORNIA  
DEPARTMENT OF CORRECTIONS  
CDC-128 B (8-87)

**NAME and NUMBER**    RAYA, A.    C99451    ED-164U

Inmate RAYA, has been actively attending the **Alcoholics Anonymous (Group "C")** at CTF-Central Facility. The meetings are held in the Dining Hall #2 on Saturdays between 1030 and 1230 hours. Mr. RAYA has been an contributing member of this group since **10/2003**. Mr. RAYA has positively participated and shown his ability to understand and comprehend all aspects of the Twelve Steps Programs, through his own self-improvement techniques. Mr. RAYA is to be commended for his continued participation and positive contributions to Alcoholics Anonymous here at CTF-Central Facility.

[For: 3rd Quarter 2005]

ORIG    :    CENTRAL FILE    (RAYA, C99451)  
cc    :    INMATE  
    :    SPONSOR

**DAVE RODRIGUEZ**  
Alcoholics Anonymous Sponsor  
CTF-Central Facility

**DATE**    10/06/05    *LAUDATORY A.A. PARTICIPATION CHRONO*    **GENERAL CHRONO**

---

STATE OF CALIFORNIA  
DEPARTMENT OF CORRECTIONS AND REHABILITATION  
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    RAYA, A.    C99451    ED-164U

You attended meetings for the Monday NA Central A Group for the 3rd Quarter (July, August, September) 2005. You have actively participated in this Group. You provide service and input to the Group with your attendance. Through this program, you are shown what tools are available to you. By following 'The 12 Steps of Recovery' in your life, you show your willingness to improve yourself.

You have been a participant at CTF since: 06-07-2004  
Elected Position: None

**J. Kramer**  
Group Staff Sponsor

Original : Central File  
cc: Staff Sponsor  
: Inmate

DATE:    9/21/05    **Monday NA Central A -LAUDATORY CHRONO**

---

STATE OF CALIFORNIA  
DEPARTMENT OF CORRECTIONS  
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    RAYA, A    C99451    ED-164U

You attended meetings for the Monday NA Central A Group for the 2nd Quarter (April, May, June) 2005. Since you began, you provide service to the Group with your attendance. Through this program, you are shown the tools available to you. By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

You have been a participant at CTF since: 06-07-2004  
Elected Position: None

**J. Kramer**  
Group Staff Sponsor

Original : Central File  
cc: Staff Sponsor  
: Inmate

DATE:    6/28/05    **Monday NA Central A -LAUDATORY CHRONO**

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

NAME and NUMBER      **RAYA, A.**                                C99451        ED-164U

Inmate RAYA, has been actively attending the **Alcoholics Anonymous** (Group "C") at CTF-Central Facility. The meetings are held in the Dining Hall #2 on Saturdays between 1030 and 1230 hours. Mr. RAYA has been a contributing member of this group since **10/2003**. Mr. RAYA has positively participated and shown his ability to understand and comprehend, all aspects of the Twelve Steps Programs, through his own self-improvement techniques. Mr. RAYA is to be commended for his continued participation and positive contributions to Alcoholics Anonymous here at CTF-Central Facility.

.[For: 1ˢᵗ Quarter 2005-03-24]

ORIG    :   CENTRAL FILE        (RAYA, C99451)
Cc      :   INMATE
        :   SPONSOR

DAVE RODRIGUEZ
Alcoholics Anonymous Sponsor
CTF-Central Facility

DATE    4/1/05          *LAUDATORY A.A. PARTICIPATION CHRONO*          GENERAL CHRONO

EXHIBIT "D"

CTF - C.99451

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO**

1100 Van Ness Avenue, P.O. Box 1628

Fresno, California 93717

| | FOR COURT USE ONLY |
|---|---|

**PEOPLE OF THE STATE OF CALIFORNIA**

DEFENDANT: ABEL RODRIGUEZ RAYA    [X] Present    [ ] Not Present

FIRST AMENDED
[X] JUDGMENT OF COMMITMENT TO:    [X] STATE PRISON    [ ] COUNTY JAIL
[ ] ORDER GRANTING PROBATION    [X] AND MINUTE ORDER

CLK 3008.00 E08-70 R06-76

CASE NUMBER: 317151-9

| Date of hearing: 1/9/85 | Dept. No.: TWO | Judge: EUGENE KRUM | Clerk: BARBARA KERAN | Reporter: DOTTIE THOMPSON |
|---|---|---|---|---|
| Counsel for People: WARREN ROBINSON | | Counsel for defendant: RICHARD GATES | | Probation Officer: WILLIAM OWENS |

1. Defendant was convicted of the commission of the following crime on (Date): December 17, 1984

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | PC 187 | Murder | 2nd | Jury |

2. Defendant [ ] was arraigned [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

   a. [X] Sentences defendant to State Prison for the term prescribed by law, 15 years to life + 2 years PC
   
   b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count: 12022.5
   
   c. [ ] Sentences defendant to County Jail for the period of (Specify number of days): ........... enhancement.
   
   d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of: ........... Enhancement to
      [ ] upon conditions set forth in attachment 3d.    be served first

4. [X] Defendant, ~~convicted of more than one count~~ shall pay $100.00 Restitution Fine

   a. [ ] serve the sentence as to each count as follows: pursuant to Government Code section 13967.

   | Count | Consecutive With | Concurrent with |
   |---|---|---|

   b. [ ] serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a. [ ] concurrently.   b. [ ] consecutively.
   c. [ ] as set forth below or in attachment 5c.

6. Execution of sentence is
   a. [ ] stayed on the following count: ........... pending appeal, with the stay to become permanent when the sentence is completed as to count: ...........
   b. [ ] suspended and defendant is placed on probation for the period of: ...........
      [ ] upon conditions set forth in attachment 6b.

7. [ ] No allegation to enhance punishment was made in count: ...........

8. [X] It was alleged
   a. [ ] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged in count: ........... [ ] and allegation stricken as to count: ...........

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be

b. [X] Defendant used a firearm in count: One . . . . . . [ ] and allegation stricken as to count: . . . .

c. [ ] Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024

 [ ] and allegation stricken.

d. [ ] Other (Specify and indicate if stricken): . . . . . . . . . . . . . . . . . .

9. [X]  The Court finds the defendant

a. [ ]  *was* armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of

(1) [ ] Pen C. 3024 as to count: . . . . . . . . . [ ] but strikes the finding as to count:

(2) [ ] Pen C. 12022 as to count: . . . . . . . . . [ ] but strikes the finding as to count: . . .

(3) [ ] Pen C. 1203 (Specify weapon): . . . . . . . . .

 as to count: . . . . . . . . . . . . . . . [ ] but strikes the finding as to count: . . .

b. [ ]  *was not* armed at the time of commission or attempted commission of the crime within the meaning of

(1) [ ] Pen C. 3024 as to count:

(2) [ ] Pen C. 12022 as to count:

(3) [ ] Pen C. 1203 as to count:

c. [X]  *did* use a firearm as to count: One . . . . . . [ ] but strikes the finding as to count:

(1) [X] The use was one use for the following counts: .One . . . . . . . . . The additional penalty shall

 X~~XXXXXXXXXXXXXXXXXXXXXXXXXXX~~ be served. before and consecutive to

d. [ ]  *did not* use a firearm as to count: . . . . . . . . . . . . . . . sentence. . . . . . . . . .

e. [ ]  *was* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 . [ ] but strikes the finding.

f. [ ]  *was not* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. [ ]  Other (Specify and indicate if stricken):

10. [ ]  Prior convictions which affect defendant's sentence were alleged and disposed of [ ] as follows [ ] as set forth in attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
| --- | --- | --- | --- | --- |
| | | | | |

11. The court finds defendant    a. [ ] is    [ ] is not an habitual criminal under Pen C. 644a.

~~is not an habitual criminal under Pen C. 644b~~

12. The court pronounced sentence on (Date): JANUARY  9,  1985. and defendant was held in custody, through and including the date of pronouncement of sentence for (Total no. of days): .279 . . . . . . as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
| --- | --- | --- |
| One | Fresno County Jail | 186 - Actual |
| | | 93 - Conduct |

13. Defendant is remanded to the custody of the Sheriff

a. [ ]  For the period of (Specify no. of days): . . . . [ ] upon conditions and recommendations set forth in attachment 13a.

b. [X]  To be delivered  [X] at the earliest convenient time  [ ] after 48 hours, excluding Saturdays, Sundays and holidays [Pen C. 1203c] into the custody of the Director of Corrections at

(1) [ ] California Institution for Women—Frontera     (3) [ ] California Institution for Men—Chino

(2) [X] California Men's Facility—Vacaville     (4) [ ] Other:

14. [ ]  The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.

16. [ ]  Other (See attachment 16)

Dated: 10 - 7 - 88 . . . . . . . .    _Cuger L. Shrum_

   (Type or print name)    (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: . . . . .

CLERK'S CERTIFICATE

I hereby certify that the foregoing is a correct copy of the original on file in my office.

GALEN LARSON    Clerk of the superior Court

By _Dant Slexent_    Deputy

OCT  7 1988

*Vacaville*

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO | FOR COURT USE ONLY |
|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO**

1100 Van Ness Avenue, P.O. Box 1628

Fresno, California 93717

**PEOPLE OF THE STATE OF CALIFORNIA**

**DEFENDANT:** ABEL RODRIGUEZ RAYA    [XX] Present    [ ] Not Present

[XX] **JUDGMENT OF COMMITMENT TO:** [XX] STATE PRISON   [ ] COUNTY JAIL

[ ] **ORDER GRANTING PROBATION**   [XX] **AND MINUTE ORDER**

CLK 3008.00 E08-70 R06-76

CASE NUMBER:
317151-9

| Date of hearing: 1-9-85 | Dept. No.: 2 | Judge: E.W. KRUM | Clerk: B. KERAN | Reporter: DOTTIE THOMPSON |
|---|---|---|---|---|
| Counsel for People: WARREN ROBINSON | | Counsel for defendant: RICHARD GATES | | Probation Officer: BILL OWENS |

1. Defendant was convicted of the commission of the following crime on (Date): 12-7-84

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | PC | Murder | 2nd | Jury Trial |

2. Defendant [ ] was arraigned [ ] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

   a. [X] Sentences defendant to State Prison for the term prescribed by law.

   b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count:

   c. [ ] Sentences defendant to County Jail for the period of (Specify number of days):

   d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of:

     [ ] upon conditions set forth in attachment 3d.

4. [ ] Defendant, convicted of more than one count, shall

   a. [ ] serve the sentence as to each count as follows:

     Count      Consecutive With      Concurrent with

   b. [ ] serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a. [ ] concurrently.   b. [ ] consecutively.

   c. [ ] as set forth below or in attachment 5c.

6. Execution of sentence is

   a. [ ] stayed on the following count: . . . . . . . . . . . . . . . . pending appeal, with the stay to become permanent

     when the sentence is completed as to count:

   b. [ ] suspended and defendant is placed on probation for the period of:

     [ ] upon conditions set forth in attachment 6b.

7. [ ] No allegation to enhance punishment was made in count:

8. [X] It was alleged

   a. [X] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged

     in count   One   . . . . . . . . and allegation stricken as to count: . . . . . . . . .

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

b. ☐ Defendant used a firearm in count: . . . . . . . . . ☐ and allegation stricken as to count: . . . . . . . . .

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024

☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): . . . . . . . . . . . . . . . . . . . . .

9. ☒ The Court finds the defendant

a. ☐ *was* armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of

(1) ☐ Pen C. 3024 as to count: . . . . . . . . . . but strikes the finding as to count: . . . . . . . . .

(2) ☐ Pen C. 12022 as to count: . . . . . . . . . but strikes the finding as to count: . . . . . . . . .

(3) ☐ Pen C. 1203 (Specify weapon): . . . . . . . . . . . . . . . . . . . . . . . .

as to count: . . . . . . . . . . but strikes the finding as to count: . . . . . . . . .

b. ☐ *was not* armed at the time of commission or attempted commission of the crime within the meaning of

(1) ☐ Pen C. 3024 as to count: . . . . . . . . . . . . . . . . . . . . . . . .

(2) ☐ Pen C. 12022 as to count: . . . . . . . . . . . . . . . . . . . . . . . .

(3) ☐ Pen C. 1203 as to count: . . . . . . . . . . . . . . . . . . . . . . . .

c. ☒ *did* use a firearm as to count: . . . One . . . . . . . ☐ but strikes the finding as to count: . . . . . . .

(1) ☒ The use was one use for the following counts: . One . . . . . . . . . . . The additional penalty shall

~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ to be served. before and consecutive to
Indeterminate Sentence. . . . . . . .

d. ☐ did *not* use a firearm as to count: . . . . . . . . . . . . . . . . . . . . .

e. ☐ was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes
the finding.

f. ☐ was *not* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in
attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|
| | | | | |

11. The court finds defendant  a. ☐ is.  ☐ is not an habitual criminal under Pen C. 644a.

~~b. ☐ is ☐ is not an habitual criminal under Pen C. 644b.~~

12. The court pronounced sentence on (Date): January 9, 1985 . and defendant was held in custody, through and including
the date of pronouncement of sentence for (Total no. of days): . 279 . . . . . as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| One | (Actual 186/Conduct Credit 93) | Fresno County Jail |

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days): . . . . ☐ upon conditions and recommendations set forth in attachment 13a.

b. ☒ To be delivered  ☒ at the earliest convenient time  ☐ after 48 hours, excluding Saturdays, Sundays and holidays
[Pen C. 1203c] into the custody of the Director of Corrections at

(1) ☐ California Institution for Women—Frontera    (3) ☐ California Institution for Men—Chino

(2) ☒ California Men's Facility—Vacaville    (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.

16. ☐ Other (See attachment 16)

Dated:    January 11, 1985 . . . . . . .    _Eugene E. Gobrun_ (signature)

(Type or print name)    (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: . . . .

CLERK'S CERTIFICATE

I hereby certify that the foregoing is a correct copy of the original on file in my office.

Clerk of the superior Court

JAN 1 1 1985

By _____ Deputy

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE

FORM CR 291

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **FRESNO**

COURT I.D.                     BRANCH **FRESNO**

1 0 1 0 0

| CASE NUMBER(S) |
|---|
| 317151-9 — A |
| — B |
| — C |
| — D |
| — E |

PEOPLE OF THE STATE OF CALIFORNIA    versus    ☒ PRESENT
DEFENDANT: ABEL RODRIGUEZ RAYA              ☐ NOT PRESENT
AKA:

REPORT TO JUDICIAL COUNCIL OF: ☐ INDETERMINATE SENTENCE
TO STATE PRISON ☐ SENTENCE CHOICE OTHER THAN STATE PRISON

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 1  9, 85 | 2 | EUGENE W. KRUM | BARBARA KERAN |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| DOTTIE THOMPSON | WARREN ROBINSON | RICHARD GATES | BILL OWENS |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:

☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY/COURT TRIAL | PLEA | 654 STAY | 12022.1(a) | 12022(b) | 12022.2(b) | 12022.5 | 12022.6(a) | 12022(b) | 12022.9 | ENHANCEMENTS (CHARGED AND FOUND) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187 | Murder–2nd Deg | 84 | 12 7 84 | X | | | | | | | | Y | | |

A. Number of prior prison terms charged and found

| SECTION | NUMBER |
|---|---|
| 667.5(a) | |
| 667.5(b) | |
| 667.6(b) | |

B. Number of prior felony convictions

| SECTION | NUMBER |
|---|---|
| 667.6(a) | |

☐ Defendant was sentenced to death on counts _____, _____, _____, _____.

☒ Defendant was sentenced to State Prison:

A. ☒ For life, or a term such as 15 years to life, with possibility of parole, on counts **One**, _____, _____, _____.

B. ☐ For life without the possibility of parole on counts _____, _____, _____, _____.

C. ☐ For other term prescribed by law on counts _____, _____, _____.

☐ Counts _____, _____, _____, were deemed misdemeanors.

A. ☐ Defendant sentenced to _____ days in county jail for all counts.
        NUMBER

B. ☐ Defendant fined in sum of $ _____.

☐ For counts _____, _____, _____, the defendant was placed on probation.

A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or

   (2) ☐ Imposition of sentence was suspended.

B. Conditions of probation included ☐ Jail Time _____ days    ☐ Fine

Other dispositions

A. ☐ Defendant was committed to California Youth Authority.

B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.

C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.

D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.

E. ☒ Other (Specify) Defendant ordered to pay restitution in the amount of $100.00
pursuant to Government Code Section 13967

E: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON. THE REPORTS IMPLEMENT SECTION 1170.4 OF THE PENAL CODE AND SHALL BE MAILED TO: ADMINISTRATIVE OFFICE OF THE COURTS, 350 McALLISTER, 3200 STATE BUILDING, SAN FRANCISCO, CALIFORNIA 94102

| | SIGNATURE OF CLERK | |
|---|---|---|
| January 10, 1985 | B Keran | |

FILED

SEP 5 1984

FRESNO COUNTY CLERK
BY _____ DEPUTY

FILMED
SEP 05 1984

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

THE PEOPLE OF THE STATE OF ) CASE NUMBERS:
CALIFORNIA )
) Superior Court    317151-9
Vs. )
) Arraignment Date  9-12-84
ABEL RODRIQUEZ RAYA, )
) Municipal Court   F83498-6
)
) District Attorney 84S0302
)
)
Defendant(s). ) INFORMATION

The District Attorney of the County of Fresno hereby accuses
ABEL RODRIQUEZ RAYA of committing the following crime at and in
the County of Fresno, State of California:

VIOLATION OF SECTION 187 OF THE PENAL CODE, a felony. The
said defendant, on or about July 7, 1984, did willfully and
unlawfully and with malice aforethought murder CONCEPCION
SANCHEZ, a human being.

It is further alleged that in the commission and attempted
commission of the above offense, the said defendant personally
used a firearm, to wit: a revolver, within the meaning of Penal
Code Section 12022.5.

The foregoing instrument is a
correct copy of the original on
file in this office.

ATTEST: JAN 1 1 1985

GALEN LARSON, County Clerk
State of California, County of Fresno
By _____ DEPUTY

EDWARD W. HUNT
District Attorney for
the County of Fresno,
State of California

5207

by Warren Robinson

WARREN ROBINSON
Senior Deputy District Attorney

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D
NOV 19 1986
KEVIN A. SWANSON, Clerk
By_____
Deputy

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | No. F005143 |
| Plaintiff and Respondent, | (Super. Ct. No. 317151-9) |
| v. | O P I N I O N |
| ABEL RODRIGUEZ RAYA, | |
| Defendant and Appellant. | |

THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.   Eugene Krum, Judge.

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Thomas L. Carroll, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Susan Rankin Bunting and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

* * *

In People v. Gomez (1986) 183 Cal.App.3d 986, we very recently held erroneous the giving of CALJIC No. 8.50 (murder and manslaughter distinguished) in a form that failed to distinguish

---

*Before Brown (Geo. A.), P.J.; Martin, J.; and Ballantyne, J.

the distinct theories of heat of passion and unreasonable belief
in self-defense.  The error was harmless because the other
instructions cured possible jury confusion.  The saga of 8.50
continues in the instant case.  As in Gomez, we will hold that the
instructional error was harmless.  The critical distinction
emerged in other instructions and the argument of both counsel.

On the evening of July 7, 1984, in a Sanger bar Raya shot
and killed Concepcion Sanchez.  Sanchez, depicted at trial as a
loudmouth, bully, and regular bar patron, provoked an argument
with Raya.  Raya was 25, 129 pounds; Sanchez was 50, 165 pounds.
Both men were drunk.  Sanchez had a .23 percent blood alcohol
level.  At 12:11 a.m., several hours after the shooting, Raya's
blood alcohol tested at .17 percent.  Before coming to the bar,
Raya and Primitivo Rosalez had spent the day drinking with barmaid
Vilma Ramos and another person.  Raya consumed an estimated 17
beers.  After the shooting, he drove with Rosalez to the
Sacramento area, where he was stopped and arrested at about 11:30
p.m., July 7, 1984, for driving under the influence.  Ramos and
Rosalez, both of whom were drunk on the evening in question,
testified to the events preceding the shooting.  Neither witnessed
the shooting itself.  Ramos was elsewhere in the bar, and Rosalez
was sleeping in Raya's car parked outside.  The evidence of the
shooting itself derived solely from Raya's extrajudicial
statements and his trial testimony.

Hank Ramirez, Sanger Police Department Detective,
assigned to investigate the shooting, interviewed Raya at the
Sacramento County Jail.  The interview, in Spanish, was tape
recorded.  Raya was dancing with Vilma Ramos at the El Cinco Rojo

2.

Bar in Sanger. Sanchez approached him, said he didn't want her
dancing with him, asked him to leave the bar, and said that if he
didn't he would be killed. Sanchez reached for his waistband as
if he had a weapon. Sanchez also pointed at others in the bar and
said that if he didn't kill Raya, one of the others would. Raya
never saw a weapon in Sanchez's possession. Raya left the bar,
went to his car, retrieved a gun from the trunk, returned to the
bar, opened the door with one foot, and fired four times. After
shooting Sanchez, Raya got into his car and drove away to avoid
the police. Raya said he had been drinking, was a little drunk,
but recalled what he was doing. Asked why he had shot Sanchez,
Raya said that Sanchez has threatened to kill him, had reached for
an apparent weapon, and also said that others would kill him. If
he didn't kill Sanchez, Raya thought that Sanchez would kill him.
He was very mad at Sanchez for what he had said. In a later,
spontaneous statement, Raya said that he regularly carried a gun,
that no one had put him down in a bar, and that he couldn't stand
for someone to get smart with him. While he knew what he did was
wrong, he was blinded by Sanchez's asking him to leave the bar.

Raya testified to a somewhat different chronology.
First, he denied having danced with Ramos and did not mention any
statements by Sanchez about his dancing with her. Second, he said
that he had not gone to the car to get the gun. Rather, he simply
produced the gun from his person and shot Sanchez. Raya said that
he had lied to Officer Ramirez in this regard for fear that
matters would go worse if he admitted he always carried a gun.

Aside from these inconsistencies, Raya added further detail to his
version, including that Sanchez had rolled up his sleeves in a
threatening manner and that one of the others to whom he had
referred actually had approached Raya, only to be turned away by
Sanchez.

The prosecutor argued that Raya was guilty of first or
second degree murder. Relying heavily on Raya's original version
of events, in which he went to the car, retrieved his gun,
returned to the bar, and shot Sanchez, the prosecutor urged the
jury to reject the theories of heat of passion and unreasonable
belief. Raya's trial counsel urged that his client's trial
testimony, in which the gun already was on his person, was the
correct version. In any event, counsel argued that either version
established both heat of passion and unreasonable belief. In the
defense view, Raya was either guilty of manslaughter or not guilty
of anything, depending on whether the jury found reasonable or
unreasonable his honest belief in the need to defend himself.

At the jury's request, the trial court ordered the
rereading of Detective Ramirez's re-direct examination. The trial
court also reread instructions pertinent to murder and voluntary
manslaughter, including CALJIC Nos. 8.37 (manslaughter --
defined), 8.40 (voluntary manslaughter -- defined), 8.42 (sudden
quarrel or heat of passion and provocation explained), 8.44 (no
specific emotion constitutes heat of passion), and 8.50 (murder

4

and manslaughter distinguished).$^{1/}$   The jury resumed deliberations and returned one hour later with a second degree murder verdict.  Deliberations, including the reread, consumed less than four hours.

CALJIC No. 8.40 provides in pertinent part:

"The crime of voluntary manslaughter is the unlawful killing of a human being without malice aforethought when there is an intent to kill.

"There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion [or] [in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury].

"In order to prove the commission of the crime of voluntary manslaughter, each of the following elements must be proved:

"1.   That a human being was killed,

"2.   That the killing was unlawful, and

"3.   That the killing was done with the intent to kill."

CALJIC No. 8.50 provides:

"The distinction between murder . . . and manslaughter is that murder requires malice while manslaughter does not.

"When the act causing the death, though unlawful, is done [in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation] [in the honest but unreasonable belief in the necessity to defend

---

1/     The trial court also read 8.00 (homicide -- defined), 8.10 (murder defined), 8.11 (malice aforethought -- defined), 8.20 (deliberate and premeditated murder), 8.30 (unpremeditated murder in the second degree), 8.31 (second degree murder -- killing resulting from unlawful act dangerous to life), 8.70 (duty of jury as to degree of murder), 8.71 (doubt whether first or second degree murder), 8.72 (doubt whether murder or manslaughter), 8.73 (evidence of provocation may be considered in determining degree of murder), and other instructions as well.

against imminent peril to life or great bodily injury]-
the offense is manslaughter.  In such a case, even if an
intent to kill exists, the law is that malice, which is
an essential element of murder, is absent.

"To establish that a killing is murder . . . and not
manslaughter, the burden is on the state to prove beyond
a reasonable doubt each of the elements of murder and
that the act which caused the death was not done in the
[heat of passion or upon a sudden quarrel . . . in the
honest, even though unreasonable, belief in the necessity
to defend against imminent peril to life or great bodily
injury]."

A comparison of 8.40 with 8.50 shows that the former

properly separates with an "or" the two independent manslaughter

theories, while the latter does not.  Raya asserts two basic

problems with 8.50 as given: first, the instruction "made it

appear that neither concept was available as an independent basis

for finding involuntary manslaughter"; second, the "or" between

heat of passion and sudden quarrel could have conveyed the thought

that "an honest but unreasonable belief in the need for self-

defense must have been provoked by a sudden quarrel, and the

provocation itself must have been adequate to generate the belief":

"If the jury so understood the instruction, they would
have been in the position of having to apply not only a
legally incorrect standard, but a logically inconsistent
one as well.  They would have to have found that there
was adequate provocation for an unreasonable belief,
which is much like finding that an unreasonable belief is
reasonably held.  Of logical necessity, if a provocation
is adequate to produce the belief, the belief must be
reasonable.  Only if the provocation is inadequate can
the belief be unreasonable.  Thus, the jury may have been
under the impression that it could return a manslaughter
verdict based on the appellant's unreasonable belief only
if it found that appellant's unreasonable belief was
adequately provoked - or reasonable under the
circumstances."

People v. Gomez, supra, 183 Cal.App.3d 986, analyzed the

problem as follows:

"Clearly the omission of the 'or' in CALJIC No. 850 was erroneous. It might have caused the jury to blend the concepts of sudden quarrel and the unreasonable belief of the necessity to defend oneself. The initial error was repeated in the rereading of CALJIC No. 8.50 and the submission of the written instructions to the jury without the requisite 'or' in each paragraph.

"The question remains whether the other instructions cured the possible confusion. The jury was given separate instructions which defined heat of passion and imperfect self-defense. They were set forth as separate reasons to negate malice and find the defendant not guilty of murder. Each instruction allowed for malice to be negated on the basis of only one theory. No mixing of theories occurred here.

"Although CALJIC No. 8.50 when read orally mixed the two theories, the theories were separated by brackets when given to the jury in written form. The jury was also given CALJIC No. 8.40 which clearly separated the theories with an 'or.' When the entire instructional phase is viewed as a whole, it is clear that the jury understood the two distinct theories. The result is that the jury did not operate under a misconception of law. (People v. Wright (1985) 39 Cal.3d 576, 589 . . . .)" (Id. at pp. 992, 993; fn. omitted.)

The instant case differs from Gomez in two ways: first, the trial court did not read CALJIC No. 5.17 (honest but unreasonable belief in necessity to defend -- manslaughter). Second, the jury did not receive the written instructions and therefore could not see that brackets effectively separated the two theories of manslaughter from each other and ruled out both problems raised by Raya. Despite these factual differences, we think that the error was harmless.

First, the trial court twice read 8.40 which correctly uses the disjunctive "or" to separate the two theories. Second, the trial court twice read 8.42 (sudden quarrel or heat of passion

7

and provocation explained) which links sudden quarrel, heat of passion, and adequate provocation and does not mention unreasonable belief. Third, the trial court read 8.45 (involuntary manslaughter -- defined), which does not mention sudden quarrel, heat of passion, or adequate provocation but does discuss unreasonable belief. Although 8.45 concerns involuntary manslaughter and is no substitute for 5.17, when juxtaposed with 8.42, it helped reinforce the clear line between sudden quarrel, heat of passion, and adequate provocation, on the one hand, and unreasonable belief on the other.

Fourth, while the location of "or" in 8.50 makes it grammatically possible to interpret the instruction as Raya suggests, such a reading is, as Raya acknowledges, illogical. Indeed, it is nonsensical on its face. Beyond this, 8.42 defines adequate provocation in terms of "an ordinarily reasonable person in the same circumstances." The jury heard 8.42 twice. We cannot believe that the jurors mentally merged the concepts of sudden quarrel--adequate provocation and unreasonable belief such that the reasonableness standard eclipsed the unreasonable belief rule. Fifth, with the exception of a brief, confusing passage in the prosecutor's rebuttal summation, the arguments of both counsel clearly and repeatedly distinguished between the two theories.

In sum, CALJIC No. 8.50 cries out for interlineation of the word "or" between the bracketed provisions when the jury is

8.

instructed on both theories. Without this simple reform, the instruction carries potential for mischief. On the present record, however, we hold that Raya was not prejudiced.

The judgment is affirmed.

C 79451

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                IN AND FOR THE COUNTY OF FRESNO

3          BEFORE THE HONORABLE EUGENE W. KRUM, JUDGE

4                         DEPARTMENT TWO

5                            -o0o-                    JUL 19 1985

                                                   FRESNO CO. CLERK
6    THE PEOPLE OF THE STATE      )
     OF CALIFORNIA,               )              By
7                                 )                            DEPUTY
                        Plaintiff, )
8                                 )          CASE NO. 317151-9
          vs.                     )
9                                 )          REPORTER'S TRANSCRIPT
     ABEL R. RAYA,                )
10                                )
                        Defendant. )
11   _____)

12   Fresno, California               December 4, 5, 6, & 7, 1984
                                          and January 9, 1985
13
                                 -o0o-
14
     A P P E A R A N C E S :
15

16   FOR THE PEOPLE:              EDWARD W. HUNT, District Attorney
                                  of the County of Fresno
17                                By:  WARREN ROBINSON
                                       Deputy District Attorney

18   FOR THE DEFENDANT:           EDWARD SARKISIAN, JR., Public
                                  Defender of the County of Fresno
19                                By:  RICHARD GATES
                                       Deputy Public Defender
20
     FOR THE PROBATION            DON HOGNER, Chief Probation
21   DEPARTMENT:                  Officer of the County of Fresno
                                  By:  WILLIAM OWENS
22                                     Deputy Probation Officer

23

24                                    -o0o-

25                                DOTTIE THOMPSON, C.S.R.
                                  CERTIFICATE NO. 3866
26

68

2

|   |   |
|---|---|
| 1 | <u>JANUARY 9, 1985 - MORNING SESSION</u> |
| 2 | THE COURT:  We will call the case of People vs. Abel |
| 3 | Rodriguez Raya, action 317151-9. |
| 4 | Let the record show that the defendant is present here |
| 5 | in court with his attorney.  The Deputy District Attorney |
| 6 | is present.  William Owens is here from the Probation Office. |
| 7 | The court interpreter is present interpreting the |
| 8 | proceedings for the defendant.  Let's have the Clerk swear |
| 9 | the interpreter before we proceed. |
| 10 | (LEO ZAVALA, Certified Court Interpreter, |
| 11 | was sworn as the English-Spanish |
| 12 | Interpreter.) |
| 13 | THE COURT:  Be seated, please. |
| 14 | State your name for the record, please. |
| 15 | THE INTERPRETER:  Leo Zavala. |
| 16 | THE COURT:  And you are a certified court interpreter |
| 17 | for this court? |
| 18 | THE INTERPRETER:  Yes, I am, Your Honor. |
| 19 | THE COURT:  All right.  Mr. Gates, will you and Mr. |
| 20 | Robinson waive formal arraignment for judgment and sentencing |
| 21 | in this case? |
| 22 | MR. GATES:  Yes, Your Honor. |
| 23 | MR. ROBINSON:  Yes, Your Honor. |
| 24 | THE COURT:  Is there any legal cause why judgment should |
| 25 | not be pronounced in this case? |
| 26 | MR. GATES:  No, Your Honor. |

3

69

1     THE COURT:  I have received a copy of the probation

2  report consisting of eight pages, which I have read and

3  considered.

4     Are there any additions or corrections that should be

5  made to the report, Mr. Gates?

6     MR. GATES:  No, Your Honor.

7     THE COURT:  Mr. Robinson, is the report substantially

8  correct?

9     MR. GATES:  Your Honor, I would not make any additions

10  or corrections to the facts.  Only some minor additions

11  that I might be able to make during the time I get to address

12  the Court.

13     As far as I am concerned, the report is basically

14  accurate.

15     THE COURT:  All right.  Mr. Owens, are there any

16  additions that you feel should be made?

17     MR. OWENS:  None that I know of, Your Honor.

18     THE COURT:  According to the report, and I believe it

19  is a correct statement of the law, that Penal Code Section

20  1203.06(a), little letter (i), statutorily prohibits probation

21  in this case.

22     Do Counsel agree with that?

23     MR. ROBINSON:  Yes, Your Honor.

24     MR. GATES:  Yes, the section indicates that, Your Honor.

25     THE COURT:  Then, Mr. Gates, do you wish to be heard

26  with regard to the matter of sentencing?

4

70

1    MR. GATES:  Yes, Your Honor.  If only so the record is --

2    is complete, and so that the Community Release Board will

3    have certain additional factors that they might consider.

4        The crime was, I think, as the defendant's statement

5    outlines it, and it is that the defendant's statement, even

6    if believed in its entirety by the jury, still allowed the

7    jury to have enough justification to conclude that Mr. Raya's

8    actions, while perhaps motivated in the manner so described,

9    were simply not justified by the facts, even as Mr. Raya

10   describes them, and I bring that up only to say that this

11   is a case where Mr. Raya went to trial on the issue, basically,

12   of whether or not his response was one that was justified by

13   the facts as he saw them at the time, and was not a case

14   where Mr. Raya was trying to necessarily avoid responsibility

15   for his actions.

16       The testimony at the trial was that there was extensive

17   drinking going on, and I don't have any doubt that the jury

18   took that fact into consideration with respect to setting the

19   degree in this case, and that I believe the medical expert's

20   testimony was that if the testimony of the defendant was

21   accurate as to his drinking, and the testimony of the witness,

22   Primitivo, was believed that the defendant was well under the

23   influence of alcohol approximately the time that the incident

24   took place, at a similar situation as to the victim himself,

25   and as the only close proximate witness, Primitivo, the fact

26   that the defendant was intoxicated, as has been cited by the

1    Probation Office as a factor in mitigation.

2         I think another factor in mitigation is that the conduct

3    that led up to this action was initiated by the victim, and

4    I think that the jury came to that conclusion, also.  I

5    don't think that they could have avoided coming to that

6    conclusion, especially in light of the testimony of the

7    witnesses that the victim was a bully.

8         My client has no record in this country.  I have received

9    the customary documentation from authorities in Mexico that

10   indicates that he has no record there, and that this is his

11   first offense as an adult.  I hope that the Community Release

12   Board looks at that factor, as well as other social factors

13   with respect to Mr. Raya's employment history and his marital

14   history in setting an early release date for this man,

15   because it is unfortunate that the Court has so little

16   discretion in imposing a sentence in a case of second-degree

17   murder, because as cases of second-degree murder go, this

18   is not an aggravated case, and I hope the Community Release

19   Board understands that, and realizes it at the time they set

20   this matter under review for parole.

21        I would ask if the Court feels it is legally entitled,

22   to stay an enhancement for the use of a firearm.  That they

23   do so -- that the Court do so in this particular case, and

24   I would submit it, Your Honor.

25        THE COURT:  Mr. Robinson?

26        MR. ROBINSON:  Your Honor, in the defendant's written

72

1   statement, he repeats the assertion he made at trial that

2   he had his gun on him, and he, in fact, did not go to his

3   car to get it.

4       At trial, he testified that he merely told the

5   detective he went to the car to get his gun, because that

6   would make the facts appear better for him.

7       The jury's verdict does not indicate one way or another

8   whether they believed the defendant's statement to the

9   detectives initially, or his testimony at trial.

10      The People would oppose the staying of the penalty for

11  the use of the firearm.  There is simply no reason for the

12  Court to do that in this case.

13      THE COURT:  All right.  Is the matter submitted?

14      MR. GATES:  Yes, Your Honor.

15      MR. ROBINSON:  Yes.

16      THE COURT:  All right.  As I previously mentioned, it

17  is my understanding of the law that Penal Code Section 1203.06

18  (a), one, little letter (i) prohibits probation in a case

19  such as this.  That even if it were not prohibited, the

20  Court would not be inclined to grant probation in this case

21  in view of the seriousness of the crime, and the fact that

22  this Court feels that the defendant would be a danger to

23  others at this time if he were not in prison.

24      For the reasons previously stated, then probation is

25  denied.

26      In view of the fact that this offense is a violation of

7.

73

1    Penal Code Section 187, murder, for which the defendant was

2    found guilty, and it is murder of the second degree, the

3    indeterminate sentencing provisions of our law apply, and

4    there is no reason to consider factors in aggravation and

5    mitigation.

6         The Court, however, is in agreement with those factors

7    as they are set forth in the probation report.  There is

8    some indication, in addition, that the victim was, in fact,

9    as Mr. Gates indicated -- is probably an accurate characteriza-

10   tion, a bully.  He seemed to be saying things to perfect

11   strangers that he should not have said, but this certainly

12   would be slight mitigation under the circumstances, as the

13   Court views them, having heard the case.

14        The Court, therefore, as I stated, denies probation.

15        For a violation of Penal Code Section 187, murder of

16   the second degree, it is the judgment and sentence of this

17   Court that the defendant be imprisoned in state prison for

18   the term prescribed by law, which is 15 years to life.

19        It is also charged and found to be true that the defendant

20   personally used a handgun during the commission of this crime

21   under the provisions of Penal Code Section 12022.5.

22        It is ordered that the defendant serve two years for

23   this enhancement.  These two years are to be served before

24   and consecutive to the commencement of the 15-to-life term.

25        So there will be a total time in the state prison of

26   two years, plus the 15 years to life.

8

74

1    The defendant will be given credit for time that he

2    has served which he is entitled, and the report indicates

3    that -- it appears to be correct -- that he is entitled to

4    credit for a 186 days in jail, and 93 days of credit for

5    good time/work time, for a total credit of 279 days.

6        Also, the Court is going to order that the defendant

7    pay a restitution fine in the amount of $100.

8        It is now the duty of the Court to inform you that as

9    part of this judgment and sentence, you may be released on

10   parole after expiration of the term of imprisonment just

11   imposed, unless the Community Release Board waives parole

12   for good cause.

13       The conditions and length of parole will be determined

14   by the Community Release Board, but may not exceed a period

15   of five years.

16       If you violate any condition of parole, you may be

17   returned to custody for up to three years upon parole revoca-

18   tion.

19       If the event that your parole is revoked, time spent

20   in custody due to revocation will not be credited toward the

21   five-year limit on the parole period.

22       However, the total of the parole period and the time

23   spent in custody for revocation of parole may not exceed

24   seven years.

25       All right.  Mr. Raya, it is now my duty to advise you

26   of your rights to appeal to the Appellate Court from the

75

1    judgment of this Court in imposing sentence on you.

2        If you want to file an appeal, there is a 60-day time

3    limit within which you must act by filing a written Notice

4    of Appeal.  This 60 days starts to run from today.

5        Your Notice of Appeal must be filed in this court, and

6    not in the Court of Appeal.  Your Notice of Appeal must

7    clearly specify that you are appealing, just what it is that

8    you are appealing from, whether you are appealing from the

9    whole judgment or just part of it, and your Notice of Appeal

10   must be signed by you or your attorney.

11       If you appeal, you have the right at no cost to you

12   to a transcript and record of the trial court proceedings

13   as provided for by the California Rules of Court.

14       If you appeal, and you don't have the money to hire

15   a lawyer, the Appellate Court will appoint a lawyer to

16   represent you on appeal.  It is your obligation to keep the

17   Appellate Court advised of your current mailing address.

18   They then will be in touch with you to see whether you have

19   a right to a free lawyer after you have filed a Notice of

20   Appeal.

21       Now, do you understand your rights to appeal as I have

22   explained them to you, Mr. Raya?

23       THE DEFENDANT:  What is appeal?

24       THE COURT:  Well, you have a right to appeal to a higher

25   court the judgment of this Court.

26       Do you understand that unless your present lawyer is

76

10

1    going to file a Notice of Appeal for you, it is your duty

2    to file your own Notice of Appeal, and it must be done within

3    60 days from today?

4        THE DEFENDANT:  And why 60 days?

5        THE COURT:  Well, that is the law.  If you want to appeal

6    to a higher court for any reason, claiming that this Court

7    made a mistake or something wrong was done during your trial

8    or during sentencing, then you have a right to have this

9    be considered by the higher court, the Court of Appeal.

10        The law says that if you want to file an appeal to a

11    higher court, that this paper saying that you want to appeal

12    has to be filed in this court within 60 days of today, and

13    I am merely informing you of that rule.

14        If you wish to appeal, then it must be done within 60

15    days of today.  Do you understand that?

16        THE DEFENDANT:  Why not sooner?

17        MR. GATES:  Your Honor --

18        THE COURT:  You can do it sooner if you wish, but the

19    latest that you can do it is 60 days from today.  Do you

20    understand that?

21        THE DEFENDANT:  This thing about me signing, what about

22    that?

23        MR. GATES:  Your Honor, I have indicated to Mr. Raya

24    earlier today in more simple terms that an appeal is a review

25    by a higher court to ensure that he received a fair trial,

26    and I indicated to him that I would prepare the notice, and

1    I would file it within the 60 days.

2        In fact, I intend to file it today, and that he would

3    have a new attorney appointed for him on appeal, seeing that

4    it is apparent that he has no funds at this time to hire his

5    own attorney for appeal.

6        THE COURT:  All right.

7        MR. GATES:  And I believe he understood me when I said

8    those things to him.

9        THE COURT:  All right.  Did you hear what your lawyer

10   said, Mr. Raya?

11       THE DEFENDANT:  Yes.

12       THE COURT:  All right.  Do you have any questions that

13   you want to ask me about your appeal rights?

14       THE DEFENDANT:  Well, is that I hardly understand very

15   well.

16       THE COURT:  All right.

17       THE DEFENDANT:  It is that -- what if I'm able to sign

18   today, why should 60 days have to pass?

19       THE COURT:  Well, 60 days do not have to pass.  You have

20   to file this paper within 60 days.  You can do it today,

21   tomorrow, next week, but the latest you can do it is 60 days.

22       Do you understand that?

23       THE DEFENDANT:  Yes.

24       THE COURT:  All right.  Do you have any other questions

25   you wish to ask me about your appeal rights?

26       THE DEFENDANT:  No.

12

78

1      THE COURT:  All right.  Do you have any questions about

2   anything that has taken place here this morning, Mr. Raya?

3      THE DEFENDANT:  I don't have any questions.

4      THE COURT:  All right.  Anything further that either

5   Counsel wishes to say or Mr. Owens wishes to say?

6      MR. OWENS:  No, Your Honor.

7      MR. ROBINSON:  No, Your Honor.

8      THE COURT:  Did we forget anything that we're supposed

9   to do?

10      MR. GATES:  I don't believe so.

11      THE COURT:  I further order that the defendant be

12   remanded to the custody of the Fresno County Sheriff, and

13   I order the Sheriff to transport the defendant to the

14   Reception and Guidance Center at Vacaville, California, to

15   the custody of the Director of Corrections for execution of

16   sentence.

17                              -o0o-

18

19

20

21

22

23

24

25

26

13

STATE OF CALIFORNIA )
                     )  ss
COUNTY OF FRESNO     )

I, DOTTIE THOMPSON, Official Shorthand Reporter, do
hereby certify that the foregoing pages, numbered 1 through
14, were transcribed under my direction under my direction
by Karen Charnock, and that they are a full, true and
correct statement of my shorthand notes, and a full, true
and correct transcript of the proceedings held upon the
within-entitled matter.

Dated this 19th day of July, 1985.

DOTTIE THOMPSON, C.S.R. #3866

CALIFORNIA DEPARTMENT OF JUSTICE

## 9860086    DIS...SITION OF ARREST AND COURT A...ON

**A. LAW ENFORCEMENT INFORMATION**
ARRESTING/BOOKING AGENCY

Sanger Police Department

| BOOKING NO. | LOCAL NO. (OCA) | | POB |
|---|---|---|---|
| 84-07-076 | 8137 | | Mex |

NAME (LAST, FIRST, MIDDLE)

Rava, Abel Rodriguez

| SEX | DESCENT | HGT | WGT | EYES | HAIR | DATE OF BIRTH |
|---|---|---|---|---|---|---|
| M | M | 5'1 | 135 | Bro | Blk | 02-15-59 |

| ARREST DATE | WARRANT NO. | CHARGE 1 (SEC., CODE) | TYPE F/M | CHARGE 2 (SEC., CODE) | TYPE F/M |
|---|---|---|---|---|---|
| 7-9-84 | | 187 P.C. | M | | |

| CHARGE 3 (SEC., CODE) | TYPE F/M | CHARGE 4 (SEC., CODE) | TYPE F/M | REMARKS: |
|---|---|---|---|---|
| | | | | |

**REASON FOR RELEASE**
- ○ 849B (3) PC
- ○ 849B (1) PC

If 849B (1) PC, please check one of the following:
- ○ COMPL. REFUSES TO PROS.  ○ ADMISS. EVID. INSUFF.
- ○ ARRESTEE EXON.  ○ ASCERT. EVID. INSUFF.
- ○ FURTHER INVEST.
- ○ RELEASED TO OTHER AGENCY _____
- ○ OTHER _____

RELEASE DATE

| I.D. NUMBERS |
|---|
| CII NO. |
| FBI NO. |
| S.S. NO. |
| D.L. NO. |

**B. PROSECUTION**  DATE

○ 849.5 PC

REASON FOR REJECTION

| CHARGE 1 | CHARGE 2 | CHARGE 3 | CHARGE 4 |
|---|---|---|---|
| | | | |

**C. COURT INFORMATION**

| DATE FILED | FILE NO. | CONSOLIDATED FILE NO. | L.C. JUD. DIST. NO. |
|---|---|---|---|
| 9-5-84 | 217151-7 | | 10440 |

TYPE OF FILING: ☒ INFORMATION  ○ CERTIFICATION  ○ INDICTMENT

S.C. JUD. DIST. NO. 1010

| TYPE FILING F/M | FIRST PLEA NG/G | FINAL PLEA G. NOLO ACQ | DISPOSITION DIS. CRT/JUV HTA CRT/SC CONV | DATE | TYPE DISPO F/M | CHARGES AT DISPOSITION SECTION AND CODE | DEG | PRIOR |
|---|---|---|---|---|---|---|---|---|
| X | X | | X | 12-7-84 | X | PC 187 | 1st | |

| DATE OF SENTENCE | TRUE NAME | TYPE OF TRIAL: ☒ JURY  ○ COURT  ○ TRANSCRIPT |
|---|---|---|
| -7-84 | ABEL RODRIGUEZ RAYA | ○ FINDING/VERDICT OF NOT GUILTY-INSANE |

| SENTENCE | CHARGE 1 | SUS | CHARGE 2 | SUS | CHARGE 3 | SUS | CHARGE 4 | SUS |
|---|---|---|---|---|---|---|---|---|
| CYA | | | | | | | | |
| JAIL | | | | | | | | |
| FINE | | | | | | | | |
| RESTITUTION | #100.00 GC 13967 | | | | | | | |
| OTHER | | | | | | | | |
| PROBATION | 17 PC | | 17 PC | | 17 PC | | 17 PC | |
| PRISON | SUS | 15 year to life plus 2 year for 12022.5 term before all consecutive to the of PC187 | | | | | | |

NOTES:

REMARKS: 173= 274 nnp

| | DATE | | | | |
|---|---|---|---|---|---|
| **PROCEEDINGS SUSPENDED** | | ○ BW<br>○ APPEAL<br>○ 1000 PC | ○ CRC 3050 WIC<br>○ CRC 3051 WIC<br>○ NON-STAT DIVERSION | ○ 1203.03 PC<br>○ MISTRIAL<br>○ OTHER | ○ 1370 PC<br>○ 1026 PC<br>○ MDSO | ○ ST. HOSP.<br>○ CO. MENTAL |
| **REOPEN OR RETRIAL AFTER** | DATE | ○ BW<br>○ APPEAL<br>○ 1000 PC | ○ CRC<br>○ 1170 PC<br>○ NON-STAT DIVERSION | ○ 1203.03 PC<br>○ MISTRIAL<br>○ HUNG JURY | ○ 1370 PC<br>○ 1026 PC<br>○ MDSO | ○ CYA<br>○ JUV CRT<br>○ LOWER CRT<br>○ OTHER |
| **SUBSEQUENT ACTION** | DATE | PROBATION | | ○ VIOLATED<br>○ 1203.9 PC<br>MODIFIED TO:____ | ○ REVOKED<br>○ 1203.3 PC<br>MOS.____ DS JAIL | ○ REINSTATED<br>○ EXPIRED<br>____FINE |
| | DATE | CONVICTION SET ASIDE/REDUCED/DISMISSED | | ○ 1203.4 PC<br>○ 3200 WIC | ○ 1203.4a PC<br>○ REDUCED 17 PC | ○ 1772 WIC<br>○ OTHER |

Claimant Notification Checklist

STATE OF CALIFORNIA                                                                    GEORGE DEUKMEJIAN, Governor

# STATE BOARD OF CONTROL—VICTIM OF CRIME VERIFICATION UNIT

*January 22, 1985*

Please reply to:

☐   30 Van Ness Avenue, Third Floor  •  San Francisco, CA 94102-6074   (415) 557-2936

☐   107 South Broadway, Room       •  Los Angeles, CA 90012-4638    (213) 620-2764

☐   1008 Second Street, Lower Level  •  Sacramento, CA 95814-3278     (916) 323-7081

Rafaela Sanchez
902 Millwood Dr
Sanger, CA 93657

Re:  Victim of Violent Crime Claim No. 75585 V

Dear Mrs. Sanchez

Your application for reimbursement of expenses filed with the
State Board of Control, Victims of Violent Crimes Program has been
assigned to a Claims Specialist in this office for verification.
After an initial review of your claim, it has been determined that
the following information and/or documentation is needed before
the verification process can be completed.  Letters will be sent
out to verify this information.  However, if you have any docu-
ments to verify the information checked below, it would help us to
process your claim more quickly.

## GENERAL

☒   Crime report
☐   Reason incident was not reported to law enforcement agency
☐   Civil suit information
☐   Attorney name, address, and telephone number
☐   Proof of residency i.e., rent receipts, California drivers
     license, voter registration, ownership of property, etc.
☐   Other: Must have copy of crime report before
     anything further can be done.

## MEDICAL

☐   Are medical expenses being claimed
☐   Doctor/hospital address or telephone number
☐   Copies of medical bills
☐   Copies of medicare explanation of benefits
☐   Medi-Cal number (from POE sticker)
☐   Medi-Cal share-of-cost notification letter
☐   Health insurance company name, address, telephone and
     policy numbers
☐   Statements of insurance payments made to the doctors and
     hospitals
☐   Payment receipts or cancelled checks
☐   Other:_____

Page 2

## EMPLOYMENT/LOSS OF SUPPORT

- [X] Is a wage loss being claimed
- [ ] Employer name, address, and telephone number
- [ ] Employment verification
- [ ] Income tax returns, including W-2's (include Profit & Loss Statement if self employed)
- [ ] Worker's Compensation carrier name, address, and telephone number
- [ ] Doctor's statement of disability period
- [X] State Disability or other disability payments received
- [ ] Social Security benefits received
- [ ] Social Security Award/Denial letter
- [ ] AFDC
- [X] Public Assistance office address and telephone number
- [ ] Other: _____

## FUNERAL/BURIAL

- [ ] Are funeral/burial expenses being claimed
- [ ] Copies of funeral/burial bills
- [ ] Letter from _____ authorizing the Board to reimburse funeral/burial expenses through you
- [X] Life insurance company name, address, telephone, and policy number
- [X] Life insurance settlement received?        By Whom?
- [X] Social Security death benefit received?
- [X] Veteran's death/burial benefits
- [X] Survivor benefits award letter
- [ ] Other: Need A copy of the bill from Sanger Cemetary Distrc

## AUTO INSURANCE

- [ ] Auto insurance company name, address, telephone, and policy number
- [ ] Does auto insurance policy include medical and/or uninsured motorist coverage
- [ ] Has a claim against auto insurance been filed
- [ ] Can a claim against auto insurance be filed
- [ ] Other: _____

If you feel you can send us this information, please do so within 30 days from the date of this notification. Your claim will be completed as soon as all the information needed to fully verify your claim has been received.

Thank you for your cooperation.

Sincerely,

*[signature]*

Claims Specialist
(916) 323-7350

Enclosure

# EXHIBIT "E"

ABEL RODRIGUEZ RAYA

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff

ACTION NUMBER  317151-9

vs.

REPORT AND RECOMMENDATION OF THE
PROBATION OFFICER

ABEL RODRIGUEZ RAYA          Defendant

| | |
|---|---|
| Probation No.. | 149452 |
| CII   A07738415 | FBI |
| PD/SO | DA   84S-0302 |

TO THE HONORABLE JUDGE OF THE ABOVE ENTITLED COURT:

Pursuant to the statutes and at the direction of the court, your probation officer hereby respectfully submits the following report and recommendation as to the above named defendant, after ( ) conviction in court trial (X) verdict in jury trial ( ) plea:  Guilty

| | |
|---|---|
| 5953 Frankwood, Reedley, CA | PC 187 Second Degree with PC 12022.5 |
| Address | Charge(s) |
| 25 (2-15-59) / 279 days 186+93 | July 7, 1984 |
| Age             Time in Custody | Date of Offense |
| Public Defender, Richard Gates | July 8, 1984 |
| Attorney | Date of Arrest |
| January 9, 1985       8:30 a.m. | Eugene Krum              Two |
| Date of Sentencing    Time | Judge                    Dept. |

## BRIEF SUMMARY OF FACTS:

On July 7, 1984, the defendant shot and killed 50-year-old Concepcion Sanchez.

<u>NOTE:</u>  The defendant is an illegal alien, and a no bail hold has been placed on him at the Fresno County Jail by the United States Border Patrol.

## OPENING STATEMENT

On December 7, 1984, at the conclusion of a jury trial in Department Two of the Fresno Superior Court, defendant Abel Rodriguez Raya was convicted of a felony violation of Penal Code Section 187, Murder in the Second Degree, as charged in the Information #317151-9. It was also the jury's finding the defendant personally used a handgun during the commission of the crime within the meaning of Penal Code Section 12022.5.

This matter was referred to the Probation Department for the preparation of a presentence report and date of sentencing was calendared for January 9, 1985, at 8:30 a.m. in Department Two. The Court instructed the probation officer to file the written report by December 31, 1984.

## CIRCUMSTANCES OF THE OFFENSE

The following information has been taken from a Sanger Police Department's Crime Report, Case #84-07-076, dated July 7, 1984:

At 6:45 on the evening of July 7, 1984, Officer Shepherd was dispatched to the El Cinco Rojo Tavern at 1335 12th Street regarding a shooting. Inside the bar, Officer Shepherd found 50-year-old Concepcion Sanchez lying face down on the floor. An ambulance attendant who arrived shortly after the officer could not locate any vital signs. The victim was pronounced dead at the scene. An autopsy report disclosed the victim sustained four gunshots wounds, and died from projectiles which penetrated his aorta and lungs.

During the follow-up investigation, Office Shepherd talked with a number of witnesses who provided partial information about the circumstances surrounding the shooting. Shepherd received a description of the suspect and the vehicle he was driving. From several witnesses he was also able to piece together a partial license plate number. The Sanger Police Department ran seven different combinations of the license numbers, and picked out one possible suspect who owned a 1967 Chevrolet Sedan with the license #XZY939. This person was defendant Abel Raya, whose listed address was 1275 "I" Street, Orange Cove.

Later that night defendant Raya, in the company of a friend by the name of Primitivo Ramirez, was arrested in South Sacramento for drunk driving. Mr. Ramirez returned to Fresno County by bus. Sometime after his arrival Mr. Ramirez contacted the Sanger Police Department and provided them with the information regarding the defendant's whereabouts.

The following day the defendant was released from the Sacramento County Jail. He found his way to the south part of town and by coincidence was seen by a CHP officer who cited him for a violation of VC 21461.5. Upon returning to his vehicle, this officer happened to overhear information on his radio that the defendant was a murder suspect from Fresno County. Realizing the person he had just cited was the defendant, the officer placed him in custody.

-2-

At the preliminary hearing in the Sanger Justice Court Primitivo Ramirez testified that he had accompanied defendant Raya to the El Cinco Rojo Bar in Sanger on the evening of July 7, 1984. Ramirez said that both he and the defendant were drunk. After a short-time at the bar, Ramirez testified the defendant engaged in a discussion with the victim and this discussion later escalated into an argument. Ramirez said he was too far from the two men to hear what they were saying, although remembered the victim appearing to be angry. Ramirez believed that the victim like he and the defendant, was also drunk (a blood sample from the victim revealed a blood alcohol content of .23%).

Primitivo Ramirez went on to say he returned to the defendant's vehicle outside the bar. Not long afterward, Ramirez said the defendant returned, and they drove from the area. Enroute to Sacramento, Ramirez said the defendant showed him a .38 caliber handgun, and said he had fired some shots at someone in the bar.

On the evening of July 8, 1984, Sanger Detective Hank Ramirez traveled to Sacramento and interviewed the defendant at the Sacramento County Jail. When questioned about his involvement in the instant offense, the defendant said it started when the victim interrupted him while he was dancing with a bar maid. The defendant said the victim told him he had better leave or he would kill him. Along with this threat, the defendant told Ramirez the victim also pointed to several other friends at the bar who he said could also kill him.

The defendant said he went outside to his car, and retrieved his .38 caliber pistol from the trunk. Putting one foot inside the door of the bar, the defendant said he shot approximately four rounds at the victim. The defendant said he knew it was wrong, but was very mad at the victim because of the death threat he had made. The defendant believed that because of the victim's threat, if he didn't kill the victim, the victim would end up killing him first.

A crime report indicates the murder weapon, a .38 caliber Colt Cobra containing two live rounds and four spent casings, were recovered from the defendant's vehicle in Sacramento.

## DEFENDANT'S STATEMENT

The following statement was written for the defendant by your officer with the assistance of interpreter Larry Arce.

"I am here because they said I shot a man and he died. The man told me he was going to kill me.

"I had sixteen to seventeen beers the day this happened. I had just come into the bar when it happened. Immediately the man cussed at me and told me to leave. He grabbed me and told me to leave. I started to go, but someone else had me stay. The victim came over, told me he didn't like my face, and was going to kill me. I then pulled out my gun and shot him."

DATED: No Date                    SIGNATURE: No Signature

-3-

## VICTIM STATEMENT AND ASSESSMENT

An effort is being made by Victim Services to contact Mr. Sanchez next of kin. Any information received from them regarding the emotional and financial impact of this crime, will be provided for the Court's consideration in a separate letter at sentencing.

## STATEMENT OF THE DISTRICT ATTORNEY

A letter requesting a statement of views has been directed to the Fresno County District Attorney's Office. As of the date of dictation, no reply has been received at the Probation Office. Should one be received prior to sentencing, it will be attached to the report for the Court's consideration.

## DEFENSE STATEMENT

A letter requesting a statement of views has been directed to the Fresno County Public Defender's Office. As of the date of dictation, no reply has been received at the Probation Office. Should one be received prior to sentencing, it will be attached to the report for the Court's consideration.

## RESTITUTION

Because of medical and burial expenses, restitution is an issue.

## PRIOR JUVENILE RECORD

The defendant does not have a record as a juvenile with the Fresno County Probation Department.

## PRIOR CRIMINAL RECORD

The California Identification and Investigation teletype indicates the instant offense is the defendant's first conviction for any crime as an adult.

## PROBATION HISTORY

The defendant has never been on probation as an adult in Fresno County.

## PAROLE HISTORY

The defendant has never been on parole in the State of California.

## SOCIAL HISTORY

The following information was provided by the defendant during an interview at the Fresno County Jail with the assistance of interpreter Larry Arce:

### FAMILY HISTORY

Abel Rodriguez Raya is 25 years old and was born in Mexico on February 15, 1959.  The defendant was born to the marriage of Roberto and Elena Raya, and has two brothers and five sisters.  The defendant's immediate family members live in Mexico.  The defendant said there is no history in his family of mental disorder or arrest.

The defendant completed three years of formal education.  He has never received any formal vocational training.  During his leisure time the defendant enjoys reading.  He does not belong to any formal groups or organizations, and has never been in the military in Mexico or in the United States.

### MARITAL HISTORY

In 1981 in Mexico, the defendant married the former Teresa Aguirre.  They have two children, ages two and one.

### EMPLOYMENT HISTORY

The defendant said he has been coming to the United States periodically since 1974 to do seasonal farm labor.  The defendant had been living in Fresno County continuously for nine months at the time of his arrest, and was gainfully employed picking peaches.  He was being paid $4.50 per hour.

### FINANCIAL STATUS

The defendant was living in a labor camp and was paying $19.00 a week rent.  His only asset was a 1967 Chevrolet.  The defendant reported sending $100 to $150 a month to his wife in Mexico.  The defendant has no outstanding financial liabilities.

### USE OF ALCOHOL/CONTROLLED SUBSTANCES

The defendant said on his heavy work days, Monday, Tuesday, and Wednesday, he could not drink.  From Thursday through Sunday the defendant said he would drink on a daily basis, and about as much as he could.  Except for the instant offense, the defendant did not believe his consumption of alcohol had ever caused him any real problems.  The defendant also reported trying marijuana on several occasions.

## CUSTODY

The defendant has been in custody since his arrest in Sacramento County on the evening of July 8, 1984.  By sentencing he will have spent 186 days in jail. With 93 days credit for good time/work time, the defendant is entitled to 279 days total presentence credit.

### DISCUSSION AND EVALUATION

### FACTORS AFFECTING PROBATION

Penal Code Section 1203.06(a)(1)(i) statutorily prohibits probation.  If not imprisoned the defendant could pose a danger to others in the community (Rule 414, Sections a and b).

The following factors in mitigation and aggravation are being cited for consideration at some future date by the Community Release Board.

(The recommended application of the following factors and circumstances is set forth in the Conclusion section of this report.)

### CIRCUMSTANCES IN MITIGATION

Your officer finds no substantial circumstances in mitigation within the meaning of Rule 423, Section a.

The defendant was apparently under the influence of alcohol at the time this offense occurred (Rule 423, Section b, Subsection 3).

### CIRCUMSTANCES IN AGGRAVATION

Your officer finds no substantial circumstances in aggravation within the meaning of Rule 421, Section a.

Your officer finds no substantial circumstances in aggravation within the meaning of Rule 421, Section b.

### ENHANCEMENTS

It was the jury's determination the defendant personally used a revolver during the commission of this offense within the meaning of Penal Code Section 12022.5.

-o-

## CONCLUSION

The defendant is statutorily ineligible for probation. Imprisonment is necessary to punish the defendant, protect society, and to achieve uniformity in sentencing (Rule 410).

Before commencing service of his indeterminate prison sentence, the defendant would be required to serve a two year term for the PC 12022.5 enhancement.

## RECOMMENDED PRISON TERM

| CRIME | MIT/MID/AGG | BASE TERM | ENHANCEMENTS | CONSEC/CONCURR | |
|-------|-------------|-----------|--------------|--------|--------|
| PC 187 2nd Degree | 15 to life | | Yes PC 12022.5 2 years | N/A | N/A |

TOTAL YEARS:  TWO YEARS PLUS FIFTEEN TO LIFE

## RECOMMENDATION

It is hereby recommended that probation be denied and the defendant Abel Rodriguez Raya be committed to the California State Department of Corrections on the charge of Murder in the Second Degree for the term of 15 years to life.

Before commencing service of his indeterminate that term, it is recommended that the defendant serve a two year sentence for the violation of PC 12022.5.

It is further recommended that the defendant receive credit for 279 days in custody (186/93).

In compliance with Government Code Section 13967, it is respectfully recommended that a restitution fine of $100.00 be imposed.

The attorney hours did not appear on the Court referral to the Probation Department.

Respectfully submitted,

DON HOGNER, CHIEF PROBATION OFFICER

By: _____
William Owens, Deputy

Dated:  December 26, 1984

-7-

# EXHIBIT "F"

1  HC07CRWR678264-GSA-cm

FILED

MAR 16 2007

FRESNO COUNTY SUPERIOR COURT
By_____
                              DEPUTY

8          SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

9                          CENTRAL DIVISION

11  In re                        )  No. 07CRWR678264    Dept. 74
                                 )
12  ABEL RAYA,                   )
                                 )      ORDER
13          Petitioner           )
                                 )
14  On Habeas Corpus.            )
                                 )
    _____  )

16          Having considered the petition for writ of habeas corpus

17  filed on February 15, 2007, the court finds that existing evidence

18  does not warrant the requested relief.

19          Petitioner challenges the Parole Board's decision to

20  deny his parole. According to the petition, on December 17, 1984,

21  petitioner was convicted of second-degree murder. On January 9,

22  1985, petitioner was sentenced to 15 years to life, plus a two-

23  year enhancement for use of a firearm.

24          The Board of Parole Hearings has denied petitioner's

25  parole nine times, including the most recent denial on

26  September 26, 2006. (Exhibit A to petition.) The Board relied

27  largely on the seriousness of the underlying offense. (Id. at p.

28  43.) The Board found that "the offense was carried out in a cruel

1  and callous manner, which showed not much regard for human life,
2  and the motive is very, very trivial and inexplicable…" (*Id.* at
3  43:13-16.)    The Board noted that the petitioner had been drinking
4  at a bar on the day of the offense, and that he had been
5  approached by the victim, Mr. Sanchez, who wanted petitioner to
6  leave the bar. (*Id.* at 43:21-23.)    The Board noted that petitioner
7  left the building to get his gun from his car, although petitioner
8  has insisted that he was carrying the gun with him at the time.
9  (*Id.* at 43:26-44:3.)    In any event, petitioner shot the victim,
10  killing him.    (*Id.* at 44:3.)    However, the Board also noted that
11  petitioner had no prior criminal record. (*Id.* at 44:5.)
12  Petitioner has admitted that he was an alcoholic, and alcohol
13  played a part in the crime. (*Id.* at 44:8-9.)

14          However, the Board also noted that petitioner has had
15  some disciplinary violations after his incarceration, including
16  one 115 (serious disciplinary violation) in 1989, and five 128As
17  (counseling memos). (*Id.* at 44:14-17.)    The most recent counseling
18  memos were in 2002, for stealing food. (*Id.* at 44:16-17.)    The
19  Board also noted that, other than attending Alcoholics' Anonymous,
20  the petitioner did not attend any other self-help programming.
21  (*Id.* at 44:22-24.)    The Board felt that petitioner needed to
22  participate in self-help programming to help him understand why he
23  did what he did.    (*Id.* at 44:24-26.)    The Board recommended that
24  petitioner attend anger management and stress management classes.
25  (*Id.* at 45:1-2.)

26          Whether or not this court agrees with the Board's
27  conclusion, its decision may not be overturned so long as it is
28  supported by "some evidence." (See, e.g., *In re Fuentes* (2005) 135

1   Cal.App.4[th] 152, *In re Shaputis* (2005) 135 Cal.App.4[th] 217, *In re*
2   *Lowe* (6th Dist. 2005) 130 Cal.App.4[th] 1405, *Rosas v. Nielsen* (9th
3   Cir. 2005) 428 F.3d 1229, *In re DeLuna* (2005) 126 Cal.App.4[th] 585,
4   *In re Scott* (2005) 119 Cal.App.4[th] 871, *In re Van Houten* (2004)
5   116 Cal.App.4[th] 339, *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910,
6   and *In re Rosenkrantz* (2002) 29 Cal.4[th] 616.)   "This standard of
7   review does not require a review of the entire record, but only
8   requires such review as is necessary to determine whether there is
9   *any* evidence in the record supporting the denial. [Citation.] Once
10  the factors considered are supported by 'some evidence,' 'the
11  precise manner in which the specified factors relevant to parole
12  suitability are considered and balanced lies within the discretion
13  of the [Board], but the decision must reflect an individualized
14  consideration of the specified criteria and cannot be arbitrary or
15  capricious.   It is irrelevant that a court might determine that
16  evidence in the record tending to establish suitability for parole
17  far outweighs evidence demonstrating unsuitability for parole.'"
18  (*In re Van Houten, supra,* 116 Cal.App.4[th] at 347-348.)

19          Here, the court finds that there was at least some
20  evidence that releasing petitioner could pose an unreasonable risk
21  to society or a threat to public safety, because of the violent
22  nature of the original offense, and petitioner's disciplinary
23  violations after his incarceration.   The facts on the record show
24  that petitioner got into a dispute with the victim while both
25  petitioner and the victim were under the influence of alcohol.
26  Also, although petitioner claims that he was carrying the gun at
27  the time he committed the offense, the jury found that petitioner
28  left the bar, went to his car, retrieved the gun, then went back

COUNTY OF FRESNO
Fresno, CA

HC07CRWR678264-GSA

1   into the bar and shot the victim in the chest, fatally wounding
2   him.   Thus, there was at least some evidence of premeditation, and
3   that the petitioner acted callously and indifferently when he
4   fired his gun into the victim.

5          Furthermore, petitioner's disciplinary record has not
6   been perfect since his incarceration.   He has incurred one serious
7   115 violation for fighting, as well as five less serious 128A
8   violations, including two in 2002 for stealing food.   Thus,
9   petitioner has not been discipline free since his incarceration.
10  Upon considering the record as a whole, the court finds that there
11  was at least "some evidence" to support the Board's decision to
12  deny petitioner's parole.   Consequently, the court cannot overturn
13  the Parole Board's decision.

14          The petition is denied.

15          DATED this _16th_ day of March, 2007.

17                              **GARY S. AUSTIN**

18                              GARY S. AUSTIN
                                Judge of the Superior Court

EXHIBIT "G"

IN THE

# Court of Appeal of the State of California

### IN AND FOR THE

# Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D

JUN 2 1 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

|  |  |
|---|---|
| In re<br><br>    ABEL RAYA,<br><br>        On Habeas Corpus. | F052693 |

BY THE COURT*:

    The Attorney General is directed to file in this court, within 30 days of the date of this order, a response to the "Petition For Writ Of Habeas Corpus" in the above entitled action. The response should include, but should not be limited to, a discussion of the following cases and their application to the pending petition: *In re Lawrence* (May 22, 2007, B190874) ___ Cal.4th ___; *In re Barker* (May 24, 2007, A114686 ___ Cal.4th ___; *In re Gray* (May 24, 2007, B197193) ___ Cal.4th ___.

    Petitioner may file a reply to the response of the Attorney General within 20 days of the filing of said response in this court.

_____ Acting P.J.

*Before Harris, Acting P.J., Levy, J., and Dawson, J.

**IN THE**

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D

# Court of Appeal of the State of California

SEP **2 0** 2007

**IN AND FOR THE**

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

## Fifth Appellate District

In re

ABEL RAYA,

On Habeas Corpus.

F052693

BY THE COURT*:

The petition for writ of habeas corpus filed on April 19, 2007, is denied.

_Acting P.J.

*Before Harris, Acting P.J., Levy J. and Dawson, J.

# EXHIBIT "H"

MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR

JORGE NAVARRETE
SUPERVISING DEPUTY CLERK

SAN FRANCISCO

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK

LOS ANGELES



SAN FRANCISCO 94102
EARL WARREN BUILDING
350 McALLISTER STREET
(415) 865-7000

□    LOS ANGELES 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 830-7570

## Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

October 19, 2007

Mr. Abel Raya
C-99451
P. O. Box 689
Soledad, CA 93960-0689

Re:    **S156879 – In re Abel Raya on Habeas Corpus**

Dear Mr. Raya:

The court has granted permission to file the untimely petition for review and the petition was filed October 18, 2007.

An answer to the petition may be served and filed on or before November 8, 2007, 20 days after the petition is filed. The answer may present additional issues desired for review if the petition for review is granted.

A reply to the answer may be filed within 10 days after filing of the answer, limited to the additional issues presented in the answer, if any.

Very truly yours,

FREDERICK K. OHLRICH
Court Administrator and
Clerk of the Supreme Court

By:  C. Thompson, Deputy Clerk

Cc:    Superior Court of Fresno County
Office of the Attorney General, Fresno
Court of Appeal, Fifth Appellate District

Court of Appeal, Fifth Appellate District - No. F052693
**S156879**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ABEL RAYA on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

DEC 1 2 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ABEL RAYA,

    Petitioner,

       v.

Ben Curry, Warden,

    Respondent.

_____/

**PROOF OF SERVICE**

I hereby certify that on March 3rd, 2008, I served a copy of
the attached PETITION FOR WRIT OF HABEAS CORPUS, by placing a copy
in a postage paid envelope addressed to the person(s) hereinafter
listed, by depositing said envelope(s) in the United States mail at
Soledad, California, 93960-0689. After receiving the PETITION the
person(s) listed below will place the PETITION in the U.S. Mail at
Morro Bay, California for service to the U.S. DiIstrict Court,
Northern District.

> DAWN BRITT
> P.O. Box 1324
> Morro Bay, CA.
> 93443

I declare under penalty of perjury that the foregoing is true
and correct.

Dated this 3rd day of March, 2008, at Soledad, California.

Abel Raya,

Petitioner in Pro Se

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

*E-filing*

ABEL RAYA,

     Petitioner,

        v.

Ben Curry, Warden,

     Respondent.

                        /

**CV 08    1446**

**PJH**

PROOF OF SERVICE

**(PR)**

    I hereby certify that on March   , 2008, I served a copy of the attached PETITION FOR WRIT OF HABEAS CORPUS, by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope(s) in the United States mail at Morro Bay, California, 93443.

UNITED STATE DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

450 Golden Gate Ave.

P.O. Box 36060

San Francisco, CA.

94102

    I declare under penalty of perjury that the foregoing is true and correct.

Dated this /0ᵗʰ day of March, 2008, at Morro Bay, California, 93443.

                                  Dawn Britt,

Abel Raya, C-99451
Correctional Training Facility
P.O. Box 689 / East Dorm 79-Low
Soledad, CA. 93960-0689


March **3** , 2008


UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Ave.
P.O. Box 36060
San Francisco, CA.
94102


Re: PETITION FOR WRIT OF HABEAS CORPUS


Dear Clerk of the Court,

Enclosed please find a true copy and the required copy of
petitioner's PETITION FOR WRIT OF HABEAS CORPUS to be filed in
your court.

Enclosed as well please find a copy of the cover/caption
sheet of my copy of this PETITION to be stamped "FILED" and
returned to me in the S.A.S.E. I've provided.

Thank you for your attention to these matters. Your help is
greatly appreciated.


Sincerely,

*Abel Raya*

Abel Raya, C-99451
Petitioner in Pro Se

rt Name: U.S. District Court, NDCA
ision: 3
ceipt Number: 34611016983
Cashier ID: bucklem
Transaction Date: 03/13/2008
Payer Name: abel raya
------------------------------------
WRIT OF HABEAS CORPUS
 For: abel raya
 Amount:       $5.00
------------------------------------
MONEY ORDER
 Check/Money Order Num: 141858512
 Amt Tendered: $5.00
------------------------------------
Total Due:     $5.00
Total Tendered: $5.00
Change Amt:    $0.00

c08-1446pjh


Checks and drafts are accepted
 bject to collections and full
 dit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.





94102

0000

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Ave
P.O. Box 36060
San Francisco, CA. 94102









Abel Raya, C-99451
Correctional Training Facility
P.O. Box 689 / East Dorm 79-Low
Soledad, CA. 93960-0689